# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) ) ) ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. 06-cv-1773 (RBW) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) ) | |

## MOTION FOR OPEN AMERICA STAY

Defendant, United States Department of Justice, on behalf of the Federal Bureau of

Investigation ("FBI"), hereby moves for a stay of proceedings pursuant to 5 U.S.C.

§ 552(a)(6)(C), and Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C.

Cir. 1976). In support of this motion, defendant respectfully submits the attached memorandum

of points and authorities with a supporting declaration (attached as Exhibit 1), and a proposed

Order. Plaintiff and defendant jointly agreed upon a proposed briefing schedule for defendant's

motion for an Open America stay. On March 27, 2007, the Court entered a minute order

adopting the parties' proposed briefing schedule. The defendant has conferred with the plaintiff,

and the plaintiff has indicated that it opposes this motion.

Dated: April 2, 2007                              Respectfully submitted,

                                                 PETER D. KEISLER
                                                 Assistant Attorney General

                                                 JEFFREY A. TAYLOR
                                                 United States Attorney

                                                 ELIZABETH J. SHAPIRO
                                                 Assistant Branch Director

                                                 /s/ JAMES C. LUH
                                                 JAMES C. LUH
                                                 Trial Attorney
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 20 Massachusetts Ave NW
                                                 Washington DC 20530
                                                 Tel: (202) 514-4938
                                                 Fax: (202) 616-8460
                                                 E-mail: James.Luh@usdoj.gov
                                                 Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) |
| DEPARTMENT OF JUSTICE, | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 06-cv-1773 (RBW)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR OPEN AMERICA STAY

### INTRODUCTION

Defendant, United States Department of Justice, on behalf of the Federal Bureau of Investigation ("FBI"), moves this Court for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C), and Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976). Plaintiff has submitted two requests to the FBI under the Freedom of Information Act ("FOIA") seeking "disclosure of records concerning the scope and privacy impact of the Federal Bureau of Investigation's Investigative Data Warehouse, a huge database that holds hundreds of millions of records containing personal information." (Compl. for Injunctive Relief ¶ 1). Although the FBI is exercising due diligence in responding to plaintiff's FOIA requests, exceptional circumstances prevent it from processing the requests within the statutory time limit. Pursuant to 5 U.S.C. § 552(a)(6)(C), which provides for additional time under such circumstances, defendant requests that the Court stay the proceedings until the FBI is able to complete processing of the plaintiff's requests. In support of its motion, defendant FBI has provided a sworn declaration from David M. Hardy, Section Chief of the Record/Information

Dissemination Section (RIDS), Records Management Division (RMD), of FBI Headquarters, (FBIHQ), which explains that based on the number of potentially responsive documents the FBI has located, the FBI requires a stay of approximately 71 months, or until February of 2013, to process plaintiff's FOIA requests and complete the release of responsive records. (See Declaration of David M. Hardy ("Hardy Decl."), attached as Exhibit 1). This estimate is based on the large number of documents identified as potentially responsive and includes three months for plaintiff's FOIA requests to rise to the top of the backlog queue for large requests and 68 months for processing.

The FBI anticipates that before processing begins, it will be able to significantly reduce the total time required to complete processing by eliminating a significant volume of documents that are not responsive to the plaintiff's requests and will not need to be processed. This review has not yet been completed, however, so it is not possible at present to estimate the potential savings in processing time. The FBI proposes to file a status report within 120 days of the entry of a stay, and at 120-day intervals thereafter, to update the Court and the plaintiff on the status of the plaintiff's requests and provide updated estimates of the time needed to complete processing.

The FBI acknowledges that it is asking the Court for a lengthy stay. However, the FBI's request meets the standards established under Open America, and a stay of 71 months is warranted by the facts of this case in light of the large number of potentially responsive documents and the FBI's existing backlog. The FBI is processing plaintiff's requests in accordance with established policies that allow for the equitable and orderly processing of FOIA requests on a first-in, first-out basis.  Although the FBI has a backlog of pending FOIA requests, it is making substantial efforts to reduce the backlog and has achieved significant reductions in backlog and processing time. Nevertheless, the volume of potentially responsive records in this

case, the large number of pending requests that predate plaintiff's request, and the limited

resources currently available to the FBI for the processing of FOIA requests constitute

exceptional circumstances necessitating a stay so that the FBI may complete its review of the

records.

## STATEMENT OF FACTS

**A.     The FBI's FOIA Request Processing System**

### 1.     Duties and Personnel Divisions

The Record/Information Dissemination Section ("RIDS"), Records Management

Division ("RMD"), at FBI Headquarters ("FBIHQ") in Washington, D.C., has the collective

mission of effectively planning, developing, directing, and managing responses to requests for

access to FBI records and information pursuant to FOIA; Privacy Act; Executive Order 12958,

as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions;

and Presidential and Congressional directives. (Hardy Decl. ¶ 2.) RIDS also provides

prepublication review of material written by current or former FBI employees concerning FBI

matters as mandated by the FBI's employment agreement, executes the FBI's historic

declassification program, and assists in managing defense discovery efforts in large

counterterrorism criminal trials. (Id. ¶ 22.)

In recent years, FOIA management at FBIHQ has continuously reengineered the process

of responding to FOIA/Privacy Act requests in an effort to better serve the needs of requesters

who seek information from the FBI. (Id. ¶ 21.) In 2002, reorganization of various divisions at

FBIHQ resulted in the formation of the RMD, which now handles all FOIA/Privacy Act requests

through RIDS. (Id.)

RIDS currently employs approximately 200 personnel, most of whom are Legal

Administrative Specialists ("LAS"), and who are assigned among the 11 units within RIDS. (<u>Id.</u> ¶ 22.) RIDS employees intake, review, process, and release information in response to FOIA and Privacy Act requests. (<u>Id.</u>) To accomplish this mission, RIDS consists of the following eleven Units: one Service Request Unit ("SRU"), two Work Process Units ("WPU"), three Classification Units ("CU"), four FOIPA Units ("Disclosure Units"),[1] and the Litigation Support Unit ("LSU"). (<u>Id.</u>)

The SRU contains the Negotiation Team, which works with individuals whose requests have generated a large volume of records to attempt to narrow the scope of responsive records and facilitate more rapid response. (<u>Id.</u>) Since 1995, this team has been able to reduce the scope of FOIA/Privacy Act requests by over 13 million pages. (<u>Id.</u>) The SRU has a RIDS Public Information Official, who is responsible for assisting requesters with issues concerning their requests. The Government Response Team ("GRT"), also a part of the SRU, provides timely feedback to other federal agencies and other DOJ components with regard to referrals of documents which are either FBI-originated or contain FBI-originated information. (<u>Id.</u>) Referred documents are sent to the FBI for consultation or for direct response to the requester. (<u>Id.</u>) Finally, the SRU handles administrative appeals and criminal discovery matters. (<u>Id.</u>)

The two WPUs are responsible for reviewing and sorting all correspondence and incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies, and other FBI entities (<u>i.e.</u>, FBI field offices and Legal Attaches). (<u>Id.</u>) The WPUs conduct searches of the General Indices (described below) for identifiable records, confirm responsive documents, stamp files for retention, address fee issues

---

[1] One of the four FOIPA Disclosure Units operates at an off-site location in Savannah, Georgia. (Hardy Decl. ¶ 22 n.3.)

(other than fee waiver reviews), retrieve and forward files for scanning into the FOIPA

Document Processing System ("FDPS"), respond to status inquiries, and maintain requests prior

to their transfer to the Disclosure Units. (<u>Id.</u>)

      The WPUs handle the various initial tasks required to "perfect" a FOIA/Privacy Act

request, including sending letters to acknowledge requests, advising a requester to provide

identifying data so that an accurate records search can be made or to submit a notarized signature

or Privacy Act waiver, and advising a requester when no responsive records are located. (<u>Id.</u>)

The WPUs also open new requests, assign FOIA/Privacy Act Request Numbers, and enter the

perfected requests into the FDPS tracking system. (<u>Id.</u>) The WPUs are responsible for preparing

perfected requests for transfer to the four Disclosure Units. (<u>Id.</u>) A request is considered

"perfected" when all administrative tasks have been completed and all responsive documents

have been scanned into FDPS. (<u>Id.</u>) Once a request has been perfected it is placed in the

"perfected backlog" for assignment to a FOIA Disclosure Unit for processing. (<u>Id.</u>)

      To ensure fairness to all requesters and to equitably administer the large volume of

FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of

receipt on a first-in, first-out basis within one of three queues. (<u>Id.</u>) The FBI uses a three-queue

system as a way to fairly assign and process new requests. (<u>Id.</u>) The three-queue system went

into effect on July 10, 1997, replacing a prior system of only two queues (one for 100 pages or

less, the other for requests greater than 100 pages). (<u>Id.</u>) The three-queue system established

multi-track processing for requests, based on the amount of time and work involved in handling

a particular request. (<u>Id.</u>) The system nevertheless preserves the principle that, within the three

queues, requests are still assigned and processed on a first-in/first out basis. (<u>Id.</u>)

      The placement of a request in one of the three queues depends on the total amount of

material responsive to that request: 500 pages or less ("small queue"), 501 to 2500 pages ("medium queue"), or more than 2500 pages ("large queue"). (Id.) This standard operating procedure, coupled with the FBI's first-in, first-out policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate only to a small number of documents. (Id.) As described above, individuals whose requests have been placed in the large queue are given the opportunity, through contact with the SRU's Negotiation Team, to reduce the scope of their requests and accelerate assignment of their requests by relocating them to a more advantageous queue. (Id.)

The three CUs are responsible for complying with the classification/declassification review of FBI records under Executive Order 12958, as amended, and for conducting mandatory declassification review consistent with Executive Order 12958, as amended. (Id.) The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, Office of Inspector General Reports, and other federal agency requests in order to determine whether such material should remain classified or be declassified. (Id.) In addition, the CUs review and prepare classified material for review by the Department of Justice Review Committee ("DRC").[2] (Id.)

The four FOIPA Disclosure Units perform the actual processing of records pursuant to the provisions of the FOIA and Privacy Act. (Id.) Processing involves a page-by-page, line-by-line review of the responsive documents to determine which, if any, FOIA and Privacy Act exemptions may apply. (Id.) This includes redaction of the exempt material and notation of the

---

[2] The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information. (Hardy Decl. ¶ 22 n.8.)

applicable exemptions in the margins of each page or preparation of deleted page information sheets when pages are withheld in their entirety, which is now done electronically in FDPS. (Id.) During the course of their review, the Disclosure Units consult with other government agencies for their determinations as to the releasability of other agencies' information contained within FBI records, or refer non-FBI documents to those originating agencies for processing and direct response to the requester. (Id.) The Disclosure Units ensure that FOIA and Privacy Act exemptions have been applied properly, no releasable material has been withheld, no material meriting protection has been released, all necessary classification reviews have been completed by transferring applicable cases to the CUs, and other government agency information or entire documents originating with other government agencies have been properly handled. (Id.)

The Litigation Support Unit ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel and Chief Division Counsels and Assistant Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. (Id.) The LSU coordinates the progress of the FBI's response to a particular FOIA/Privacy Act request as it progresses through the units described above, the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and the referral of documents to other DOJ components and government agencies. (Id.) The LSU prepares the administrative record, drafts both procedural and substantive declarations and court pleadings, codes documents processed by the Disclosure Units, and drafts detailed declarations justifying the assertion of all applicable FOIA/Privacy Act exemptions. (Id.)

To promote administrative efficiency, Legal Administrative Specialists (LASs) work on more than one request at a time. (Id. ¶ 23). Certain cases may require that the usual processing be

halted midstream. This can occur for a variety of reasons, including the resolution of a classification issue, the location of additional records, or consultation with other government agencies as to the nature and propriety of releasing certain information. (Id.) In the interest of efficiency, during this waiting period, the LAS may fully process other requests. (Id.) Large requests are often processed on parallel tracks with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS' resources. (Id.)

Consistent with standard administrative procedure, any records referred to the FBI from other DOJ components or other government agencies in response to a particular request are added to that pending FOIA/Privacy Act request. (Id. ¶ 24). This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. (Id.) Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. (Id.) By ensuring continuity in the processing of FOIA requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient, since the same issues presented by the referred records will already have been addressed by the LAS in processing the responsive FBI files. (Id.)

## 2.    FBI Systems of Records

The Central Records System ("CRS") enables the FBI to maintain all information acquired in the course of fulfilling its mandated law enforcement responsibilities. (Id. ¶ 29.) The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. (Id.) The CRS is organized into a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may correspond to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). (Id.) Certain records in the CRS

are maintained at FBIHQ, whereas records that are pertinent to specific field offices of the FBI

are maintained in those field offices. (Id.) While the CRS is primarily designed to serve as an

investigative tool, the FBI searches the CRS for documents that are potentially responsive to

FOIA/Privacy Act requests. (Id.) The mechanism that the FBI uses to search the CRS is the

Automated Case Support System ("ACS"). (Id.)

On or about October 16, 1995, the ACS was implemented for all Field Offices, Legal

Attaches, and FBIHQ in order to consolidate portions of the CRS that were previously

automated. (Id. ¶ 30.) The ACS can be described as an internal computerized subsystem of the

CRS. (Id.) Because the CRS cannot electronically query the case files for data, such as an

individual's name or Social Security Number, the required information is duplicated and moved

to the ACS so that it can be searched. (Id.) More than 105 million records from the CRS were

converted from automated systems previously utilized by the FBI. (Id.) Automation did not

change the CRS; instead, automation has facilitated more economical and expeditious access to

records maintained in the CRS. (Id.)

The retrieval of data from the CRS is made possible through the ACS using the General

Indices, which are arranged in alphabetical order. (Id. ¶ 31.) The entries in the General Indices

fall into two categories: (a) a "main" entry or "main" file carries the name corresponding with a

subject of a file contained in the CRS; and (b) "reference" entries, sometimes called "cross-

references," are generally only a mere mention or reference to an individual, organization, or

other subject matter, contained in a document located in another "main" file on a different

subject. (Id.)  The General Indices to the CRS files are the means by which the FBI can

determine what retrievable information, if any, the FBI may have in its CRS files on a particular

subject or individual, such as the Investigative Data Warehouse, the subject of the plaintiff's

FOIA requests. (<u>Id.</u> ¶ 34).

**B.      Plaintiff's FOIA Requests**

By letter dated September 1, 2006, the plaintiff submitted a FOIA request to the FBI

seeking information pertaining to the FBI's Investigative Data Warehouse, a "659 million-record

database" described as "one of the most powerful data analysis tools available to law

enforcement and counterterrorism [FBI] agents." (<u>Id.</u> ¶ 26). Specifically, the request sought

"agency records (including, but not limited to, electronic records)" concerning 1) "all records

describing data expungement, restriction or correction procedures for the IDW;" 2) "all privacy

impact statements created for the IDW;" and 3) "all results of audits conducted to ensure proper

operation of the IDW." (<u>Id.</u> ¶ 26 & Ex. A.) By letter dated September 21, 2006, FBIHQ

acknowledged receipt of plaintiff's FOIA request and notified plaintiff that the request had been

assigned FOIPA Request No. 1058805-000 and that a search was being conducted at FBIHQ.

(<u>Id.</u> ¶ 27 & Ex. B).

The plaintiff's complaint in this litigation stated that the plaintiff had submitted an earlier

request for records pertaining to the Investigative Data Warehouse by letter dated August 25,

2006. The FBI has no record of having received plaintiff's request on that date. However, on

November 29, 2006, the plaintiff provided a copy of the request to the FBI, and the FBI has

agreed to treat the request as if it had been received on the August 25, 2006, date. (<u>See</u> <u>id.</u> ¶ 25

n.11, ¶ 28 & Ex. C; <u>see also</u> Def.'s Suppl. Answer.) This request sought "the following agency

records (including, but not limited to, electronic records) concerning the FBI's 'Investigative

Data Warehouse' ('IDW'): 1) records listing, describing or discussing the categories of

individuals covered by the IDW; 2) records listing, describing, or discussing the categories of

records in the IDW; 3) records listing, describing or discussing criteria for inclusion of

information in the IDW; 4) records describing or discussing any FBI determination that the IDW is, or is not, subject to the requirements of the Privacy Act of 1974; and 5) records describing or discussing any FBI determination that the IDW is, or is not, subject to federal records retention requirements, including the filing of Standard Form (SF) 115, 'Request for Records Disposition Authority.'"

In addition to initiating a standard search of records in the CRS, the FBI also conducted an individualized inquiry of the most logical offices at FBIHQ which could have potentially responsive records. (Hardy Decl. ¶ 37.) RIDS prepared and circulated an Electronic Communication ("EC") to those FBIHQ divisions and offices most likely to possess potentially responsive records requesting all personnel to conduct a thorough search of any documents in their possession, including unserialized copies and e-mails responsive to plaintiff's requests. (Id.)

As a result of these search efforts, which are now complete, a total of approximately 72,000 pages potentially responsive to plaintiff's requests were located. (Id. ¶ 38.) RIDS personnel are currently reviewing this enormous volume of documents to determine which records are within the scope of the plaintiff's requests and which records are not. This process is known as "scoping."

The 72,000 potentially responsive documents are being scanned into electronic format and will be forwarded to the perfected-case backlog for assignment to a FOIPA processing analyst. (Id. ¶ 39.) Based on the page count of approximately 72,000 pages, plaintiff's request is currently in the large queue of the perfected-case backlog. (Id.) As explained above, in order to ensure fairness to all requesters and to equitably administer the large volume of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a first-in,

in, first-out basis from within each of three queues. (Id.) Based on the date of plaintiff's

request—September 1, 2006—there are approximately five (5) requests, which total 35,801

pages, pending ahead of plaintiff's request in the large queue. (Id.)

The FBI anticipates that the earliest plaintiff's request will be assigned to a Disclosure

Unit for processing is in approximately three months, which is the estimated time for this request

to rise to the top of the queue.[3] (Id. ¶ 39.) The FBI will be able to process approximately 800

pages every four (4) weeks, and therefore anticipates that it will require approximately 68

months for responsive documents to be processed and released to plaintiffs. (Id.) Due to the

volume and complexity of the material, which consist of a number of highly technical documents

as well as lengthy email trails, the FBI will release documents on a rolling basis, that is, as a

significant number of the documents are processed, the FBI will make releases approximately

every four (4) weeks until the production is complete, rather than delay the release until the

entire production is ready. (Id.)

As noted above, the FBI anticipates that the current volume of 72,000 potentially

responsive documents may be significantly reduced once the documents have been reviewed to

isolate the documents that are within the scope of the plaintiff's requests. At that point the FBI

will be able to provide the Court and the plaintiff with a revised estimate of the total time

required to complete processing of the plaintiff's request. The FBI is prepared to update the

Court and the plaintiff of the status of the request 120 days after issuance of the requested stay

and at 120-day intervals thereafter.

---

[3] If, for example, in response to a later-filed request, the FBI and/or DOJ grants a request
for expedited processing (or expedition is ordered by a court), that request is moved to the head
of the backlog queue. (Hardy Decl. ¶ 39 n.14.) As a result, a request that has been granted
expedition could conceivably jump ahead of plaintiff's request as would any perfected request
with a date before that of the plaintiff's request. Id.

**C.**    **Facts Supporting an Open America Stay: The FBI's Increasing FOIA Workload, Steps Taken to Address Backlog and Processing Delays, and Competing Demands on FBI Resources**

The number of FOIA and Privacy Act requests received by the FBI has increased dramatically from the early 1980s. (Hardy Decl. ¶ 5.) The Freedom of Information and Privacy Acts ("FOIPA") Section [the predecessor to RIDS] began processing requests in 1975. (Id.) Initially overwhelmed by the number of requests, by 1981, the FBI had maintained a steady backlog of between 4,000 and 7,000 requests. (Id.) Then, beginning in 1985, the unavailability of additional employees and a steady, large stream of new requests increased the backlog substantially, until in 1996 there were in excess of 16,000 requests. (Id.) In 1996, the median time for a pending request was in excess of three years. (Id.)

In the past, the FBI repeatedly sought additional funding for the creation of new FOIPA positions. (Id. ¶ 6.) For example, Congress appropriated funds in the 1997 fiscal year budget providing for 129 additional employees, and in the 1998 fiscal year budget providing for 239 additional employees. (Id.) In 2002, RIDS moved to paperless processing through its FOIPA Document Processing System ("FDPS"). (Id.) The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. (Id.) RIDS is now using this system to process virtually all of its FOIA/Privacy Act requests. (Id.) The new process required the FBI to redistribute some of its FOIPA personnel to other sections within the RMD in order to support the scanning and archival services necessary for automated processing. (Id.) Despite an additional reduction of RIDS personnel following September 11, 2001, the new efficiencies stemming from FDPS allowed the FBI to make great strides in reducing its FOIA/Privacy Act backlog. (Id.) For example, the backlog of requests in RIDS in various stages of processing between December 31, 1996 and December 31, 2006,

dropped from 16,244 to 1,672. (<u>Id.</u>) The median processing time for a pending request dropped

from 1,160 days on December 31, 1996, to 156 days on December 31, 2006. (<u>Id.</u> )

During 2006 there was an increase in requests, up from an average of 911 per month in

2005 to an average of 1,277 per month. (<u>Id.</u> ¶ 7.) Despite this increase, the FBI met or surpassed

its primary goal of reducing the time required to process requests. (<u>Id.</u>) In this regard, the median

time for processing small requests (less than 500 pages) decreased by 10%; the median time for

medium requests (501 pages to 2500 pages) decreased by 16%. (<u>Id.</u>) However, the median time

for the processing of large queue requests (over 2500 pages) increased by 22 %. (<u>Id.</u>) This

increase was due to a concerted effort to reduce the backlog of the older, larger cases. (<u>Id.</u>) This

effort resulted in the number of pending large queue requests decreasing from 122 to 51. (<u>Id.</u>)

RIDS has taken all possible steps—using available technologies—to aid in the streamlining and

reduction of the FOIA/Privacy Act backlog. (<u>Id.</u> ¶ 8.) These include the use of direct on-line

computer searches to locate responsive records, the use of forms that eliminate delays associated

with word processing, the formation of specific teams to target backlog issues, the development

of alternative methods to handle consultations with other government agencies, and the

formation of the RIDS FOIPA Litigation Services Unit ("LSU"), which handles all

FOIA/Privacy Act litigation. (<u>Id.</u>) RIDS has a FOIPA Process Board and an Information

Technology Change Management Board to improve existing processes, including the use of

information technology enhancements to the existing automated processing system. (<u>Id.</u>) These

boards provide a systematic methodology to implement continuous process improvement for the

future. (<u>Id.</u>)

Two steps the FBI is taking to update its technology and facilities have the potential to

reduce dramatically the FBI FOIA/Privacy Act processing times: (a) development of the

electronic investigative case file (the Sentinel Project) and (b) establishment of an FBI Central

Records Complex. (<u>Id.</u> ¶ 9.) The Sentinel Project is an ongoing, multiyear project that will result

in the elimination of paper investigative case files. (<u>Id.</u>) With an embedded Records Management

Application ("RMA"), FBI employees will be able to search for and retrieve these records

electronically. (<u>Id.</u>) Concurrently, the FBI has begun the process of designing and building a

new, state-of-the art Central Records Complex ("CRC") in Frederick County, Virginia. (<u>Id.</u>) This

initiative will consolidate all closed FBI paper records from more than 265 different storage

locations to one central site. (<u>Id.</u>) When requested, paper records will be scanned and forwarded

electronically. (<u>Id.</u>) These initiatives will significantly improve RIDS's search and record

retrieval capabilities by increasing search accuracy, decreasing search time, reducing lost files

and missing serials, and eliminating the manual movement of files. (<u>Id.</u>) RIDS expects these

initiatives, after they are fully implemented, to reduce current processing times by 40 percent.

(<u>Id.</u>) Phase One of the Sentinel Program is scheduled to be launched in the spring of 2007. (<u>Id.</u>)

In 2006, RIDS completed its first phase of moving to an interim facility in Frederick County,

Virginia, to recruit and train new employees in anticipation of the construction of the CRC. (<u>Id.</u>)

While this move is essential to future FBI FOIA/Privacy Act operations, it has created

significant strains on the FBI's FOIA/Privacy Act resources. (<u>Id.</u>)

     Although the decision regarding the exact location of the permanent CRC site in

Frederick County, Virginia, is still pending at the U.S. General Services Administration, the FBI

has begun the temporary relocation of RMD sections to interim sites in Frederick County,

Virginia, and will continue with a full relocation of its workforce once the permanent CRC is

built and ready for occupancy, sometime around the year 2010. (<u>Id.</u> ¶ 11.) The interim sites are

approximately 90 miles outside the Washington, D.C., metropolitan area. (<u>Id.</u>)

RIDS began relocation of its operations in February of 2006 by establishing an advance team to prepare for the eventual relocation of RIDS in incremental stages. (Id. ¶ 12.) In the summer of 2006, RIDS began the first phase of its relocation by reassigning five and one half of its ten unit functions to an interim site. (Id.) The reassigned sections were half of the Service Request Unit, and all of Work Process Unit One, Work Process Unit Two, FOIPA Unit One, FOIPA Unit Two, and Classification Unit Two. (Id.) To ensure continuing RIDS operations during the move, half of the Service Request Unit function and the functions of FOIPA Unit Three, Classification Unit One, Classification Unit Three, and the Litigation Support Unit remain at FBIHQ. Id. These FBIHQ units, with a total of 85 employees currently on board, consist of the most senior and experienced RIDS employees. (Id.)

As evidenced by the FBI's 2006 FOIA/Privacy Act statistics discussed above, RIDS is making every effort to minimize disruption to operations during this transition period. (Id. ¶ 13.) This has been made all the more challenging because many employees have decided not to transfer with their unit function, opting to retire or find other jobs rather than relocate to Frederick County, Virginia. (Id.) Unfortunately, many of these employees are among the most senior and experienced in their area of expertise. (Id.) Since RMD announced its off-site relocation plans, a total of 58 former RIDS employees have either resigned, retired, or found other jobs in the Washington, D.C., area, rather than relocate with their unit. (Id.) To date, a total of 64 RIDS employees from FBIHQ relocated with their unit to Frederick County, Virginia. (Id.)

To bring staffing levels back up, the FBI is engaged in aggressive and intense recruitment and hiring efforts in the Frederick County, Virginia, area. (Id. ¶ 14.) In response to several recent postings for new hires, RIDS selected 333 individuals for interviews in June and November of 2005 and in January, February, March, August, October, and December of 2006, collectively.

(Id.) Of the 333 selected for interviews, 82 candidates advised that they were no longer interested prior to the interview; of the remaining 251 candidates interviewed, 94 either declined the initial offer of conditional employment following their interview or were disqualified during their background investigation, 35 employees have come on board, and the remainder are still pending in the background process. (Id.) Past experience has shown that approximately 33% of those in FBI background investigations successfully complete the process. (Id.) With approximately 200 employees currently on the rolls, RIDS is 111 positions under its funded staffing level of 311 employees due to attrition and reasons attributable to the move. (Id.)

In addition, in light of the continuing resolution pursuant to which much of the federal government is operating, and which has resulted in a hiring freeze until further notice, RMD may not be able to hire any new support employees in the immediate future. (Id.) The new RIDS employees who have less than one year of experience are in various stages of professional development, but none are yet operating as experienced employees; it takes an average of three years to adequately train a new employee in the FOIA/PA process to be able to work independently in a productive, efficient, and effective manner. (Id.) Accordingly, RIDS has only a limited number of experienced employees processing FOIA/PA requests at this time. (Id.) Simultaneously with this reduction in personnel, RIDS has experienced a significant increase in its FOIA litigation workload, including several urgent and competing federal district court litigation deadlines that have impacted the FBI's ability to process recently located records. (Id. ¶¶ 10, 15.)

One of these litigation deadlines is in Gerstein v. CIA, et al., Civ. A. No. 06-4643 (N.D. Cal.), in which plaintiff seeks, inter alia, access to all documents related to criminal referrals submitted to the U.S. Department of Justice or the FBI since January 1, 2001, regarding

unauthorized disclosures of classified information to the press or public. (Hardy Decl. ¶ 16.) The

court has ordered the FBI to expedite plaintiff's request, which has resulted in the FBI's intense

search and identification of over 2,500 pages of potentially responsive records, with the search

still ongoing. (Id.) The FBI sought and received an additional 120 days from the original date of

January 5, 2007, initially ordered by the court to complete its review and processing of this

material. (Id.) The FBI must now review, process and release over 2,500 pages by April 27,

2007. (Id.)

In the largest FOIA litigation in the FBI's history, Rosenfeld v. U.S. Dep't of Justice, et

al., Civ. A. Nos. 90-3576 MHP, 85-1709 MHP and 85-2247 (N.D. Cal.), the FBI has been

ordered to conduct hand searches of its COINTELPRO files for numerous subjects and to open

13 new FOIPA requests on individual subjects. (Hardy Decl. ¶ 17.) In order to comply with these

demands, the FBI has again had to realign its personnel resources and has made a substantial

commitment of resources to address these court-ordered issues. (Id.)

In Hidalgo v. FBI, Civ. A. No. 06-CV-1513 (D.D.C.), the FBI had to review and process

over 3,000 pages of documents responsive to plaintiff's request for documents related to an

acknowledged FBI informant, and it had to complete the task by March 16, 2007. (Hardy Decl.

¶ 18.) Also, in Vampire Nation v. Department of Justice, et al., Civ. A. No. 06-CV-01950

(D.D.C.), and Electronic Frontier Foundation v. Department of Justice, et al. Civ. A. No. 06-CV-

1708 (D.D.C.), the FBI is requesting Open America stays from the respective courts in the next

several weeks. (Hardy Decl. ¶ 19.) If these requests are denied by the courts or the time

requested is substantially reduced, additional shifting of already strained employee resources

will become necessary. (Id.)

Finally, in the past, the backlog in RIDS has been exacerbated by the high volume of

18

administrative appeals which require review and response by the RIDS personnel. (Id. ¶ 20.)

RIDS personnel work closely with the staff of the U.S. Department of Justice, Office of

Information and Privacy ("OIP"), to review and assist with OIP's responses and determinations

of pending appeals. (Id.) During 2006, the FBI received a total of 1015 administrative appeals.

As of February 28, 2007, 520 administrative appeals were pending resolution. (Id.) While this

number does not represent an increase, the number of appeals remains another significant drain

on resources, because inevitably the time spent by RIDS personnel handling these appeals

reduces the amount of time for regular processing duties. (Id.)

## **ARGUMENT**

### A.    **Legal Standard for a Stay of Proceedings**

An agency receiving a FOIA request generally must determine whether to comply with

the request within 20 working days. 5 U.S.C. § 552(a)(6)(A)(i). Once the initial twenty days has

passed without an agency determination on the request, the FOIA requester "shall be deemed to

have exhausted his administrative remedies," id. at § 552(a)(6)(C)(i), and the requestor can file

suit in federal court. The Court may, however, "allow the agency additional time to complete its

review of the records" upon a showing that "exceptional circumstances exist and that the agency

is exercising due diligence in responding to the request." Id. § 552(a)(6)(C)(i). This provision

"was designed and inserted specifically as a safety valve for [FOIA]." Open America v.

Watergate Special Prosecution Force, 547 F.2d 605, 610 (D.C. Cir. 1976).

Effective October 2, 1997, as part of the Electronic Freedom of Information Act

Amendments of 1996, Congress amended 5 U.S.C. § 552(a)(6)(C)(i) by adding the following

two subsections:

(ii)    For purposes of [5 U.S.C. § 552(a)(6)(C)], the term "exceptional
circumstances" does not include a delay that results from a predictable agency

workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii)     Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing the request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

See 5 U.S.C. § 552(a)(6)(C)(ii), (iii).[4]

The leading case construing § 552(a)(6)(C) is Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976). In that case, which involved a FOIA request directed to the FBI, the Court of Appeals for the D.C. Circuit held that an agency is entitled to additional time to process a FOIA request under § 552(a)(6)(C) when it:

is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)).[5] See also Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination.").

---

[4] The 1996 Amendments to FOIA upheld the decision in Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), affirmed the proposition that stays should be granted to agencies faced with a large volume of FOIA requests, and clarified that even a "predictable agency workload of requests" constituted "exceptional circumstances" when an agency could demonstrate that it was making progress in reducing its backlog. See, e.g., H.R. Rep. No. 104-795, at 24, reprinted in 1996 U.S.C.C.A.N. 3448, 3467 (noting that the FOIA Amendments were "consistent" with the holding in Open America).

[5] At the time of the Open America decision, the D.C. Circuit found "exceptional circumstances" where the FBI had a backlog of "only" 5,137 requests. See Open America, 547 F.2d at 609, 613.

"[E]xceptional circumstances" therefore include "any delays encountered in responding to a request as long as the agencies are making good-faith efforts and exercising due diligence in processing requests on a first-in, first out basis." Appleton v. FDA, 254 F. Supp. 2d 6, 8-9 (D.D.C. 2003). In addition, "exceptional circumstances" include delays encountered when an agency is "deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of . . . [5 U.S.C. § 552(a)(6)(A)], and when the agency can show that it is 'exercising due diligence'" in processing the requests. Edmonds v. FBI, 2002 WL 32539613 at *1 (D.D.C. Dec. 3, 2002) (quoting Open America, 547 F.2d at 616).[6] "It also has been recognized, based on . . . legislative history, that other circumstances in addition to FOIA request backlogs may be a basis for finding exceptional circumstances, including 'resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals.'" Ctr. for Pub. Integrity v. U.S. Dep't of State, 2006 WL 1073066 at *2 (D.D.C. 2006) (quoting Wilderness Soc'y v. U.S. Dep't of the Interior, 2005 WL 3276256 at *6 (D.D.C. 2005).

Thus, under D.C. Circuit law, exceptional circumstances have been construed to exist and a stay pursuant to FOIA and the Open America doctrine may be granted: "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency

---

[6] "Exceptional circumstances" permitting the granting of additional time do not include delays resulting from a "predictable workload" of FOIA requests, "unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

shows 'reasonable progress' in reducing its backlog of requests." <u>Williams v. FBI</u>, 2000 WL 1763680, *2 (D.D.C. 2000); <u>see also</u> <u>Summers v. Dep't of Justice</u>, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors).

Courts have frequently issued orders extending the time to respond to FOIA requests, including orders granting stays of several years in length or otherwise permitting agencies several years to process documents under exceptional circumstances. <u>See, e.g.</u>, <u>Piper v. U.S. Dep't of Justice</u>, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); <u>Appleton</u>, 254 F. Supp. 2d at 11 (granting FDA's motion for stay pending completion of search and production of documents); <u>Williams v. FBI</u>, 2000 WL 1763680, at *3 (giving the FBI until May 2, 2001, to review records requested prior to August 21, 1998); <u>Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice</u>, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000, to respond to a request dated July 15, 1997); <u>Edmond v. U.S. Attorney</u>, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998, to respond to a request filed August 14, 1992); <u>Rabin v. U.S. Dep't of State</u>, 980 F. Supp. 116, 123-24 (E.D.N.Y. 1997) (granting motion for <u>Open America</u> stay and permitting Department of State over three years to process plaintiff's FOIA request); <u>Jimenez v. FBI</u>, 938 F. Supp. 21, 31 (D.D.C. 1996) (permitting the FBI a total of nearly five years from the date of plaintiff's FOIA request to respond to the request); <u>Ohaegbu v. FBI</u>, 936 F. Supp. 7, 8-9 (D.D.C. 1996) (granting request for stay and permitting July 1997 response to FOIA request submitted in July 1995).

As shown below, because the FBI can demonstrate both exceptional circumstances and due diligence in handling plaintiff's request, as well as reasonable progress in reducing its backlog, the Court should stay the proceedings until February 2013 to allow the FBI time to process plaintiff's request. As stated above, the FBI is hopeful that the time required to process

the plaintiff's request will be significantly reduced before processing begins. The FBI is prepared to submit a status report within 120 days of the entry of the stay, and at 120-day intervals thereafter, to advise the Court and the plaintiff of the status of the plaintiff's request and provide any available revised estimates of the time required to complete processing.

**B.     The FBI is Entitled to an Open America Stay**

**1.     The FBI is Operating Under Exceptional Circumstances**

During 2006 there was an increase in FOIA requests, up from an average of 911 per month in 2005 to an average of 1,277 per month. (Hardy Decl. ¶ 7.) As of December 31, 2006, the backlog of requests in RIDS in various stages of processing stood at 1,672. (Id. ¶ 6.) The FBI has taken all possible steps to aid in the streamlining and reduction of the FOIA/Privacy Act backlog, including development of the electronic investigative case file (the Sentinel Project), and the establishment of an FBI Central Records Complex in Frederick, Virginia. (Id. ¶¶ 8-9.) The FBI expects these initiatives, after they are fully implemented, to reduce processing times by 40 percent. (Id. ¶ 9.) Unfortunately, however, in the short term, there has been an impact on available FBI FOIA processing resources.

While RIDS has transferred more than half of its unit functions to an interim site in Frederick, Virginia, many of the employees in those units, who are among the most senior and experienced in their areas of expertise, have opted to retire or find other jobs rather than relocate. (Id. ¶ 13.) Since RMD announced its off-site relocation plans, a total of 58 former RIDS employees have either resigned, retired, or found other jobs in the Washington, D.C., area, rather than relocate with their unit. (Id.)

To bring staffing levels back up, the FBI is engaged in aggressive and intense recruitment and hiring efforts in the Frederick County, Virginia area. (Id. ¶ 14.)  Nonetheless, RIDS has yet

to fill many of the available positions. In addition, the new RIDS employees who have less than one year of experience are in various stages of professional development, but none are yet operating as experienced employees; it takes an average of three years to adequately train a new employee in the FOIA/PA process to be able to work independently in a productive, efficient, and effective manner. (Id.) Accordingly, RIDS has only a limited number of experienced employees processing FOIA/PA requests at this time. (Id.) In fact, with approximately 200 employees currently on the rolls, RIDS is 111 positions under its funded staffing level of 311 employees due to attrition and reasons attributable to the move to Frederick, Virginia. (Id.) Moreover, the continuing resolution under which the federal government is currently operating has also resulted in a hiring freeze until further notice. (Id.)

Simultaneously with this reduction in personnel, RIDS has experienced a significant increase in its FOIA litigation workload, including several urgent and competing federal district court litigation deadlines that have impacted the FBI's ability to process recently located records. (Id. ¶¶ 10, 15.) As described above, RIDS has been ordered by courts in Gerstein v. CIA, et al., Civ. A. No. 06-4643 (N.D. Cal.), Rosenfeld v. U.S. Department of Justice, et al., Civ. A. Nos. 90-3576 MHP, 85-1709 MHP and 85-2247 (N.D. Cal.), and Hidalgo v. FBI, Civ. A. No. 06-CV-1513 (D.D.C.), to process and produce documents in recent or coming months. (Hardy Decl. ¶¶ 16-18.) These cases take resources away from other pending FOIA requests.

Finally, the backlog in RIDS is exacerbated by the high volume of administrative appeals that require review and response by the RIDS personnel. (Id. ¶ 20.) During 2006, the FBI received a total of 1015 administrative appeals. As of February 28, 2007, 520 administrative appeals were pending resolution. (Id.) While this number does not represent an increase, the number of appeals remains another significant drain on resources, because inevitably the time

spent by RIDS personnel handling these appeals reduces the amount of time for regular

processing duties. (Id.)

For all of these reasons, the FBI faces "exceptional circumstances" in reducing its FOIA

backlog warranting an Open America stay. Other courts have granted Open America stays

several years in duration when warranted under the circumstances. See, e.g., Edmonds, 2002 WL

32539613, at *2 (FOIA staff's time spent on "administrative appeals, litigation and large

projects" contributed to finding of exceptional circumstances); Jimenez, 938 F. Supp. at 31

(four-year stay granted to process 700 pages); Haddon v. Freeh, 31 F. Supp. 2d 16, 19 (D.D.C.

1998) (noting that court had granted Open America stay until January 1998 on request submitted

to FBI nearly four years before); Guzzino v. FBI, 1997 WL 22886, *2 (D.D.C. 1997) (granting

stay of more than four years because "[t]he FBI has shown that even though it is exercising due

diligence, because of inadequate resources it is unable to respond to plaintiff's request within the

statutory [] limit."); Schweihs v. FBI, 933 F. Supp. 719, 721-22 (N.D. Ill. 1996) (finding

exceptional circumstances justified over four years from date of request to process plaintiff's

FOIA request); Cecola v. FBI, 1995 WL 549066, at *2 (N.D. Ill. 1995) (finding that exceptional

circumstances justified more than six years from date of request to process 1500 pages and

dismissing action without prejudice).

**2.    The FBI is Exercising Due Diligence in Processing Plaintiff's Requests and is
        Making Reasonable Progress in Reducing its Backlog of Pending Requests**

In addition to having demonstrated "exceptional circumstances," the FBI is exercising

due diligence in responding to plaintiff's FOIA request and has made reasonable progress in

reducing its backlog despite the tremendous burdens on its resources.

Each year the FBI receives thousands of FOIPA requests. (Hardy Decl. ¶¶ 5-7.) Due to

this continual influx, and to the appeals and litigation arising from it, the FBI's backlog jumped

from its 1981 level of between 4,000 and 7,000 requests to a high of 16,000 requests in 1996. (<u>Id.</u> ¶ 5.) In 1996, the median time for a pending request was in excess of three years. (<u>Id.</u>) The FBI, however, has demonstrated its commitment to reducing the backlog of information requests that confront it and has achieved significant reductions since 1996. Moreover, the FBI has taken all available steps to implement even greater reductions and to achieve a more streamlined processing of FOIA requests in the future.

In the past, the FBI repeatedly sought additional funding for the creation of new FOIPA positions. (<u>Id.</u> ¶ 6.) For example, Congress appropriated funds in the 1997 fiscal year budget providing for 129 additional employees, and in the 1998 fiscal year budget providing for 239 additional employees. (<u>Id.</u>) In 2002, RIDS moved to paperless processing through its FOIPA Document Processing System ("FDPS"). (<u>Id.</u>) The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. (<u>Id.</u>) RIDS is now using this system to process virtually all of its FOIA/Privacy Act requests. (<u>Id.</u>) The new process required the FBI to redistribute some of its FOIPA personnel to other sections within the RMD in order to support the scanning and archival services necessary for automated processing. (<u>Id.</u>) Despite an additional reduction of RIDS personnel following September 11, 2001, the new efficiencies stemming from FDPS allowed the FBI to make great strides in reducing its FOIA/Privacy Act backlog. (<u>Id.</u>) For example, the backlog of requests in RIDS in various stages of processing between December 31, 1996 and December 31, 2006, dropped from 16,244 to 1,672, resulting in a reduction of 14,572 requests. (<u>Id.</u>) The median processing time for a pending request dropped from 1,160 days on December 31, 1996, to 156 days on December 31, 2006. (<u>Id.</u>)

During 2006 there was an increase in requests, up from an average of 911 per month in

2005 to an average of 1,277 per month. (Id. ¶ 7.) Despite this increase, the FBI met or surpassed

its primary goal of reducing the time required to process requests. (Id.) In this regard, the median

time for processing small requests (less than 500 pages) decreased by 10%; the median time for

medium requests (501 pages -2500 pages) decreased by 16%. (Id.) However, the median time for

the processing of large queue requests (over 2500 pages) increased by 22 %. (Id.) This increase

was due to a concerted effort to reduce the backlog of the older, larger cases. (Id.) This effort,

however, resulted in the number of pending large queue requests decreasing from 122 to 51. (Id.)

As described above, the FBI has taken additional steps to further reduce the backlog and

reduce processing time, including development of the electronic investigative case file (the

Sentinel Project) and the establishment of an FBI Central Records Complex in Frederick,

Virginia. (Id. ¶¶ 8-9.) Although the implementation stage of these projects has strained FBI

resources, ultimately the FBI expects these initiatives, after they are fully implemented, to reduce

current processing times by 40%. (Id. ¶ 9); see Pray v. FBI, 1995 WL 764149, *2 (S.D.N.Y.

1995) (considering improved technology as a factor in establishing due diligence).

Accordingly, the FBI has demonstrated that it has made reasonable progress in reducing

its backlog, despite the tremendous burdens on its resources. Indeed, the reduction in the backlog

of requests from 16,244 on December 31, 1996, to 1,672 as of December 31, 2006, as well as the

drop in median processing time for a pending request from 1,160 days in December of 2006 to

156 days as of December 2006, provide concrete evidence of "reasonable progress" for purposes

of § 552(a)(6)(C)(ii).

Moreover, the FOIPA Section's current three-queue, first-in, first-out system is an

improvement on the two-track, first-in, first-out system the D.C. Circuit expressly recognized as

supporting the due diligence requirement. See Open America, 547 F.2d at 616. As explained

above, the move to a three-tiered system has greatly increased the efficiency and fairness with which the FBI processes the thousands of FOIA requests it receives each year.

The FBI has likewise exercised due diligence in responding to plaintiff's FOIA request. The FBI has identified approximately 72,000 pages of documents potentially responsive to plaintiff's request. (Id. ¶ 38.) The FBI is in the process of scanning the documents and will place plaintiff's request, pursuant to standard procedures, in the large queue of the perfected-case backlog, where it will be reviewed on a first-in, first-out basis. (Id. ¶ 39.) Given the volume of potentially responsive documents, and the fact that processing involves a page-by-page, line-by-line review of the responsive documents to determine what, if any, FOIA and/or Privacy Act exemptions may apply, it is not surprising that it will take the FBI months to process these documents. (Id. ¶ 22.) See, e.g., Jimenez, 938 F. Supp. at 24, 31-32 (issuing Open America stay until March 2000, and thereby permitting a total of more than five years from the date of the request, for processing of a request that produced an estimated 700 pages of responsive records); Ohaegbu, 936 F. Supp. at 8 (granting stay until July 1997, and thereby permitting more than three years from the date of the request, to permit FBI to process 175 pages); Cecola v. FBI, 1995 WL 549066, at *1-2 (dismissing case without prejudice to permit FBI until November 1999 to complete processing of over 1500 pages responsive to a request filed in July 1993); Fox v. U.S. Dep't of Justice, 1994 WL 923072 (C.D. Cal. 1994) (granting FBI motion for stay until 1999 to process 300 pages of documents responsive to a request filed in July 1993).[7] As noted above, the FBI is hopeful that the expected time required to complete processing will be significantly reduced once the potentially responsive documents have been reviewed to

---

[7] In these prior cases, the courts granted Open America stays lasting for several years to permit the FBI to process hundreds of pages of documents. The present case, by contrast, involves a request that requires the review of many times that amount of material.

determine which documents fall within the scope of the plaintiff's requests. The FBI is prepared to provide periodic status reports, beginning 120 days after the date of the issuance of a stay, to keep the Court and the plaintiff apprised of the FBI's progress in processing the plaintiff's requests and provide any revisions to the expected time required to complete processing.

Thus, because the FBI is "making a good faith effort and exercising due diligence in processing [plaintiff's] requests on a first-in first-out basis," see Kuffel v. U.S. Bureau of Prisons, 882 F. Supp. 1116, 1127 (D.D.C. 1995), its request for a stay should be granted. See also Rabin, 980 F. Supp. at 123 (finding that the "defendant State Department has shown the . . . 'due diligence' that courts have required . . . The Department presently faces an overwhelming backlog of requests for information, processes them in the approximate order received unless there is an urgent need for the information and appears to be attempting to comply with requests."); Lisee v. CIA, 741 F. Supp. 988, 989 (D.D.C. 1990) (holding that agencies' processing of FOIA requests on a first-in, first-out basis satisfied the "exceptional circumstance" and "due diligence" requirements for stay).

## <u>CONCLUSION</u>

In view of the foregoing, defendant respectfully requests that the Court stay the pending proceeding for 71 months, or until February 28, 2013, provided that within 120 days of the date of the order, and at 120-day intervals thereafter, the defendant will advise the Court and the plaintiff in writing of the current status of the plaintiff's request and any revised estimates of the total time required to complete processing of the plaintiff's request.

Dated: April 2, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

/s/ JAMES C. LUH
JAMES C. LUH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,<br><br>         Plaintiff,<br><br>   vs.<br><br>DEPARTMENT OF JUSTICE,<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 06-cv-1773 (RBW)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

UPON CONSIDERATION of defendant's Motion for <u>Open America</u> Stay, it is hereby ordered as follows:

The motion is GRANTED, and proceedings in this case are stayed until February 28, 2013.

It is FURTHER ORDERED that within 120 days of this order, and each subsequent 120 days until this order is modified or lifted, defendant shall file a status report regarding the status of the processing of the plaintiff's Freedom of Information Act (FOIA) requests.

Dated:

_____
REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELECTRONIC FRONTIER FOUNDATION,    )
                                   )
        Plaintiff,                 )
                                   )
            v.                     )    Civil Action No. 1:06-cv-01773-RBW
                                   )
DEPARTMENT OF JUSTICE,             )
                                   )
        Defendant.                 )
                                   )

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at the Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 21, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the state of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 200 employees who staff a total of ten (10) units and a field operational service center unit whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 12958, as

amended,[1] and the preparation of affidavits/declarations in support of Exemption 1 claims asserted under the FOIA.[2] I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 12958, as amended, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the FOIA request of plaintiff, the Electronic Frontier Foundation ("EFF"), for specific types of FBI documents related to the FBI's Investigative Data Warehouse ("IDW"), a database of 659 million records, including terrorist watch lists, intelligence cable and financial transactions, that is culled from more than 50 government agency sources in addition to the FBI. More specifically, plaintiff's August 25, 2006 FOIA request seeks access to FBI records pertaining to the "listing, describing or discussing" of the categories of individuals covered by the IDW; the "listing, describing or discussing" of the categories of records in the IDW; the "listing, describing or discussing" of the criteria for inclusion of information in the IDW; the "describing or discussing" of any FBI determination that the IDW is, or is not, subject to the requirements of the Privacy Act of 1974; and the "describing or discussing" of any FBI determination that the IDW is, or is not, subject to federal records retention requirements, including the filing of Standard Form (SF) 115, which is titled "Request for Records Disposition Authority." In addition, plaintiff's September 1, 2006, FOIA request seeks access to FBI records pertaining to the "describing of data expungement, restriction or

---

[1]  60 Fed. Reg. 19825 (1995) and 69 Fed. Reg. 15315 (2003).

[2]  5 U.S.C. § 552 (b)(1).

correction procedures" for the IDW; all privacy impact statements created for the IDW; and all results of audits conducted to ensure proper operation of the IDW.

(4)    The purpose of this declaration is to provide the Court and plaintiff with an overview of the FBI's RIDS, and an explanation for the delay associated with the FBI's processing of documents responsive to plaintiff's FOIA request. For the reasons which will be discussed below in greater detail, the FBI is submitting this declaration in support of a stay of proceedings for approximately 71 months (three months for the case to rise to the top of the backlog queue and 68 months for processing), no later than February 28, 2013, to allow the FBI to complete the processing and release of documents responsive to plaintiff's request. This length of time is based on the volume of 72,000 pages that the FBI has identified as potentially responsive. However, the FBI anticipates that after review and determination of the volume of documents which are within the scope of plaintiff's request are completed, the actual number of documents to be processed, and the time required to process those documents, could be much lower. Thus, the FBI anticipates that the stay, once issued, could be shortened by the Court at a later date to reflect updated estimates of processing time. The FBI will promptly advise the Court and plaintiff of any significant reductions in its estimates of the time required to process the request.

## OVERVIEW OF THE FBI'S FOIA/PRIVACY ACT BACKLOG

(5)    The number of FOIA and Privacy Act requests received by the FBI increased dramatically from the early 1980s. The Freedom of Information and Privacy Acts ("FOIPA") Section [the predecessor to RIDS] began processing requests in 1975. Initially overwhelmed by the number of requests, by 1981, the FBI had achieved a steady backlog between 4,000-7,000 requests. Beginning in 1985, the unavailability of additional employees and a steady, large stream of new requests increased the backlog substantially until in 1996 there were in excess of 16,000 requests. In 1996, the median time for a pending request was in excess of three years.

(6)    During the years that the backlog continued to grow, the FBI repeatedly sought

-3-

additional funding for the creation of new FOIPA positions. It was not until the 1997 fiscal year budget that Congress appropriated funds which provided for the funding of 129 additional employees, and in the 1998 fiscal year budget provided for the funding of 239 additional employees. In 2002, RIDS moved to paperless processing through its FOIPA Document Processing System ("FDPS"). The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. RIDS is now using this system to process virtually all of its FOIA/Privacy Act requests. The new process required the FBI to redistribute some of its FOIPA personnel to other sections within the RMD in order to support the scanning and archival services necessary for automated processing. Despite an additional reduction of RIDS personnel following September 11, 2001, to support the war on terrorism, the new efficiencies allowed the FBI to make great strides in reducing further its FOIA/Privacy Act backlog. For example, the backlog of requests in RIDS in various stages of processing between December 31, 1996 and December 31, 2006, dropped from 16,244 to 1,672, resulting in a reduction of 14,572 requests. The median time for a pending request dropped from 1,160 days on December 31, 1996, to 156 days on December 31, 2006.

(7)    During 2006, there was an increase in requests, up from an average of 911 per month in 2005 to an average of 1,277 per month. Despite this increase, the FBI met or surpassed its primary goal of reducing the time required to process requests. The median time for processing small queue requests (less than 500 pages) decreased by 10% and the median time for processing medium queue requests (501 pages-2500 pages) decreased by 16%. However, the median time for the processing of large queue requests (over 2500 pages) increased by 22%. This increase was due to a concerted effort to reduce the backlog of the older, larger cases. This effort resulted in the number of pending large queue requests decreasing from 122 to 51.

(8)    RIDS has taken all possible steps - using available technologies - to aid in the streamlining and reduction of the FOIA/Privacy Act backlog. These include the use of direct on-line computer searches to locate responsive records, the use of forms which eliminate delays

-4-

associated with word processing, the formation of specific teams to target backlog issues, the development of alternative methods to handle consultations with other government agencies, and the formation of the RIDS FOIPA LSU, which handles all FOIA/Privacy Act litigation. RIDS has a FOIPA Process Board and an Information Technology Change Management Board to improve existing processes, including the use of information technology enhancements to the existing automated processing system. These boards provide a systematic methodology to .implement continuous process improvement for the future.

(9)    Currently, the FBI is taking two steps to update its technology and facilities that have the potential to reduce dramatically the amount of time it takes the FBI to respond to FOIA and Privacy Act requests: (a) development of the electronic investigative case file (the Sentinel Project) and (b) establishment of an FBI Central Records Complex. The Sentinel Project is an on-going, multi-year project that will result in the elimination of paper investigative case files. With an embedded Records Management Application ("RMA"), FBI employees will be able to search for and retrieve these records electronically. Concurrently, the FBI has begun the process of designing and building a new, state-of-the art Central Records Complex ("CRC") in Frederick County, Virginia. This initiative will consolidate all closed FBI paper records from more than 265 different storage locations to one central site. When requested, paper records will be scanned and forwarded electronically. These initiatives will significantly improve RIDS's search and record retrieval capabilities by increasing search accuracy, by decreasing search time, by reducing lost files and missing serials, and eliminating the manual movement of files. RIDS expects these initiatives, after they are fully implemented, to reduce by 40% the time required to process a FOIA/Privacy Act request. Phase One of the Sentinel Program is scheduled to be launched in the spring of 2007. During 2006, RIDS completed its first phase of moving to an interim facility in Frederick County, Virginia, to recruit and train new employees in anticipation of the construction of the CRC. While this move is essential to future FBI FOIA/Privacy Act operations, it has created significant strains on the FBI's FOIA/Privacy Act resources.

-5-

## STRAINS ON THE FBI'S FOIA RESOURCES

(10)    Two significant factors impact the FBI's ability to process recently located records: (a) the physical relocation of a portion of RIDS personnel and resources from FBIHQ to the interim facility in Frederick County, Virginia; and (b) several urgent and competing litigation deadlines, both of which will be discussed in further detail below.

### RMD Relocation to Frederick County, Virginia

(11)    The decision to locate the permanent CRC site in Frederick County, Virginia, is currently pending with the U.S. General Services Administration. The FBI has begun the temporary relocation of RMD sections to interim sites in Frederick County, Virginia, and will continue with a full relocation of its workforce once the permanent CRC is built and ready for occupancy, sometime around the year 2010. The interim sites are approximately 90 miles out of the Washington, D.C. Metropolitan area – about a 1 ½-hour drive from FBIHQ.

(12)    RIDS began relocation of its operations in February 2006 by establishing an advance team to prepare for the eventual relocation of RIDS in incremental stages. During the summer of 2006, RIDS began the first phase by relocating five and one half of its ten FBIHQ unit functions to an interim site - specifically half of the Service Request Unit, and all of Work Process Unit One, Work Process Unit Two, FOIPA Unit One, FOIPA Unit Two, and Classification Unit Two. To ensure continuing RIDS operations during the move, half of the Service Request Unit function and the functions of FOIPA Unit Three, Classification Unit One, Classification Unit Three, and the Litigation Support Unit remain at FBIHQ. These FBIHQ units, with a total of 85 employees currently on board, consist of the most senior and experienced RIDS employees.

(13)    As evidenced by the FBI's 2006 FOIA/Privacy Act statistics, RIDS is making every effort to minimize disruption to operations during this transition period. This has been made all the more challenging as many employees have opted not to transfer with their unit function, opting to either retire or find other jobs rather than relocate to Frederick County,

-6-

Virginia. Unfortunately, many of these employees were among the most senior and experienced in their area of expertise. Since RMD announced its off-site relocation plans, a total of 58 former RIDS employees have either resigned, retired, or found other jobs in the Washington, D. C. Metropolitan area, rather than relocate with their unit. To date, a total of 64 RIDS employees from FBIHQ have relocated with their unit to Frederick County, Virginia.

(14)    The FBI is engaged in aggressive and intense recruitment and hiring efforts in the Frederick County, Virginia area. In response to several recent postings for new hires, RIDS selected 333 individuals for interviews in June and November of 2005 and in January, February, March, August, October, and December of 2006, collectively. Of the 333 individuals selected for interviews, 82 candidates advised they were no longer interested prior to their interview; of the remaining 251 candidates interviewed, 94 either declined the initial offer of conditional employment following their interview or were disqualified during their background investigation; 35 employees have come on board; and the remaining are still pending in the background process. Past experience has shown that approximately 33% of those in FBI background investigations successfully complete the hiring process. With approximately 200 employees currently on the rolls, RIDS is 111 positions under its funded staffing level of 311 employees due to attrition and the reasons explained in Paragraph 13, supra. In addition, in light of the continuing resolution pursuant to which much of the federal government is operating, and which has resulted in a hiring freeze until further notice, RMD may not be able to hire any new support employees in the immediate future. The new RIDS employees who have less than one year of experience are in various stages of professional development, but none are yet operating as experienced employees. It takes an average of three years to adequately train a new employee in the FOIA/Privacy Act process to be able to work independently in a productive, efficient, and effective manner. Accordingly, RIDS has only a limited number of experienced employees processing FOIA/Privacy Act requests at this time.

**Pending FOIA Litigations**

(15)    Simultaneously with this resource drain, RIDS has experienced a significant increase in its FOIA litigation workload, including several urgent and competing federal district court litigation deadlines:

(16)    In <u>Gerstein v. CIA, et al.</u>, Civ. A. No. 06-4643 (N.D. Cal.), plaintiff seeks, <u>inter alia</u>, access to all documents related to criminal referrals submitted to the U.S. Department of Justice or the FBI since January 1, 2001 regarding unauthorized disclosures of classified information to the press or public. The Court has ordered the FBI to expedite plaintiff's request, which has resulted in the FBI's intense search and identification of over 2,500 pages of potentially responsive records, with the search still ongoing. The FBI sought and received an additional 120 days from the original date of January 5, 2007, initially ordered by the Court to complete its review and processing of this material. The FBI must now complete the processing by April 27, 2007.

(17)    In the FBI's largest FOIA litigation in its history, <u>Rosenfeld v. U.S. Department of Justice, et al.</u>, Civ. A. Nos. 90-3576-MHP, 85-1709-MHP and 85-2247-MHP (N.D. Cal.), the FBI has been ordered by the Court to conduct hand searches of its COINTELPRO files for numerous subjects and to open 13 new FOIA requests on individual subjects. In order to comply with these demands, the FBI has again had to realign its personnel resources and has made a substantial commitment of resources to address these court-ordered issues.

(18)    In <u>Hidalgo v. FBI</u>, Civ. A. No. 06-CV-1513 (D.D.C.), the FBI has recently had to review and process over 3,000 pages of documents responsive to plaintiff's request for documents related to an acknowledged FBI informant, by a Court-ordered completion date of March 16, 2007.

(19)    In <u>Vampire Nation v. Department of Justice, et al.</u>, Civ. A. No. 06-CV-01950 (D.D.C.) and <u>Electronic Frontier Foundation v. Department of Justice, et al.</u>, Civ. A. No. 06-CV-1708 (D.D.C.), the FBI requested <u>Open America</u> stays from each of the Courts and the

-8-

motions are still pending. If these requests are either denied by the Courts or the requested processing time is substantially reduced, additional shifting of already strained employee resources will become necessary.

(20)    In the past, the backlog in RIDS has been exacerbated by the high volume of administrative appeals which require review and response by RIDS personnel. RIDS personnel work closely with the staff of the U.S. Department of Justice, Office of Information and Privacy ("OIP") to review and assist with OIP's responses and determinations regarding pending appeals. During 2006, the FBI received a total of 1015 administrative appeals. As of February 28, 2007, 520 administrative appeals were pending resolution. While this number does not represent an increase, the aggregate number of appeals remains another significant drain on resources because inevitably, the time spent by RIDS personnel handling these appeals reduces the amount of time that they are able to devote for regular processing duties.

### HOW A FOIA REQUEST IS PROCESSED IN RIDS

(21)    Over the years, FOIA management at FBIHQ has continuously re-engineered the process of responding to FOIA/Privacy Act requests in an effort to better serve the needs of requesters who seek information from the FBI. In 2002, reorganization of various divisions at FBIHQ resulted in the formation of the RMD, which now handles all FOIA/Privacy Act requests through the RIDS. These most recent re-engineering efforts have resulted in a new organizational plan which will be discussed in more detail below.

(22)    The mission of RIDS is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information. RIDS provides program and policy management that pertains to the research, review, analysis, processing, and classification/declassification work related to the FOIA and Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. RIDS also provides prepublication review of material written by current and/or former FBI employees concerning FBI matters as mandated by

the FBI's employment agreement, executes the FBI's historic declassification program, and assists in managing defense discovery efforts in large counterterrorism criminal trials. RIDS currently employs approximately 200 personnel, most of whom are Legal Administrative Specialists ("LASs"), and who are assigned among the 11 units within RIDS. RIDS employees intake, review, process, and release information in response to FOIA and Privacy Act requests. To accomplish this mission, RIDS consists of the following 11 Units: one Service Request Unit ("SRU"), two Work Process Units ("WPU"), three Classification Units ("CU"), four FOIPA Units ("FOIPA Disclosure Units"),[3] and the Litigation Support Unit ("LSU").

      (a)   Service Request Unit: the Service Request Unit ("SRU") includes the Negotiation Team, which works with individuals whose requests generate a large volume of records in an attempt to narrow the scope of responsive records and facilitate a more rapid response. Since 1995, this team has eliminated over 13 million pages from FOIA/Privacy Act requests. The Unit also has a RIDS Public Information Official, who is responsible for assisting requesters with issues concerning their request. The Government Response Team ("GRT"), also a part of SRU, provides timely feedback to other federal agencies and other DOJ components with regard to referrals of documents which are either FBI-originated or contain FBI-originated information.[4] Referred documents are sent to the FBI for consultation or for direct response to the requester. Finally, SRU handles administrative appeals and criminal discovery matters.

      (b)   Work Process Units

         (i)   The two WPUs are responsible for reviewing and sorting all correspondence/incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies, and other FBI entities (i.e., FBI

---

[3] One of the four FOIPA Disclosure Units operates at an off-site location in Savannah, Georgia.

[4] The Government Response Team ("GRT") was formerly known as the "Government Response and Prepublication Review Unit." However, an internal reorganization resulted in shifting the GRT and its functions to the SRU, and shifting the Prepublication Review Team to the RIDS front office.

field offices, Legats). The WPUs handle various initial tasks required to "perfect" a FOIA/Privacy Act request, including sending letters to acknowledge requests, advising a requester to provide identifying data so that an accurate records search can be made and/or to submit a notarized signature/Privacy Act waiver, and advising a requester when no responsive records are located. The WPUs also open new requests, assign a FOIA/Privacy Act Request Number, and enter the perfected requests into the FDPS tracking system. The WPUs are responsible for preparing "perfected" requests for transfer to the four Disclosure Units. A request is considered "perfected" when all administrative tasks have been completed and all responsive documents have been scanned into FDPS. Once a request has been perfected, it is placed in the backlog for assignment to a FOIPA Disclosure Unit for processing. The WPUs conduct searches of the general indices for identifiable records, confirm responsive documents, stamp files for retention, address fee issues (other than fee waiver reviews), retrieve and forward files for scanning into FDPS, respond to status inquiries, and maintain requests prior to their transfer to the FOIPA Disclosure Units.

(ii)    After the WPUs perfect a request, it is sent to the "perfected backlog." To ensure fairness to all requesters and to equitably administer the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis within each of three queues according to sound administrative practices.[5] The FBI uses a three-queue system as a way to fairly assign and process new requests.[6] The three-queue system established "multi-track" processing for requests, based on the amount of time and work involved in handling a particular request.[7] The system nevertheless preserves the principle that, within the three queues, requests are still assigned and processed on

_____

[5] See 28 C.F.R. § 16.5(a).

[6] This system went into effect on July 10, 1997, superseding the previous system of two queues (one for 100 pages or less, the other for requests greater than 100 pages).

[7] See 5 U.S.C. § 552(a)(6)(D)(I) and 28 C.F.R. § 16.5(b).

a first-in/first out basis. The placement of a request in one of the three queues depends on the total amount of material responsive to that request - 500 pages or less ("small queue"), 501 to 2,500 pages ("medium queue"), or more than 2,500 pages ("large queue"). This standard operating procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate only to a small number of documents. As described earlier, individuals whose requests have been placed in the large queue are given the opportunity, through contact with SRU's Negotiation Team, to reduce the scope of their requests and accelerate assignment of their requests by relocating them to a more advantageous queue.

(b)  Classification Units: The three Classification Units ("CUs") are responsible for complying with the classification/declassification review of FBI records under Executive Order 12958, as amended, and for conducting mandatory declassification review consistent with Executive Order 12958, as amended. The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, Office of Inspector General Reports, and other federal agency requests in order to determine whether such material should remain classified or be declassified. In addition, the CUs review and prepare classified material for review by the Department of Justice Review Committee ("DRC").[8]

(c)  FOIPA Units: The four FOIPA Disclosure Units perform the actual processing of records pursuant to the provisions of the FOIA and Privacy Act. "Processing" involves a page-by-page, line-by-line review of the responsive documents to determine which, if any, FOIA and/or Privacy Act exemptions may apply. This includes redaction of the exempt material and notation of the applicable exemption(s) in the margin of each page and/or

---

[8] The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information. See 28 C.F.R. § 17.14.

-12-

preparation of deleted page information sheets when pages are withheld in their entireties, which is now done electronically in FDPS. During the course of their review, the FOIPA Disclosure Units consult with other government agencies for their determination as to the releasability of the other agency's information contained within FBI records, or refer non-FBI documents to those originating agencies for processing and direct response to the requester. The FOIPA Disclosure Units ensure that FOIA and/or Privacy Act exemptions have been applied properly, no releasable material has been withheld, no material meriting protection has been released, all necessary classification reviews have been completed by transferring applicable cases to the CUs, and other government agency information and/or entire documents originating with other government agencies have been properly handled.

(d)    Litigation Support Unit:  The Litigation Support Unit ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel and Chief Division Counsels and Assistant Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. The LSU coordinates the progress of the FBI's response to a particular FOIA/Privacy Act request as it progresses through the units described above, the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and the referral of documents to other DOJ components and government agencies. The LSU prepares the administrative record, drafts both procedural and substantive declarations, codes documents processed by the Disclosure Units,[9] and drafts detailed declarations justifying the

---

[9]  A coded format is used in cases to assist the Court and parties in reviewing information which the FBI withholds within the context of processed documents. Each instance of information withheld pursuant to the FOIA is accompanied by a coded designation that corresponds to specified categories. For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to Exemption (b)(7)(C) of the FOIA, which concerns "Unwarranted Invasion of Privacy." The numerical designation "(-1)" following the "(b)(7)(C)" narrows the main category to the more specific subcategory of "Names and/or Identifying Data of Third Party Individuals Merely Mentioned in FBI Records." Although adding codes is a time-consuming process, it helps the Court and the parties in those jurisdictions that accept coded declarations to

(continued...)

-13-

assertion of all applicable FOIA/Privacy Act exemptions.

(23)    To promote administrative efficiency, LASs work on more than one request at a time. Certain cases may require that the usual processing be halted midstream. This can occur for a variety of reasons, including the resolution of classification issues, the location of additional records, or consultation with other government agencies as to the nature and propriety of releasing certain information. In the interest of efficiency during this waiting period, the LAS may fully process other requests. Large requests are often processed on parallel tracks with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS resources.

(24)    Consistent with standard administrative procedure, any records referred to the FBI from other DOJ components or other government agencies in response to a particular request are added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. By ensuring continuity in the processing of FOIA requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient.

## CHRONOLOGY OF PLAINTIFF'S FOIA REQUEST

(25)    Set forth below is a chronology and description of the correspondence pertaining to plaintiff's FOIA request.[10] Copies of this correspondence are attached hereto as **Exhibits A-C**.

---

[9](...continued)
more clearly explain the nature of the withheld material.

[10]    The correspondence is set out in the chronological order that it was received at, or generated by, RIDS at FBIHQ. In its review of this Complaint, the FBI determined that it had never received plaintiff's request letter dated August 25, 2006, (see Exhibit C) allegedly sent to RIDS at FBIHQ by facsimile on the same date as the letter. However, RIDS at FBIHQ has no record of receiving plaintiff's request letter on that date and never sent an acknowledgment letter as standard practice requires. Moreover, plaintiff does not allege receipt of an acknowledgment
(continued...)

(26)    By letter dated September 1, 2006, addressed to RIDS at FBIHQ and sent by facsimile on the same date, Marcia Hofmann, Esq. submitted a FOIA request on behalf of plaintiff, the Electronic Frontier Foundation ("EFF"), for specific types of FBI concerning "the FBI's "Investigative Data Warehouse" ("IDW")", a "659 million-record database" which is described as "one of the most powerful data analysis tools available to law enforcement and counterterrorism [FBI] agents." Specifically, plaintiff EFF requested "agency records (including, but not limited to, electronic records) concerning 1) all records describing data expungement, restriction or correction procedures for the IDW; 2) all privacy impact statements created for the IDW; and 3) all results of audits conducted to ensure proper operation of the IDW." Ms. Hofmann also attached a newspaper article concerning the IDW from the website of the Washington Post newpaper. Ms. Hofmann also requested a waiver of all duplication and search/review fees associated with this FOIA request for plaintiff based on its status as a non-profit public interest organization that routinely and systematically disseminates information to the public through its website, its online newsletter, and its publication of white papers and books. **(See Exhibit A)**.

(27)    By letter dated September 21, 2006, addressed to plaintiff, FBIHQ acknowledged receipt of plaintiff's FOIA request, notified plaintiff that its FOIA request had been assigned FOIPA Request No. 1058805-000, advised plaintiff that a search of the indices to the Central Records System at FBIHQ was being conducted for the records it had requested concerning the IDW, and further advised plaintiff that it would be informed of the results of this search as soon as possible. **(See Exhibit B.)**

(28)    By letter dated August 25, 2006, addressed to RIDS at FBIHQ and sent to the FBI

---

[10](...continued)
letter for the August 25, 2006 request. Therefore, the first of plaintiff's FOIA requests for records about the IDW, that RIDS at FBIHQ received  was plaintiff's request letter dated September 1, 2006 (see Exhibit A).  After discussions with Mr. Sobel, the FBI agreed to treat the copy of plaintiff's request letter dated August 25, 2006, sent to the FBI through its counsel in this action on November 29, 2006, as if it had been received on the August 25th date.

through its counsel in this action on November 29, 2006, David Sobel, Esq. submitted a FOIA request on behalf of plaintiff for specific types of FBI concerning "the FBI's "Investigative Data Warehouse" ("IDW")", a "database [which] comprises more that 100 milllion pages of terrorism related documents, and billions of structured records such as addresses and phone numbers" which "provides [FBI] agents and analysts with instant access to photographs, biographical information, physical location information, and financial data for thousands of known and suspected terrorists." Specifically, plaintiff requested "the following agency records (including, but not limited to, electronic records) concerning the FBI"s "Investigative Data Warehouse" ("IDW"): 1) records listing, describing or discussing of the categories of individuals covered by the IDW; 2) records listing, describing or discussing of the categories of records in the IDW; 3) records listing, describing or discussing of the criteria for inclusion of information in the IDW; 4) records describing or discussing of any FBI determination that the IDW is, or is not, subject to the requirements of the Privacy Act of 1974; and 5) records describing or discussing of any FBI determination that the IDW is, or is not, subject to federal records retention requirements." Mr. Sobel also requested a waiver of all duplication and search/review fees associated with this FOIA request for plaintiff based on its status as a non-profit public interest organization that routinely and systematically disseminates information to the public through its website, its online newsletter, and its publication of white papers and books. **(See Exhibit C)**.

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(29)   The Central Records System ("CRS") enables the FBI to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. CRS is organized into a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may correspond to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records in the CRS are maintained

-16-

at FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices. While the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that are potentially responsive to FOIA/Privacy Act requests. The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(30)    On or about October 16, 1995, the ACS was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that were previously automated. ACS can be described as an internal computerized subsystem of the CRS. Because the CRS cannot electronically query the case files for data, such as an individual's name or Social Security number, the required information is duplicated and moved to the ACS so that it can be searched. More than 105 million records from the CRS were converted from automated systems previously utilized by the FBI. Automation did not change the CRS; instead, automation has facilitated more economic and expeditious access to records maintained in the CRS.

(31)    The retrieval of data from the CRS is made possible through the ACS using the General Indices, which are arranged in alphabetical order.[11] The entries in the General Indices fall into two categories:

> (a) A "main" entry – A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry – "Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(32)    Searches made in the General Indices to locate records concerning a particular subject, such as the Investigative Data Warehouse, are made by searching the subject requested in the index.

---

[11] The General Indices, which became fully automated on September 24, 1987, also include index cards which allow a manual search for records prior to that date.

(33)    The ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a)    Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"). When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by all FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the investigation. Using the fictitious file number "44-HQ-12345," as an example, an explanation of the UCFN is as follows: "44" indicates the classification for the specific type of investigation, which in this example is "Civil Rights"; "HQ" is the abbreviated form used for the OO of the investigation, which in this example is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b)    Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c)    Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 97.8 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(34)    The decision to index names other than subjects, suspects, and victims is a

-18-

discretionary decision made by the FBI Special Agent ("SA") – and on occasion, support employees – assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, i.e., the Investigative Data Warehouse. .

### SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(35)   In this case, the FBI has employed several mechanisms as part of its search efforts to identify documents responsive to plaintiff's request. As a threshold matter, it is important to note that the nature of plaintiff's FOIA request for specific records concerning the IDW does not lend itself readily or naturally to the searches that the FBI routinely conducts in response to FOIA requests seeking access to FBI investigative files. This is particularly the case where the subject matter of the request is relatively recent, and responsive records may not have yet been indexed to the FBI's CRS. As a result, the FBI initiated a standard search of records in the CRS, as well as an individualized inquiry of the most logical offices at FBIHQ which could have potentially responsive records concerning the IDW.

(36)   On September 21, 2006, the RIDS staff initiated a search in the CRS for records responsive to plaintiff's request. The specific search inquiry in CRS included the following search terms: "Investigative Data Warehouse", "IDW", "Investigative Data Warehouse Account Password", Investigative Data Warehouse", "Investigative Data Warehouse Regional Training", "Investigative Data Warehouse Version One Three Day Regional Training", "Investigative Data

Warehouse Version One", "Investigative Data Warehouse Version One Training", and "Investigative Data Warehouse Version 1.3." The date parameters for the search were for any responsive records created on or before September 21, 2006. The scope of the search included the Automated Data Base ("ADB"). The search sought main files and cross-references, whether security or criminal. As a result of this CRS search, FBIHQ identified no responsive FBIHQ main files for the above search terms concerning the IDW and only one FBIHQ cross-reference, which pertains to the search term "Investigative Data Warehouse Version One Three Day Regional Training."

(37)    In addition, RIDS prepared and circulated an Electronic Communication ("EC") to those FBIHQ divisions and offices most likely to possess potentially responsive records requesting that all personnel to conduct a thorough search of any documents in their possession, including unserialized copies of documents; electronic records maintained on computers, audiotapes, or videotapes; e-mails; records maintained on portable media such as CD-ROMs or diskettes; and records maintained on any stand-alone databases created for the purpose of particular investigations, which may be responsive to the types of records concerning the IDW enumerated in plaintiff's request letter dated September 1, 2006. The date parameters for this search were for any responsive records created on or before September 21, 2006. This EC requested that these FBIHQ divisions and offices conduct the requested searches of their records and reply either positively or negatively to the appropriate RIDS personnel in WPU by October 23, 2006. FBIHQ divisions and offices with positive responses were also requested to forward copies of their potentially responsive records the appropriate RIDS personnel in WPU. This EC was circulated to the following FBIHQ divisions and offices, which were determined to most likely possess responsive documents concerning the IDW: the Director's Office; the Intelligence Directorate; the Office of the Chief Information Officer ("OCIO"); the Cyber Division; the Information Technology Operations Division ("ITOD"); the Office of Information Technology Policy and Planning; the Office of Information Technology Program Management;

-20-

the Office of Operational Technology; the Office of the General Counsel ("OGC"); the Office of

Congressional Affairs ("OCA"); the Office of Public Affairs ("OPA"); the Critical Incident

Response Group ("CIRG"); the Criminal Justice Information Services Division ("CJIS"); the

Counterintelligence Division ("CD"); the Counterterrorism Division ("CTD"); the Criminal

Investigative Division ("CID"), the Finance Division, the Inspection Division ("INSD"); the

Security Division; and the Training and Development Division. Individuals in all of these

FBIHQ divisions and offices have undertaken searches of their office records and files for

potentially responsive records concerning the IDW. Given the nature of plaintiff's request,

which seeks documents related to the IDW, the individuals who conducted these particular

searches are those individuals most likely to possess potentially responsive records or who have

knowledge as to where potentially responsive records could be located. Any suggestions or

logical leads regarding potentially responsive documents have been followed up by RIDS

personnel in WPU.

(38)    As a result of these search efforts, which are now complete, a total of

approximately 72,000 pages of records potentially responsive to plaintiff's request have been

located and forwarded to RIDS personnel. This enormous volume of potentially responsive

records is currently being reviewed by RIDS personnel in the Litigation Support Unit to

determine whether or not the submitted records are within the scope of plaintiff's request, as

defined in its FOIA request letters dated August 25, 2006, and September 1, 2006. This

procedure is referred to as "scoping."[12]

(39)    The responsive documents are being scanned into electronic format and will be

---

[12] Plaintiff's FOIA request dated August 25, 2006, which was sent to FBIHQ by plaintiff's
attorney by facsimile dated November 29, 2006 was not specifically addressed by the EC.
However, RIDS has been advised that the types of records concerning the IDW as listed in this
request letter would have been included in the records already provided to RIDS personnel in
WPU or records which were being located for forwarding to RIDS personnel in WPU.
Therefore, it was decided that another EC requesting further searches for the types of records
concerning the IDW listed in plaintiff's request letter dated August 25, 2006, would be an
unnecessary redundancy.

forwarded to the "perfected" case backlog for assignment to a FOIPA LAS for processing. Based on the page count of approximately 72,000 pages, plaintiff's request will be placed in the large queue of the "perfected" case backlog. As explained earlier, in order to ensure fairness to all requesters and to administer equitably the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis from within each of three queues according to sound administrative practices. Based on the date of this request – September 1, 2006 – there are approximately five requests, which total 35,801 pages, pending ahead of plaintiff's request in the large queue. The FBI anticipates that the earliest plaintiff's request will be assigned to a FOIPA Disclosure Unit for processing is in approximately three months, which is the estimated time for this request to rise to the top of the queue.[13] The FBI will be able to review and process approximately 800 pages every four weeks, and anticipates that it will require a total of approximately 68 months to review and process the responsive documents. Due to the volume and complexity of the material, which consists of a number of highly technical documents, as well as lengthy e-mail trails, the FBI will release documents on a rolling basis. As the processing of a significant number of documents is completed, the FBI will make releases approximately every four weeks until the production is complete, rather than delay the release until the entire production is ready.

(40)    The FBI takes its responsibilities with regard to the administration of the FOIA/Privacy Act program very seriously, and all reasonable efforts are being made to comply with the statutory deadlines. Regrettably, compliance with these deadlines is often not possible. However, as explained supra, the FBI has made tremendous strides in reducing its backlog over time. A reduction in pending requests has occurred even while the FBI continues to receive hundreds of new FOIA/Privacy Act requests. Nevertheless, the most equitable way to reduce the

---

[13] Once the FBI and/or DOJ grants a request for expedited processing, that request is moved to the head of the backlog queue. As a result, a request which has been granted expedition could conceivably jump ahead of plaintiff's request as would any perfected request with a date antecedent to that of plaintiff's request.

backlog and ensure that each request receives the attention it deserves is to process these requests based on the date of receipt according to sound administrative practices as explained above. It would be unfair to assign plaintiff's request for processing before other individuals whose requests were in the queue ahead of plaintiff. Each court order which requires that one request be given priority ahead of the others invariably works to the detriment of the other more patient requesters and encourages other requesters to seek relief in the courts, thereby undermining the FBI's attempt to manage the thousands of FOIA/Privacy Act requests it receives annually in a fair and consistent fashion.[14]

(41)    For the above reasons, the FBI submits this declaration in support of its request in support of a stay of proceedings for approximately 71 months, no later than February 28, 2013, in order to allow the FBI to complete the processing and release of those documents responsive to plaintiff's request.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through C attached hereto are true and correct copies.

Executed this _28th_ day of March, 2007.


DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

---

[14] Due to the extraordinarily large number of potentially responsive pages in this case, some preliminary scanning and scoping has begun by a LAS from the LSU, but the process remains essentially as described, respecting the "first in-first out" principle.

# Exhibit A

**Electronic Frontier Foundation**

1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
+1 202 797 9009 (tel)
+1 202 797 9066 (fax)

## FAX COVER SHEET

DATE: 9/1/06

TO: DAVID HARDY, FBI

Fax Number: (202) 324-3752

FROM: MARCIA HOFMANN

RE: FOIA REQUEST

Pages sent: 7 including cover page

COMMENTS:

NOTICE This fax is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure. If you are not the intended recipient or his or her agent, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and asked to please notify us immediately by telephone. Thank you.

PLEASE CALL IF THERE IS A PROBLEM



**Electronic Frontier Foundation**

September 1, 2006

**BY FACSIMILE — (202) 324-3752**

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue NW
Washington, DC 20535-0001

RE:     Freedom of Information Act Request

Dear Mr. Hardy:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,
and is submitted to the Federal Bureau of Investigation ("FBI") on behalf of the Electronic
Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for
Accountable Government ("FLAG") Project, which works to obtain government documents and
make them widely available to the public.

On August 30, 2006, the Washington Post published an article, attached hereto, concerning the
FBI's "Investigative Data Warehouse" ("IDW").[1] According to the article, the FBI described the
659 million-record database as "one of the most powerful data analysis tools available to law
enforcement and counterterrorism agents."

With respect to the data quality practices used to maintain the IDW, the article reported:

> Irrelevant information can be purged or restricted, and incorrect information is
> corrected, [Gurvais Grigg, acting director of the FBI's Foreign Terrorist Tracking
> Task Force] said. Willie T. Hulon, executive assistant director of the FBI's
> National Security Branch, said that generally information is not removed from the
> system unless there is "cause for removal."

> Every data source is reviewed by security, legal and technology staff members,
> and a privacy impact statement is created, Grigg said. The FBI conducts in-house
> auditing so that each query can be tracked, he said.

---

[1] Ellen Nakashima, "FBI Shows Off Counterterrorism Database," *Washington Post*, Aug. 30, 2006 at A06, *available*
*at* http://www.washingtonpost.com/wp-dyn/content/article/2006/08/29/AR2006082901520.html.

1875 Connecticut Ave., NW · Suite 650 · Washington, DC 20009
📞 202 797 9009    📠 202 797 9066    🌐 www.eff.org    ✉ information@eff.org

We seek disclosure of the following agency records (including, but not limited to, electronic records):

1. all records describing data expungement, restriction or correction procedures for the IDW;

2. all privacy impact statements created for the IDW; and

3. all results of audits conducted to ensure proper operation of the IDW.

### Request for News Media Fee Status

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a representative of the news media pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 38,858,298 hits in July 2006 — an average of 52,228 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes two blogs that highlight the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology, while miniLinks (http://www.eff.org/minilinks/) directs readers to other news articles and commentary on these issues. DeepLinks had 817,993 hits in July 2006; miniLinks received 436,043 hits during the same period.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Sept. 1, 2006).

[3] Id.

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

2

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon. com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking -des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded about 5,000 times from EFF's web site last month.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, the FBI determines whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the FBI's development and use of the IDW concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i).

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on the FBI's development and use of a large investigative database, as well as its functionality and the extent of its use.

Third, the requested material will "contribute to public understanding" of the nature and extent of the information contained in the IDW. 28 C.F.R. § 16.12(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the FBI's investigative activity, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the FBI's development and use of the IDW. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Little is publicly known about the IDW, so disclosure of this

3

information will help inform the public about the database and its potential impact on personal privacy.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Thank you for your consideration of this request. If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 12. As the FOIA provides, I will anticipate a determination on this request from your office within 20 working days.

Sincerely,

Marcia Hofmann
Staff Attorney

4

# washingtonpost.com

# FBI Shows Off Counterterrorism Database



Advertisement

By Ellen Nakashima
Washington Post Staff Writer
Wednesday, August 30, 2006; A06

The FBI has built a database with more than 659 million records -- including terrorist watch lists, intelligence cables and financial transactions -- culled from more than 50 FBI and other government agency sources. The system is one of the most powerful data analysis tools available to law enforcement and counterterrorism agents, FBI officials said yesterday.

The FBI demonstrated the database to reporters yesterday in part to address criticism that its technology was failing and outdated as the fifth anniversary of the Sept. 11, 2001, terrorist attacks nears.

Privacy advocates said the Investigative Data Warehouse, launched in January 2004, raises concerns about how long the government stores such information and about the right of citizens to know what records are kept and correct information that is wrong.

The data warehouse is an effort to "connect the dots" that the FBI was accused of missing in the months before the 2001 attacks, bureau officials said. About a quarter of the information comes from the FBI's records and criminal case files. The rest -- including suspicious financial activity reports, no-fly lists, and lost and stolen passport data -- comes from the Treasury, State and Homeland Security departments and the Federal Bureau of Prisons.

"That's where the real knowledge comes from . . . sharing information," said Gurvais Grigg, acting director of the FBI's Foreign Terrorist Tracking Task Force, who helped develop the system.

In a demonstration, Grigg sat at a computer and typed in the name "Mohammad Atta," one of the 19 hijackers in 2001. The system can handle variants of names and up to 29 variants on birth dates. He typed "flight training" in the query box and pulled up 250 articles relating to Atta.

The system, designed by Chiliad Inc. of Amherst, Mass., can be programmed to send alerts to agents on new information, Grigg said. Names, Social Security numbers and driver's license details can be linked and cross-matched across hundreds of millions of records.

No top secret information is in the system, officials said.

Grigg said that before 2002, it would take 32,222 hours to run 1,000 names and birth dates across 50 databases. Now agents can make such a search in 30 minutes or less, he said.

The 13,000 agents and analysts who use the system make an average 1 million queries a month, Grigg said.

The system does not reach into the databases themselves but mines copies that are updated regularly, he said.

Irrelevant information can be purged or restricted, and incorrect information is corrected, he said. Willie T. Hulon, executive assistant director of the FBI's National Security Branch, said that generally information is not removed from the system unless there is "cause for removal."

Every data source is reviewed by security, legal and technology staff members, and a privacy impact statement is created, Grigg said. The FBI conducts in-house auditing so that each query can be tracked, he said.

David Sobel, senior counsel of the Electronic Frontier Foundation, said the Federal Register has no record of the creation of such a system, a basic requirement of the Privacy Act. He also said the FBI's use of an internal privacy assessment undercuts the intent of the privacy law.

FBI officials said the database is in "full compliance" with the law.

Sobel said he learned under a Freedom of Information Act disclosure last week that the system includes 250 million airline passenger records, stored permanently.

"It appears to be the largest collection of personal data ever amassed by the federal government," he said. "When they develop the capability to cross-reference and data-mine all these previously separate sources of information, there are significant new privacy issues that need to be publicly debated."

Michael Morehart, chief of the FBI's Terrorist Financing Operations Section, has testified to Congress about some aspects of the system. He said that Treasury Department documents included in the database have helped counterterrorism investigations significantly.

© 2006 The Washington Post Company

Ads by Google

**Koppel on Discovery:**
The Price of Security. Let's all Discover Where to Draw the Line.
osc.discovery.com

**i2 Analyst's Workstation**
Data Mining, Crime Mapping, Reporting, Intelligence Analysis
www.i2inc.com

**Law Enforcement Software**
Specialized L.E. Programs Free Demo. Free 20-Day Trial
www.leadatatech.com

# Exhibit B



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535

September 21, 2006

MARCIA HOFMANN ESQ
ELECTRONIC FRONTIER FOUNDATION
SUITE 650
1875 CONNECTICUT AVENUE, NORTHWEST
WASHINGTON, DC 20009

Request No.: 1058805- 000
Subject: INVESTIGATIVE DATA
WAREHOUSE

Dear Requester:

☒ This acknowledges receipt of your Freedom of Information-Privacy Acts (FOIPA) request to the FBI. The FOIPA number listed above has been assigned to your request.

☐ For an accurate search of our records, please provide the complete name, alias, date and place of birth for the subject of your request. Any other specific data you could provide such as prior addresses, or employment information would also be helpful. If your subject is deceased, please include date and proof of death.

☐ To make sure information about you is not released to someone else, we require your notarized signature or, in place of a notarized signature, a declaration pursuant to Title 28, United States Code 1746. For your convenience, the reverse side of this letter contains a form which may be used for this purpose.

☐ If you want the FBI's Criminal Justice Information System (CJIS) to perform a search for your arrest record, please follow the enclosed instructions in Attorney General Order 556-73. You must submit fingerprint impressions so a comparison can be made with the records kept by CJIS. This is to make sure your information is not released to an unauthorized person.

☒ We are searching the indices to our central records system at FBI Headquarters for the information you requested, and will inform you of the results as soon as possible.

☐ Processing delays have been caused by the large number of requests received by the FOIPA. We will process your request(s) as soon as possible.

Your request has been assigned the number indicated above. Please use this number in all correspondence with us. Your patience is appreciated.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
    Dissemination Section
Records Management Division

# Exhibit C



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

August 25, 2006

**BY FACSIMILE — (202) 324-3752**

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue NW
Washington, DC  20535-0001

RE:    Freedom of Information Act Request

Dear Mr. Hardy:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5
U.S.C. § 552, and is submitted to the Federal Bureau of Investigation ("FBI") on behalf
of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's
FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain
government documents and make them widely available to the public.

We seek disclosure of the following agency records (including, but not limited to,
electronic records) concerning the FBI's "Investigative Data Warehouse" ("IDW"):

> 1) records listing, describing or discussing the categories of individuals
> covered by the IDW;
>
> 2) records listing, describing or discussing the categories of records in the
> IDW;
>
> 3) records listing, describing or discussing criteria for inclusion of
> information in the IDW;
>
> 4) records describing or discussing any FBI determination that the IDW is,
> or is not, subject to the requirements of the Privacy Act of 1974; and
>
> 5) records describing or discussing any FBI determination that the IDW is,
> or is not, subject to federal records retention requirements, including the
> filing of Standard Form (SF) 115, "Request for Records Disposition
> Authority."

David M. Hardy
August 25, 2006
Page two

To assist you in conducting a search for responsive records, we note that FBI Deputy
Assistant Director John E. Lewis stated, in a speech on March 14, 2005, that

> within the FBI's Counterterrorism Division, we operate an information
> system known as the Investigative Data Warehouse. The IDW provides
> our agents and analysts with instant access to photographs, biographical
> information, physical location information, and financial data for
> thousands of known and suspected terrorists. The database comprises
> more than 100 million pages of terrorism-related documents, and billions
> of structured records such as addresses and phone numbers. . . .

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF
qualifies as a representative of the news media pursuant to the FOIA and 28 C.F.R. §
16.11(b)(6).

EFF is a non-profit public interest organization that works "to protect and enhance our
core civil liberties in the digital age."[1] One of EFF's primary objectives is "to educate
the press, policymakers and the general public about online civil liberties."[2] To
accomplish this goal, EFF routinely and systematically disseminates information in
several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received
38,858,298 hits in July 2006 — an average of 52,228 per hour. The web site reports the
latest developments and contains in-depth information about a variety of civil liberties
and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The
EFFector currently has more than 77,000 subscribers. A complete archive of past
EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes two blogs that highlight the latest news from around the
Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy
developments in technology, while miniLinks (http://www.eff.org/minilinks/) directs

---

[1] Guidestar Basic Report, Electronic Frontier Foundation,
http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited July 5, 2006).
[2] Id.

David M. Hardy
August 25, 2006
Page three

readers to other news articles and commentary on these issues. DeepLinks had 817,993 hits in July 2006; miniLinks received 436,043 hits during the same period.[3]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon. com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/ linenoiseogg.xml. These podcasts were downloaded about 5,000 times from EFF's web site last month.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, the FBI determines whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

---

[3] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

David M. Hardy
August 25, 2006
Page four

First, the FBI's development and use of the IDW concerns "the operations or activities of
the government." 28 C.F.R. § 16.11(k)(2)(i).

Second, disclosure of the requested information will "contribute to an understanding of
government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation
marks omitted). EFF has requested information that will shed light on the FBI's
development and use of a large investigative database, as well as its functionality and the
extent of its use.

Third, the requested material will "contribute to public understanding" of the nature and
extent of the information contained in the IDW. 28 C.F.R. § 16.12(k)(2)(iii) (internal
quotation marks omitted). This information will contribute not only to EFF's
understanding of the FBI's investigative activity, but to the understanding of a reasonably
broad audience of persons interested in the subject. EFF will make the information it
obtains under the FOIA available to the public and the media through its web site and
newsletter, which highlight developments concerning privacy and civil liberties issues,
and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and
understanding of the FBI's development and use of the IDW. 28 C.F.R. § 16.11(k)(2)(iv)
(internal quotation marks omitted). Little is publicly known about the IDW, so disclosure
of this information will help inform the public about the database and its potential impact
on personal privacy.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in
the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3)
nonprofit organization, and will derive no commercial benefit from the information at
issue here.

Thank you for your consideration of this request. If you have any questions or concerns,
please do not hesitate to contact me at (202) 797-9009 x. 10. As the FOIA provides, I
will anticipate a determination on this request from your office within 20 working days.

Sincerely,

David Sobel (neg)

David L. Sobel
Senior Counsel