## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) ) ) ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. 06-cv-1773 (RBW) |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR OPEN AMERICA STAY

### INTRODUCTION

Defendant, United States Department of Justice, on behalf of the Federal Bureau of

Investigation ("FBI"), moves this Court for a stay of proceedings pursuant to 5 U.S.C.

§ 552(a)(6)(C), and Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C.

Cir. 1976). Plaintiff has submitted two requests to the FBI under the Freedom of Information Act

("FOIA") seeking "disclosure of records concerning the scope and privacy impact of the Federal

Bureau of Investigation's Investigative Data Warehouse, a huge database that holds hundreds of

millions of records containing personal information." (Compl. for Injunctive Relief ¶ 1).

Although the FBI is exercising due diligence in responding to plaintiff's FOIA requests,

exceptional circumstances prevent it from processing the requests within the statutory time limit.

Pursuant to 5 U.S.C. § 552(a)(6)(C), which provides for additional time under such

circumstances, defendant requests that the Court stay the proceedings until the FBI is able to

complete processing of the plaintiff's requests. In support of its motion, defendant FBI has

provided a sworn declaration from David M. Hardy, Section Chief of the Record/Information

Dissemination Section (RIDS), Records Management Division (RMD), of FBI Headquarters, (FBIHQ), which explains that based on the number of potentially responsive documents the FBI has located, the FBI requires a stay of approximately 71 months, or until February of 2013, to process plaintiff's FOIA requests and complete the release of responsive records. (See Declaration of David M. Hardy ("Hardy Decl."), attached as Exhibit 1). This estimate is based on the large number of documents identified as potentially responsive and includes three months for plaintiff's FOIA requests to rise to the top of the backlog queue for large requests and 68 months for processing.

The FBI anticipates that before processing begins, it will be able to significantly reduce the total time required to complete processing by eliminating a significant volume of documents that are not responsive to the plaintiff's requests and will not need to be processed. This review has not yet been completed, however, so it is not possible at present to estimate the potential savings in processing time. The FBI proposes to file a status report within 120 days of the entry of a stay, and at 120-day intervals thereafter, to update the Court and the plaintiff on the status of the plaintiff's requests and provide updated estimates of the time needed to complete processing.

The FBI acknowledges that it is asking the Court for a lengthy stay. However, the FBI's request meets the standards established under Open America, and a stay of 71 months is warranted by the facts of this case in light of the large number of potentially responsive documents and the FBI's existing backlog. The FBI is processing plaintiff's requests in accordance with established policies that allow for the equitable and orderly processing of FOIA requests on a first-in, first-out basis.  Although the FBI has a backlog of pending FOIA requests, it is making substantial efforts to reduce the backlog and has achieved significant reductions in backlog and processing time. Nevertheless, the volume of potentially responsive records in this

case, the large number of pending requests that predate plaintiff's request, and the limited

resources currently available to the FBI for the processing of FOIA requests constitute

exceptional circumstances necessitating a stay so that the FBI may complete its review of the

records.

**STATEMENT OF FACTS**

**A.      The FBI's FOIA Request Processing System**

**1.      Duties and Personnel Divisions**

The Record/Information Dissemination Section ("RIDS"), Records Management

Division ("RMD"), at FBI Headquarters ("FBIHQ") in Washington, D.C., has the collective

mission of effectively planning, developing, directing, and managing responses to requests for

access to FBI records and information pursuant to FOIA; Privacy Act; Executive Order 12958,

as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions;

and Presidential and Congressional directives. (Hardy Decl. ¶ 2.) RIDS also provides

prepublication review of material written by current or former FBI employees concerning FBI

matters as mandated by the FBI's employment agreement, executes the FBI's historic

declassification program, and assists in managing defense discovery efforts in large

counterterrorism criminal trials. (Id. ¶ 22.)

In recent years, FOIA management at FBIHQ has continuously reengineered the process

of responding to FOIA/Privacy Act requests in an effort to better serve the needs of requesters

who seek information from the FBI. (Id. ¶ 21.) In 2002, reorganization of various divisions at

FBIHQ resulted in the formation of the RMD, which now handles all FOIA/Privacy Act requests

through RIDS. (Id.)

RIDS currently employs approximately 200 personnel, most of whom are Legal

Administrative Specialists ("LAS"), and who are assigned among the 11 units within RIDS. (Id.
¶ 22.) RIDS employees intake, review, process, and release information in response to FOIA and
Privacy Act requests. (Id.) To accomplish this mission, RIDS consists of the following eleven
Units: one Service Request Unit ("SRU"), two Work Process Units ("WPU"), three
Classification Units ("CU"), four FOIPA Units ("Disclosure Units"),[1] and the Litigation Support
Unit ("LSU"). (Id.)

The SRU contains the Negotiation Team, which works with individuals whose requests
have generated a large volume of records to attempt to narrow the scope of responsive records
and facilitate more rapid response. (Id.) Since 1995, this team has been able to reduce the scope
of FOIA/Privacy Act requests by over 13 million pages. (Id.) The SRU has a RIDS Public
Information Official, who is responsible for assisting requesters with issues concerning their
requests. The Government Response Team ("GRT"), also a part of the SRU, provides timely
feedback to other federal agencies and other DOJ components with regard to referrals of
documents which are either FBI-originated or contain FBI-originated information. (Id.) Referred
documents are sent to the FBI for consultation or for direct response to the requester. (Id.)
Finally, the SRU handles administrative appeals and criminal discovery matters. (Id.)

The two WPUs are responsible for reviewing and sorting all correspondence and
incoming requests for information from the public, Congress, Presidential Libraries, foreign
governments, other federal and state agencies, and other FBI entities (i.e., FBI field offices and
Legal Attaches). (Id.) The WPUs conduct searches of the General Indices (described below) for
identifiable records, confirm responsive documents, stamp files for retention, address fee issues

---

[1] One of the four FOIPA Disclosure Units operates at an off-site location in Savannah,
Georgia. (Hardy Decl. ¶ 22 n.3.)

(other than fee waiver reviews), retrieve and forward files for scanning into the FOIPA

Document Processing System ("FDPS"), respond to status inquiries, and maintain requests prior

to their transfer to the Disclosure Units. (Id.)

The WPUs handle the various initial tasks required to "perfect" a FOIA/Privacy Act

request, including sending letters to acknowledge requests, advising a requester to provide

identifying data so that an accurate records search can be made or to submit a notarized signature

or Privacy Act waiver, and advising a requester when no responsive records are located. (Id.)

The WPUs also open new requests, assign FOIA/Privacy Act Request Numbers, and enter the

perfected requests into the FDPS tracking system. (Id.) The WPUs are responsible for preparing

perfected requests for transfer to the four Disclosure Units. (Id.) A request is considered

"perfected" when all administrative tasks have been completed and all responsive documents

have been scanned into FDPS. (Id.) Once a request has been perfected it is placed in the

"perfected backlog" for assignment to a FOIA Disclosure Unit for processing. (Id.)

To ensure fairness to all requesters and to equitably administer the large volume of

FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of

receipt on a first-in, first-out basis within one of three queues. (Id.) The FBI uses a three-queue

system as a way to fairly assign and process new requests. (Id.) The three-queue system went

into effect on July 10, 1997, replacing a prior system of only two queues (one for 100 pages or

less, the other for requests greater than 100 pages). (Id.) The three-queue system established

multi-track processing for requests, based on the amount of time and work involved in handling

a particular request. (Id.) The system nevertheless preserves the principle that, within the three

queues, requests are still assigned and processed on a first-in/first out basis. (Id.)

The placement of a request in one of the three queues depends on the total amount of

material responsive to that request: 500 pages or less ("small queue"), 501 to 2500 pages ("medium queue"), or more than 2500 pages ("large queue"). (Id.) This standard operating procedure, coupled with the FBI's first-in, first-out policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate only to a small number of documents. (Id.) As described above, individuals whose requests have been placed in the large queue are given the opportunity, through contact with the SRU's Negotiation Team, to reduce the scope of their requests and accelerate assignment of their requests by relocating them to a more advantageous queue. (Id.)

The three CUs are responsible for complying with the classification/declassification review of FBI records under Executive Order 12958, as amended, and for conducting mandatory declassification review consistent with Executive Order 12958, as amended. (Id.) The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, Office of Inspector General Reports, and other federal agency requests in order to determine whether such material should remain classified or be declassified. (Id.) In addition, the CUs review and prepare classified material for review by the Department of Justice Review Committee ("DRC").[2] (Id.)

The four FOIPA Disclosure Units perform the actual processing of records pursuant to the provisions of the FOIA and Privacy Act. (Id.) Processing involves a page-by-page, line-by-line review of the responsive documents to determine which, if any, FOIA and Privacy Act exemptions may apply. (Id.) This includes redaction of the exempt material and notation of the

---

[2] The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information. (Hardy Decl. ¶ 22 n.8.)

applicable exemptions in the margins of each page or preparation of deleted page information sheets when pages are withheld in their entirety, which is now done electronically in FDPS. (Id.) During the course of their review, the Disclosure Units consult with other government agencies for their determinations as to the releasability of other agencies' information contained within FBI records, or refer non-FBI documents to those originating agencies for processing and direct response to the requester. (Id.) The Disclosure Units ensure that FOIA and Privacy Act exemptions have been applied properly, no releasable material has been withheld, no material meriting protection has been released, all necessary classification reviews have been completed by transferring applicable cases to the CUs, and other government agency information or entire documents originating with other government agencies have been properly handled. (Id.)

The Litigation Support Unit ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel and Chief Division Counsels and Assistant Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. (Id.) The LSU coordinates the progress of the FBI's response to a particular FOIA/Privacy Act request as it progresses through the units described above, the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and the referral of documents to other DOJ components and government agencies. (Id.) The LSU prepares the administrative record, drafts both procedural and substantive declarations and court pleadings, codes documents processed by the Disclosure Units, and drafts detailed declarations justifying the assertion of all applicable FOIA/Privacy Act exemptions. (Id.)

To promote administrative efficiency, Legal Administrative Specialists (LASs) work on more than one request at a time. (Id. ¶ 23). Certain cases may require that the usual processing be

halted midstream. This can occur for a variety of reasons, including the resolution of a classification issue, the location of additional records, or consultation with other government agencies as to the nature and propriety of releasing certain information. (Id.) In the interest of efficiency, during this waiting period, the LAS may fully process other requests. (Id.) Large requests are often processed on parallel tracks with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS' resources. (Id.)

Consistent with standard administrative procedure, any records referred to the FBI from other DOJ components or other government agencies in response to a particular request are added to that pending FOIA/Privacy Act request. (Id. ¶ 24). This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. (Id.) Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. (Id.) By ensuring continuity in the processing of FOIA requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient, since the same issues presented by the referred records will already have been addressed by the LAS in processing the responsive FBI files. (Id.)

## 2. FBI Systems of Records

The Central Records System ("CRS") enables the FBI to maintain all information acquired in the course of fulfilling its mandated law enforcement responsibilities. (Id. ¶ 29.) The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. (Id.) The CRS is organized into a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may correspond to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). (Id.) Certain records in the CRS

are maintained at FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices. (Id.) While the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that are potentially responsive to FOIA/Privacy Act requests. (Id.) The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS"). (Id.)

On or about October 16, 1995, the ACS was implemented for all Field Offices, Legal Attaches, and FBIHQ in order to consolidate portions of the CRS that were previously automated. (Id. ¶ 30.) The ACS can be described as an internal computerized subsystem of the CRS. (Id.) Because the CRS cannot electronically query the case files for data, such as an individual's name or Social Security Number, the required information is duplicated and moved to the ACS so that it can be searched. (Id.) More than 105 million records from the CRS were converted from automated systems previously utilized by the FBI. (Id.) Automation did not change the CRS; instead, automation has facilitated more economical and expeditious access to records maintained in the CRS. (Id.)

The retrieval of data from the CRS is made possible through the ACS using the General Indices, which are arranged in alphabetical order. (Id. ¶ 31.) The entries in the General Indices fall into two categories: (a) a "main" entry or "main" file carries the name corresponding with a subject of a file contained in the CRS; and (b) "reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject. (Id.)  The General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject or individual, such as the Investigative Data Warehouse, the subject of the plaintiff's

FOIA requests. (Id. ¶ 34).

**B.      Plaintiff's FOIA Requests**

By letter dated September 1, 2006, the plaintiff submitted a FOIA request to the FBI

seeking information pertaining to the FBI's Investigative Data Warehouse, a "659 million-record

database" described as "one of the most powerful data analysis tools available to law

enforcement and counterterrorism [FBI] agents." (Id. ¶ 26). Specifically, the request sought

"agency records (including, but not limited to, electronic records)" concerning 1) "all records

describing data expungement, restriction or correction procedures for the IDW;" 2) "all privacy

impact statements created for the IDW;" and 3) "all results of audits conducted to ensure proper

operation of the IDW." (Id. ¶ 26 & Ex. A.) By letter dated September 21, 2006, FBIHQ

acknowledged receipt of plaintiff's FOIA request and notified plaintiff that the request had been

assigned FOIPA Request No. 1058805-000 and that a search was being conducted at FBIHQ.

(Id. ¶ 27 & Ex. B).

The plaintiff's complaint in this litigation stated that the plaintiff had submitted an earlier

request for records pertaining to the Investigative Data Warehouse by letter dated August 25,

2006. The FBI has no record of having received plaintiff's request on that date. However, on

November 29, 2006, the plaintiff provided a copy of the request to the FBI, and the FBI has

agreed to treat the request as if it had been received on the August 25, 2006, date. (See id. ¶ 25

n.11, ¶ 28 & Ex. C; see also Def.'s Suppl. Answer.) This request sought "the following agency

records (including, but not limited to, electronic records) concerning the FBI's 'Investigative

Data Warehouse' ('IDW'): 1) records listing, describing or discussing the categories of

individuals covered by the IDW; 2) records listing, describing, or discussing the categories of

records in the IDW; 3) records listing, describing or discussing criteria for inclusion of

information in the IDW; 4) records describing or discussing any FBI determination that the IDW is, or is not, subject to the requirements of the Privacy Act of 1974; and 5) records describing or discussing any FBI determination that the IDW is, or is not, subject to federal records retention requirements, including the filing of Standard Form (SF) 115, 'Request for Records Disposition Authority.'"

  In addition to initiating a standard search of records in the CRS, the FBI also conducted an individualized inquiry of the most logical offices at FBIHQ which could have potentially responsive records. (Hardy Decl. ¶ 37.) RIDS prepared and circulated an Electronic Communication ("EC") to those FBIHQ divisions and offices most likely to possess potentially responsive records requesting all personnel to conduct a thorough search of any documents in their possession, including unserialized copies and e-mails responsive to plaintiff's requests. (Id.)

  As a result of these search efforts, which are now complete, a total of approximately 72,000 pages potentially responsive to plaintiff's requests were located. (Id. ¶ 38.) RIDS personnel are currently reviewing this enormous volume of documents to determine which records are within the scope of the plaintiff's requests and which records are not. This process is known as "scoping."

  The 72,000 potentially responsive documents are being scanned into electronic format and will be forwarded to the perfected-case backlog for assignment to a FOIPA processing analyst. (Id. ¶ 39.) Based on the page count of approximately 72,000 pages, plaintiff's request is currently in the large queue of the perfected-case backlog. (Id.) As explained above, in order to ensure fairness to all requesters and to equitably administer the large volume of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a first-in,

in, first-out basis from within each of three queues. (Id.) Based on the date of plaintiff's request—September 1, 2006—there are approximately five (5) requests, which total 35,801 pages, pending ahead of plaintiff's request in the large queue. (Id.)

The FBI anticipates that the earliest plaintiff's request will be assigned to a Disclosure Unit for processing is in approximately three months, which is the estimated time for this request to rise to the top of the queue.[3] (Id. ¶ 39.) The FBI will be able to process approximately 800 pages every four (4) weeks, and therefore anticipates that it will require approximately 68 months for responsive documents to be processed and released to plaintiffs. (Id.) Due to the volume and complexity of the material, which consist of a number of highly technical documents as well as lengthy email trails, the FBI will release documents on a rolling basis, that is, as a significant number of the documents are processed, the FBI will make releases approximately every four (4) weeks until the production is complete, rather than delay the release until the entire production is ready. (Id.)

As noted above, the FBI anticipates that the current volume of 72,000 potentially responsive documents may be significantly reduced once the documents have been reviewed to isolate the documents that are within the scope of the plaintiff's requests. At that point the FBI will be able to provide the Court and the plaintiff with a revised estimate of the total time required to complete processing of the plaintiff's request. The FBI is prepared to update the Court and the plaintiff of the status of the request 120 days after issuance of the requested stay and at 120-day intervals thereafter.

---

[3] If, for example, in response to a later-filed request, the FBI and/or DOJ grants a request for expedited processing (or expedition is ordered by a court), that request is moved to the head of the backlog queue. (Hardy Decl. ¶ 39 n.14.) As a result, a request that has been granted expedition could conceivably jump ahead of plaintiff's request as would any perfected request with a date before that of the plaintiff's request. Id.

**C.     Facts Supporting an Open America Stay: The FBI's Increasing FOIA Workload, Steps Taken to Address Backlog and Processing Delays, and Competing Demands on FBI Resources**

The number of FOIA and Privacy Act requests received by the FBI has increased dramatically from the early 1980s. (Hardy Decl. ¶ 5.) The Freedom of Information and Privacy Acts ("FOIPA") Section [the predecessor to RIDS] began processing requests in 1975. (Id.) Initially overwhelmed by the number of requests, by 1981, the FBI had maintained a steady backlog of between 4,000 and 7,000 requests. (Id.) Then, beginning in 1985, the unavailability of additional employees and a steady, large stream of new requests increased the backlog substantially, until in 1996 there were in excess of 16,000 requests. (Id.) In 1996, the median time for a pending request was in excess of three years. (Id.)

In the past, the FBI repeatedly sought additional funding for the creation of new FOIPA positions. (Id. ¶ 6.) For example, Congress appropriated funds in the 1997 fiscal year budget providing for 129 additional employees, and in the 1998 fiscal year budget providing for 239 additional employees. (Id.) In 2002, RIDS moved to paperless processing through its FOIPA Document Processing System ("FDPS"). (Id.) The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. (Id.) RIDS is now using this system to process virtually all of its FOIA/Privacy Act requests. (Id.) The new process required the FBI to redistribute some of its FOIPA personnel to other sections within the RMD in order to support the scanning and archival services necessary for automated processing. (Id.) Despite an additional reduction of RIDS personnel following September 11, 2001, the new efficiencies stemming from FDPS allowed the FBI to make great strides in reducing its FOIA/Privacy Act backlog. (Id.) For example, the backlog of requests in RIDS in various stages of processing between December 31, 1996 and December 31, 2006,

dropped from 16,244 to 1,672. (Id.) The median processing time for a pending request dropped

from 1,160 days on December 31, 1996, to 156 days on December 31, 2006. (Id. )

    During 2006 there was an increase in requests, up from an average of 911 per month in

2005 to an average of 1,277 per month. (Id. ¶ 7.) Despite this increase, the FBI met or surpassed

its primary goal of reducing the time required to process requests. (Id.) In this regard, the median

time for processing small requests (less than 500 pages) decreased by 10%; the median time for

medium requests (501 pages to 2500 pages) decreased by 16%. (Id.) However, the median time

for the processing of large queue requests (over 2500 pages) increased by 22 %. (Id.) This

increase was due to a concerted effort to reduce the backlog of the older, larger cases. (Id.) This

effort resulted in the number of pending large queue requests decreasing from 122 to 51. (Id.)

RIDS has taken all possible steps—using available technologies—to aid in the streamlining and

reduction of the FOIA/Privacy Act backlog. (Id. ¶ 8.) These include the use of direct on-line

computer searches to locate responsive records, the use of forms that eliminate delays associated

with word processing, the formation of specific teams to target backlog issues, the development

of alternative methods to handle consultations with other government agencies, and the

formation of the RIDS FOIPA Litigation Services Unit ("LSU"), which handles all

FOIA/Privacy Act litigation. (Id.) RIDS has a FOIPA Process Board and an Information

Technology Change Management Board to improve existing processes, including the use of

information technology enhancements to the existing automated processing system. (Id.) These

boards provide a systematic methodology to implement continuous process improvement for the

future. (Id.)

    Two steps the FBI is taking to update its technology and facilities have the potential to

reduce dramatically the FBI FOIA/Privacy Act processing times: (a) development of the

electronic investigative case file (the Sentinel Project) and (b) establishment of an FBI Central

Records Complex. (Id. ¶ 9.) The Sentinel Project is an ongoing, multiyear project that will result

in the elimination of paper investigative case files. (Id.) With an embedded Records Management

Application ("RMA"), FBI employees will be able to search for and retrieve these records

electronically. (Id.) Concurrently, the FBI has begun the process of designing and building a

new, state-of-the art Central Records Complex ("CRC") in Frederick County, Virginia. (Id.) This

initiative will consolidate all closed FBI paper records from more than 265 different storage

locations to one central site. (Id.) When requested, paper records will be scanned and forwarded

electronically. (Id.) These initiatives will significantly improve RIDS's search and record

retrieval capabilities by increasing search accuracy, decreasing search time, reducing lost files

and missing serials, and eliminating the manual movement of files. (Id.) RIDS expects these

initiatives, after they are fully implemented, to reduce current processing times by 40 percent.

(Id.) Phase One of the Sentinel Program is scheduled to be launched in the spring of 2007. (Id.)

In 2006, RIDS completed its first phase of moving to an interim facility in Frederick County,

Virginia, to recruit and train new employees in anticipation of the construction of the CRC. (Id.)

While this move is essential to future FBI FOIA/Privacy Act operations, it has created

significant strains on the FBI's FOIA/Privacy Act resources. (Id.)

Although the decision regarding the exact location of the permanent CRC site in

Frederick County, Virginia, is still pending at the U.S. General Services Administration, the FBI

has begun the temporary relocation of RMD sections to interim sites in Frederick County,

Virginia, and will continue with a full relocation of its workforce once the permanent CRC is

built and ready for occupancy, sometime around the year 2010. (Id. ¶ 11.) The interim sites are

approximately 90 miles outside the Washington, D.C., metropolitan area. (Id.)

RIDS began relocation of its operations in February of 2006 by establishing an advance team to prepare for the eventual relocation of RIDS in incremental stages. (Id. ¶ 12.) In the summer of 2006, RIDS began the first phase of its relocation by reassigning five and one half of its ten unit functions to an interim site. (Id.) The reassigned sections were half of the Service Request Unit, and all of Work Process Unit One, Work Process Unit Two, FOIPA Unit One, FOIPA Unit Two, and Classification Unit Two. (Id.) To ensure continuing RIDS operations during the move, half of the Service Request Unit function and the functions of FOIPA Unit Three, Classification Unit One, Classification Unit Three, and the Litigation Support Unit remain at FBIHQ. Id. These FBIHQ units, with a total of 85 employees currently on board, consist of the most senior and experienced RIDS employees. (Id.)

As evidenced by the FBI's 2006 FOIA/Privacy Act statistics discussed above, RIDS is making every effort to minimize disruption to operations during this transition period. (Id. ¶ 13.) This has been made all the more challenging because many employees have decided not to transfer with their unit function, opting to retire or find other jobs rather than relocate to Frederick County, Virginia. (Id.) Unfortunately, many of these employees are among the most senior and experienced in their area of expertise. (Id.) Since RMD announced its off-site relocation plans, a total of 58 former RIDS employees have either resigned, retired, or found other jobs in the Washington, D.C., area, rather than relocate with their unit. (Id.) To date, a total of 64 RIDS employees from FBIHQ relocated with their unit to Frederick County, Virginia. (Id.)

To bring staffing levels back up, the FBI is engaged in aggressive and intense recruitment and hiring efforts in the Frederick County, Virginia, area. (Id. ¶ 14.) In response to several recent postings for new hires, RIDS selected 333 individuals for interviews in June and November of 2005 and in January, February, March, August, October, and December of 2006, collectively.

16

(Id.) Of the 333 selected for interviews, 82 candidates advised that they were no longer interested prior to the interview; of the remaining 251 candidates interviewed, 94 either declined the initial offer of conditional employment following their interview or were disqualified during their background investigation, 35 employees have come on board, and the remainder are still pending in the background process. (Id.) Past experience has shown that approximately 33% of those in FBI background investigations successfully complete the process. (Id.) With approximately 200 employees currently on the rolls, RIDS is 111 positions under its funded staffing level of 311 employees due to attrition and reasons attributable to the move. (Id.)

In addition, in light of the continuing resolution pursuant to which much of the federal government is operating, and which has resulted in a hiring freeze until further notice, RMD may not be able to hire any new support employees in the immediate future. (Id.) The new RIDS employees who have less than one year of experience are in various stages of professional development, but none are yet operating as experienced employees; it takes an average of three years to adequately train a new employee in the FOIA/PA process to be able to work independently in a productive, efficient, and effective manner. (Id.) Accordingly, RIDS has only a limited number of experienced employees processing FOIA/PA requests at this time. (Id.) Simultaneously with this reduction in personnel, RIDS has experienced a significant increase in its FOIA litigation workload, including several urgent and competing federal district court litigation deadlines that have impacted the FBI's ability to process recently located records. (Id. ¶¶ 10, 15.)

One of these litigation deadlines is in Gerstein v. CIA, et al., Civ. A. No. 06-4643 (N.D. Cal.), in which plaintiff seeks, inter alia, access to all documents related to criminal referrals submitted to the U.S. Department of Justice or the FBI since January 1, 2001, regarding

unauthorized disclosures of classified information to the press or public. (Hardy Decl. ¶ 16.) The

court has ordered the FBI to expedite plaintiff's request, which has resulted in the FBI's intense

search and identification of over 2,500 pages of potentially responsive records, with the search

still ongoing. (Id.) The FBI sought and received an additional 120 days from the original date of

January 5, 2007, initially ordered by the court to complete its review and processing of this

material. (Id.) The FBI must now review, process and release over 2,500 pages by April 27,

2007. (Id.)

In the largest FOIA litigation in the FBI's history, Rosenfeld v. U.S. Dep't of Justice, et

al., Civ. A. Nos. 90-3576 MHP, 85-1709 MHP and 85-2247 (N.D. Cal.), the FBI has been

ordered to conduct hand searches of its COINTELPRO files for numerous subjects and to open

13 new FOIPA requests on individual subjects. (Hardy Decl. ¶ 17.) In order to comply with these

demands, the FBI has again had to realign its personnel resources and has made a substantial

commitment of resources to address these court-ordered issues. (Id.)

In Hidalgo v. FBI, Civ. A. No. 06-CV-1513 (D.D.C.), the FBI had to review and process

over 3,000 pages of documents responsive to plaintiff's request for documents related to an

acknowledged FBI informant, and it had to complete the task by March 16, 2007. (Hardy Decl.

¶ 18.) Also, in Vampire Nation v. Department of Justice, et al., Civ. A. No. 06-CV-01950

(D.D.C.), and Electronic Frontier Foundation v. Department of Justice, et al. Civ. A. No. 06-CV-

1708 (D.D.C.), the FBI is requesting Open America stays from the respective courts in the next

several weeks. (Hardy Decl. ¶ 19.) If these requests are denied by the courts or the time

requested is substantially reduced, additional shifting of already strained employee resources

will become necessary. (Id.)

Finally, in the past, the backlog in RIDS has been exacerbated by the high volume of

administrative appeals which require review and response by the RIDS personnel. (<u>Id.</u> ¶ 20.)

RIDS personnel work closely with the staff of the U.S. Department of Justice, Office of

Information and Privacy ("OIP"), to review and assist with OIP's responses and determinations

of pending appeals. (<u>Id.</u>) During 2006, the FBI received a total of 1015 administrative appeals.

As of February 28, 2007, 520 administrative appeals were pending resolution. (<u>Id.</u>) While this

number does not represent an increase, the number of appeals remains another significant drain

on resources, because inevitably the time spent by RIDS personnel handling these appeals

reduces the amount of time for regular processing duties. (<u>Id.</u>)

## ARGUMENT

**A.      Legal Standard for a Stay of Proceedings**

An agency receiving a FOIA request generally must determine whether to comply with

the request within 20 working days. 5 U.S.C. § 552(a)(6)(A)(i). Once the initial twenty days has

passed without an agency determination on the request, the FOIA requester "shall be deemed to

have exhausted his administrative remedies," <u>id.</u> at § 552(a)(6)(C)(i), and the requestor can file

suit in federal court. The Court may, however, "allow the agency additional time to complete its

review of the records" upon a showing that "exceptional circumstances exist and that the agency

is exercising due diligence in responding to the request." <u>Id.</u> § 552(a)(6)(C)(i). This provision

"was designed and inserted specifically as a safety valve for [FOIA]." <u>Open America v.</u>

<u>Watergate Special Prosecution Force</u>, 547 F.2d 605, 610 (D.C. Cir. 1976).

Effective October 2, 1997, as part of the Electronic Freedom of Information Act

Amendments of 1996, Congress amended 5 U.S.C. § 552(a)(6)(C)(i) by adding the following

two subsections:

> (ii)      For purposes of [5 U.S.C. § 552(a)(6)(C)], the term "exceptional
> circumstances" does not include a delay that results from a predictable agency

workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii)      Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing the request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

See 5 U.S.C. § 552(a)(6)(C)(ii), (iii).[4]

The leading case construing § 552(a)(6)(C) is Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976). In that case, which involved a FOIA request directed to the FBI, the Court of Appeals for the D.C. Circuit held that an agency is entitled to additional time to process a FOIA request under § 552(a)(6)(C) when it:

is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

Id. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)).[5] See also Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination.").

_____

[4] The 1996 Amendments to FOIA upheld the decision in Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976), affirmed the proposition that stays should be granted to agencies faced with a large volume of FOIA requests, and clarified that even a "predictable agency workload of requests" constituted "exceptional circumstances" when an agency could demonstrate that it was making progress in reducing its backlog. See, e.g., H.R. Rep. No. 104-795, at 24, reprinted in 1996 U.S.C.C.A.N. 3448, 3467 (noting that the FOIA Amendments were "consistent" with the holding in Open America).

[5] At the time of the Open America decision, the D.C. Circuit found "exceptional circumstances" where the FBI had a backlog of "only" 5,137 requests.  See Open America, 547 F.2d at 609, 613.

"[E]xceptional circumstances" therefore include "any delays encountered in responding to a request as long as the agencies are making good-faith efforts and exercising due diligence in processing requests on a first-in, first out basis." Appleton v. FDA, 254 F. Supp. 2d 6, 8-9 (D.D.C. 2003). In addition, "exceptional circumstances" include delays encountered when an agency is "deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of . . . [5 U.S.C. § 552(a)(6)(A)], and when the agency can show that it is 'exercising due diligence'" in processing the requests. Edmonds v. FBI, 2002 WL 32539613 at *1 (D.D.C. Dec. 3, 2002) (quoting Open America, 547 F.2d at 616).[6] "It also has been recognized, based on . . . legislative history, that other circumstances in addition to FOIA request backlogs may be a basis for finding exceptional circumstances, including 'resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals.'" Ctr. for Pub. Integrity v. U.S. Dep't of State, 2006 WL 1073066 at *2 (D.D.C. 2006) (quoting Wilderness Soc'y v. U.S. Dep't of the Interior, 2005 WL 3276256 at *6 (D.D.C. 2005).

Thus, under D.C. Circuit law, exceptional circumstances have been construed to exist and a stay pursuant to FOIA and the Open America doctrine may be granted: "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency

---

[6] "Exceptional circumstances" permitting the granting of additional time do not include delays resulting from a "predictable workload" of FOIA requests, "unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

shows 'reasonable progress' in reducing its backlog of requests." <u>Williams v. FBI</u>, 2000 WL 1763680, *2 (D.D.C. 2000); <u>see also</u> <u>Summers v. Dep't of Justice</u>, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors).

Courts have frequently issued orders extending the time to respond to FOIA requests, including orders granting stays of several years in length or otherwise permitting agencies several years to process documents under exceptional circumstances. <u>See, e.g.</u>, <u>Piper v. U.S. Dep't of Justice</u>, 339 F. Supp. 2d 13, 16 (D.D.C. 2004) (discussing a stay of two years given to the FBI); <u>Appleton</u>, 254 F. Supp. 2d at 11 (granting FDA's motion for stay pending completion of search and production of documents); <u>Williams v. FBI</u>, 2000 WL 1763680, at *3 (giving the FBI until May 2, 2001, to review records requested prior to August 21, 1998); <u>Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice</u>, 102 F. Supp. 2d 6, 9 & n.1 (D.D.C. 2000) (discussing an order giving the FBI until June 8, 2000, to respond to a request dated July 15, 1997); <u>Edmond v. U.S. Attorney</u>, 959 F. Supp. 1, 4 (D.D.C. 1997) (giving the U.S. Attorney's Office until April 1, 1998, to respond to a request filed August 14, 1992); <u>Rabin v. U.S. Dep't of State</u>, 980 F. Supp. 116, 123-24 (E.D.N.Y. 1997) (granting motion for <u>Open America</u> stay and permitting Department of State over three years to process plaintiff's FOIA request); <u>Jimenez v. FBI</u>, 938 F. Supp. 21, 31 (D.D.C. 1996) (permitting the FBI a total of nearly five years from the date of plaintiff's FOIA request to respond to the request); <u>Ohaegbu v. FBI</u>, 936 F. Supp. 7, 8-9 (D.D.C. 1996) (granting request for stay and permitting July 1997 response to FOIA request submitted in July 1995).

As shown below, because the FBI can demonstrate both exceptional circumstances and due diligence in handling plaintiff's request, as well as reasonable progress in reducing its backlog, the Court should stay the proceedings until February 2013 to allow the FBI time to process plaintiff's request. As stated above, the FBI is hopeful that the time required to process

the plaintiff's request will be significantly reduced before processing begins. The FBI is prepared to submit a status report within 120 days of the entry of the stay, and at 120-day intervals thereafter, to advise the Court and the plaintiff of the status of the plaintiff's request and provide any available revised estimates of the time required to complete processing.

**B.      The FBI is Entitled to an Open America Stay**

   **1.      The FBI is Operating Under Exceptional Circumstances**

During 2006 there was an increase in FOIA requests, up from an average of 911 per month in 2005 to an average of 1,277 per month. (Hardy Decl. ¶ 7.) As of December 31, 2006, the backlog of requests in RIDS in various stages of processing stood at 1,672. (Id. ¶ 6.) The FBI has taken all possible steps to aid in the streamlining and reduction of the FOIA/Privacy Act backlog, including development of the electronic investigative case file (the Sentinel Project), and the establishment of an FBI Central Records Complex in Frederick, Virginia. (Id. ¶¶ 8-9.) The FBI expects these initiatives, after they are fully implemented, to reduce processing times by 40 percent. (Id. ¶ 9.) Unfortunately, however, in the short term, there has been an impact on available FBI FOIA processing resources.

While RIDS has transferred more than half of its unit functions to an interim site in Frederick, Virginia, many of the employees in those units, who are among the most senior and experienced in their areas of expertise, have opted to retire or find other jobs rather than relocate. (Id. ¶ 13.) Since RMD announced its off-site relocation plans, a total of 58 former RIDS employees have either resigned, retired, or found other jobs in the Washington, D.C., area, rather than relocate with their unit. (Id.)

To bring staffing levels back up, the FBI is engaged in aggressive and intense recruitment and hiring efforts in the Frederick County, Virginia area. (Id. ¶ 14.)  Nonetheless, RIDS has yet

to fill many of the available positions. In addition, the new RIDS employees who have less than

one year of experience are in various stages of professional development, but none are yet

operating as experienced employees; it takes an average of three years to adequately train a new

employee in the FOIA/PA process to be able to work independently in a productive, efficient,

and effective manner. (Id.) Accordingly, RIDS has only a limited number of experienced

employees processing FOIA/PA requests at this time. (Id.) In fact, with approximately 200

employees currently on the rolls, RIDS is 111 positions under its funded staffing level of 311

employees due to attrition and reasons attributable to the move to Frederick, Virginia. (Id.)

Moreover, the continuing resolution under which the federal government is currently operating

has also resulted in a hiring freeze until further notice. (Id.)

Simultaneously with this reduction in personnel, RIDS has experienced a significant

increase in its FOIA litigation workload, including several urgent and competing federal district

court litigation deadlines that have impacted the FBI's ability to process recently located records.

(Id. ¶¶ 10, 15.) As described above, RIDS has been ordered by courts in Gerstein v. CIA, et al.,

Civ. A. No. 06-4643 (N.D. Cal.), Rosenfeld v. U.S. Department of Justice, et al., Civ. A. Nos.

90-3576 MHP, 85-1709 MHP and 85-2247 (N.D. Cal.), and Hidalgo v. FBI, Civ. A. No. 06-CV-

1513 (D.D.C.), to process and produce documents in recent or coming months. (Hardy Decl.

¶¶ 16-18.) These cases take resources away from other pending FOIA requests.

Finally, the backlog in RIDS is exacerbated by the high volume of administrative appeals

that require review and response by the RIDS personnel. (Id. ¶ 20.) During 2006, the FBI

received a total of 1015 administrative appeals. As of February 28, 2007, 520 administrative

appeals were pending resolution. (Id.) While this number does not represent an increase, the

number of appeals remains another significant drain on resources, because inevitably the time

spent by RIDS personnel handling these appeals reduces the amount of time for regular processing duties. (Id.)

For all of these reasons, the FBI faces "exceptional circumstances" in reducing its FOIA backlog warranting an Open America stay. Other courts have granted Open America stays several years in duration when warranted under the circumstances. See, e.g., Edmonds, 2002 WL 32539613, at *2 (FOIA staff's time spent on "administrative appeals, litigation and large projects" contributed to finding of exceptional circumstances); Jimenez, 938 F. Supp. at 31 (four-year stay granted to process 700 pages); Haddon v. Freeh, 31 F. Supp. 2d 16, 19 (D.D.C. 1998) (noting that court had granted Open America stay until January 1998 on request submitted to FBI nearly four years before); Guzzino v. FBI, 1997 WL 22886, *2 (D.D.C. 1997) (granting stay of more than four years because "[t]he FBI has shown that even though it is exercising due diligence, because of inadequate resources it is unable to respond to plaintiff's request within the statutory [] limit."); Schweihs v. FBI, 933 F. Supp. 719, 721-22 (N.D. Ill. 1996) (finding exceptional circumstances justified over four years from date of request to process plaintiff's FOIA request); Cecola v. FBI, 1995 WL 549066, at *2 (N.D. Ill. 1995) (finding that exceptional circumstances justified more than six years from date of request to process 1500 pages and dismissing action without prejudice).

**2.      The FBI is Exercising Due Diligence in Processing Plaintiff's Requests and is Making Reasonable Progress in Reducing its Backlog of Pending Requests**

In addition to having demonstrated "exceptional circumstances," the FBI is exercising due diligence in responding to plaintiff's FOIA request and has made reasonable progress in reducing its backlog despite the tremendous burdens on its resources.

Each year the FBI receives thousands of FOIPA requests. (Hardy Decl. ¶¶ 5-7.) Due to this continual influx, and to the appeals and litigation arising from it, the FBI's backlog jumped

from its 1981 level of between 4,000 and 7,000 requests to a high of 16,000 requests in 1996. (Id. ¶ 5.) In 1996, the median time for a pending request was in excess of three years. (Id.) The FBI, however, has demonstrated its commitment to reducing the backlog of information requests that confront it and has achieved significant reductions since 1996. Moreover, the FBI has taken all available steps to implement even greater reductions and to achieve a more streamlined processing of FOIA requests in the future.

In the past, the FBI repeatedly sought additional funding for the creation of new FOIPA positions. (Id. ¶ 6.) For example, Congress appropriated funds in the 1997 fiscal year budget providing for 129 additional employees, and in the 1998 fiscal year budget providing for 239 additional employees. (Id.) In 2002, RIDS moved to paperless processing through its FOIPA Document Processing System ("FDPS"). (Id.) The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually. (Id.) RIDS is now using this system to process virtually all of its FOIA/Privacy Act requests. (Id.) The new process required the FBI to redistribute some of its FOIPA personnel to other sections within the RMD in order to support the scanning and archival services necessary for automated processing. (Id.) Despite an additional reduction of RIDS personnel following September 11, 2001, the new efficiencies stemming from FDPS allowed the FBI to make great strides in reducing its FOIA/Privacy Act backlog. (Id.) For example, the backlog of requests in RIDS in various stages of processing between December 31, 1996 and December 31, 2006, dropped from 16,244 to 1,672, resulting in a reduction of 14,572 requests. (Id.) The median processing time for a pending request dropped from 1,160 days on December 31, 1996, to 156 days on December 31, 2006. (Id.)

During 2006 there was an increase in requests, up from an average of 911 per month in

2005 to an average of 1,277 per month. (Id. ¶ 7.) Despite this increase, the FBI met or surpassed

its primary goal of reducing the time required to process requests. (Id.) In this regard, the median

time for processing small requests (less than 500 pages) decreased by 10%; the median time for

medium requests (501 pages -2500 pages) decreased by 16%. (Id.) However, the median time for

the processing of large queue requests (over 2500 pages) increased by 22 %. (Id.) This increase

was due to a concerted effort to reduce the backlog of the older, larger cases. (Id.) This effort,

however, resulted in the number of pending large queue requests decreasing from 122 to 51. (Id.)

As described above, the FBI has taken additional steps to further reduce the backlog and

reduce processing time, including development of the electronic investigative case file (the

Sentinel Project) and the establishment of an FBI Central Records Complex in Frederick,

Virginia. (Id. ¶¶ 8-9.) Although the implementation stage of these projects has strained FBI

resources, ultimately the FBI expects these initiatives, after they are fully implemented, to reduce

current processing times by 40%. (Id. ¶ 9); see Pray v. FBI, 1995 WL 764149, *2 (S.D.N.Y.

1995) (considering improved technology as a factor in establishing due diligence).

Accordingly, the FBI has demonstrated that it has made reasonable progress in reducing

its backlog, despite the tremendous burdens on its resources. Indeed, the reduction in the backlog

of requests from 16,244 on December 31, 1996, to 1,672 as of December 31, 2006, as well as the

drop in median processing time for a pending request from 1,160 days in December of 2006 to

156 days as of December 2006, provide concrete evidence of "reasonable progress" for purposes

of § 552(a)(6)(C)(ii).

Moreover, the FOIPA Section's current three-queue, first-in, first-out system is an

improvement on the two-track, first-in, first-out system the D.C. Circuit expressly recognized as

supporting the due diligence requirement. See Open America, 547 F.2d at 616. As explained

above, the move to a three-tiered system has greatly increased the efficiency and fairness with which the FBI processes the thousands of FOIA requests it receives each year.

    The FBI has likewise exercised due diligence in responding to plaintiff's FOIA request. The FBI has identified approximately 72,000 pages of documents potentially responsive to plaintiff's request. (Id. ¶ 38.) The FBI is in the process of scanning the documents and will place plaintiff's request, pursuant to standard procedures, in the large queue of the perfected-case backlog, where it will be reviewed on a first-in, first-out basis. (Id. ¶ 39.) Given the volume of potentially responsive documents, and the fact that processing involves a page-by-page, line-by-line review of the responsive documents to determine what, if any, FOIA and/or Privacy Act exemptions may apply, it is not surprising that it will take the FBI months to process these documents. (Id. ¶ 22.) See, e.g., Jimenez, 938 F. Supp. at 24, 31-32 (issuing Open America stay until March 2000, and thereby permitting a total of more than five years from the date of the request, for processing of a request that produced an estimated 700 pages of responsive records); Ohaegbu, 936 F. Supp. at 8 (granting stay until July 1997, and thereby permitting more than three years from the date of the request, to permit FBI to process 175 pages); Cecola v. FBI, 1995 WL 549066, at *1-2 (dismissing case without prejudice to permit FBI until November 1999 to complete processing of over 1500 pages responsive to a request filed in July 1993); Fox v. U.S. Dep't of Justice, 1994 WL 923072 (C.D. Cal. 1994) (granting FBI motion for stay until 1999 to process 300 pages of documents responsive to a request filed in July 1993).[7] As noted above, the FBI is hopeful that the expected time required to complete processing will be significantly reduced once the potentially responsive documents have been reviewed to

---

[7] In these prior cases, the courts granted Open America stays lasting for several years to permit the FBI to process hundreds of pages of documents. The present case, by contrast, involves a request that requires the review of many times that amount of material.

determine which documents fall within the scope of the plaintiff's requests. The FBI is prepared to provide periodic status reports, beginning 120 days after the date of the issuance of a stay, to keep the Court and the plaintiff apprised of the FBI's progress in processing the plaintiff's requests and provide any revisions to the expected time required to complete processing.

Thus, because the FBI is "making a good faith effort and exercising due diligence in processing [plaintiff's] requests on a first-in first-out basis," see Kuffel v. U.S. Bureau of Prisons, 882 F. Supp. 1116, 1127 (D.D.C. 1995), its request for a stay should be granted. See also Rabin, 980 F. Supp. at 123 (finding that the "defendant State Department has shown the . . . 'due diligence' that courts have required . . . The Department presently faces an overwhelming backlog of requests for information, processes them in the approximate order received unless there is an urgent need for the information and appears to be attempting to comply with requests."); Lisee v. CIA, 741 F. Supp. 988, 989 (D.D.C. 1990) (holding that agencies' processing of FOIA requests on a first-in, first-out basis satisfied the "exceptional circumstance" and "due diligence" requirements for stay).

**<u>CONCLUSION</u>**

In view of the foregoing, defendant respectfully requests that the Court stay the pending proceeding for 71 months, or until February 28, 2013, provided that within 120 days of the date of the order, and at 120-day intervals thereafter, the defendant will advise the Court and the plaintiff in writing of the current status of the plaintiff's request and any revised estimates of the total time required to complete processing of the plaintiff's request.

Dated: April 2, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

/s/ JAMES C. LUH
JAMES C. LUH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorneys for Defendant