**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-1773-RBW |
| | ) | |
| **DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR *OPEN AMERICA* STAY**

Plaintiff Electronic Frontier Foundation ("EFF") initiated this action to challenge the

failure of the Federal Bureau of Investigation ("FBI") to timely process two requests EFF

submitted under the Freedom of Information Act ("FOIA"). EFF's requests sought the

disclosure of information concerning the FBI's Investigative Data Warehouse, a huge database

that contains hundreds of millions of records containing personal information. Notwithstanding

the significant public interest in the prompt disclosure of the requested information, defendant

Department of Justice ("DOJ") has moved for a stay of proceedings for *71 months* – until

February 2013 – to allow the FBI to complete its processing of the FOIA requests. For the

reasons set forth below, plaintiff opposes the government's excessive request and urges the Court

to direct the Bureau to expeditiously respond to EFF's requests.

**Background**

**I.  The FBI's Investigative Data Warehouse**

Following the terrorist attacks of September 11, 2001, the FBI began development of the

Investigative Data Warehouse ("IDW") "to provide counterterrorism investigators and analysts

with quick, easy access to the full breadth of information relating to terrorism." Federal Bureau of Investigation, Report to the National Commission on Terrorist Attacks upon the United States: The FBI's Counterterrorism Program Since September 2001 (April 14, 2004), at 53. The FBI's goal is to include in the IDW "all data that can legally be stored together." *Id.* at 54; Complaint ¶ 5; Answer ¶ 5. The IDW provides FBI agents and analysts with "instant access to photographs, biographical information, physical location information, and financial data for thousands of known and suspected terrorists." Remarks Prepared for Delivery by John E. Lewis, Deputy Assistant FBI Director, 4th Annual International Conference on Public Safety: Technology and Counterterrorism Initiatives and Partnerships, San Francisco, California (March 14, 2005). According to Mr. Lewis, as of March 2005, "[t]he database comprise[d] more than 100 million pages of terrorism-related documents, and billions of structured records such as addresses and phone numbers." *Id.*; Complaint ¶ 6; Answer ¶ 6.

The amount of information contained in the IDW appears to be growing at a tremendous rate. In May 2006, little more than a year after Mr. Lewis quantified the contents of the IDW, FBI Director Robert S. Mueller, III testified to Congress that the "IDW now contains over 560 million FBI and other agency documents." Statement of Robert S. Mueller, III, Director, Federal Bureau of Investigation, Before the Senate Committee on the Judiciary (May 2, 2006). According to Mr. Mueller, "Nearly 12,000 users can access [the IDW] via the FBI's classified network from any FBI terminal throughout the globe. And, nearly 30 percent of the user accounts are provided to task force members from other local, state, and federal agencies." *Id.*; Complaint ¶ 7; Answer ¶ 7.

To date, the FBI has not published, with respect to the IDW, a "notice of the existence and character of the system of records," under the provisions of the Privacy Act of 1974, 5

U.S.C. § 552a(e)(4).  Nor has the Bureau filed a Standard Form (SF) 115, "Request for Records Disposition Authority," nor made any other submission to the Archivist of the United States concerning the IDW under the provisions of 44 U.S.C. § 3303.  Furthermore, the FBI has not made publicly available, with respect to the IDW, a "privacy impact statement" under the provisions of the E-Government Act of 2002, P.L. 107-347.  Complaint ¶¶ 8-10; Answer ¶¶ 8-10.

## II.  **Plaintiff's FOIA Requests and the FBI's Failure to Respond**

By letter sent by facsimile to the FBI on August 25, 2006, plaintiff requested under the FOIA agency records concerning the IDW.  Specifically, plaintiff requested:

1) records listing, describing or discussing the categories of individuals covered by the IDW;

2) records listing, describing or discussing the categories of records in the IDW;

3) records listing, describing or discussing criteria for inclusion of information in the IDW;

4) records describing or discussing any FBI determination that the IDW is, or is not, subject to the requirements of the Privacy Act of 1974; and

5) records describing or discussing any FBI determination that the IDW is, or is not, subject to federal records retention requirements, including the filing of Standard Form (SF) 115, "Request for Records Disposition Authority."

Exhibit C (attached to Declaration of David M. Hardy ("Hardy Decl.").

By letter sent by facsimile to the FBI on September 1, 2006, plaintiff requested under the FOIA additional agency records concerning the IDW.  Specifically, plaintiff requested:

1) records describing data expungement, restriction or correction procedures for the IDW;

2) privacy impact statements created for the IDW; and

3) results of audits conducted to ensure proper operation of the IDW.

In support of its FOIA request, plaintiff noted that the *Washington Post* had published an article

concerning the IDW on August 30, 2006,  and that the article reported as follows:

> Irrelevant information [in the IDW] can be purged or restricted, and incorrect
> information is corrected, [Gurvais Grigg, acting director of the FBI's Foreign
> Terrorist Tracking Task Force] said.  Willie T. Hulon, executive assistant director
> of the FBI's National Security Branch, said that generally information is not
> removed from the system unless there is "cause for removal."
>
> Every data source is reviewed by security, legal and technology staff members,
> and a privacy impact statement is created, Grigg said.  The FBI conducts in-house
> auditing so that each query can be tracked, he said.

Exhibit A, attached to Hardy Decl.

After the Bureau failed to respond to plaintiff's requests within the 20-working-day

period required by the FOIA, 5 U.S.C. § 552(a)(6)(A), plaintiff filed this lawsuit on October 17,

2006.

### III.    The Controversy Surrounding the FBI's Abuse of National Security Letter Powers and Plaintiff's Request for Expedited Processing of its FOIA Requests

On March 9, 2007, defendant DOJ's Inspector General issued a report documenting

numerous instances of the FBI's "improper or illegal use" of so-called National Security Letter

("NSL") authorities granted to the Bureau under the USA Patriot Act, Pub. L. No. 107-56, 115

Stat. 272 (2001).  Specifically, the Inspector General "found that the FBI used NSLs in violation

of applicable NSL statutes, Attorney General Guidelines, and internal FBI policies."  U.S.

Department of Justice, Office of the Inspector General, "A Review of the Federal Bureau of

Investigation's Use of National Security Letters" (March 2007), at xlvii.  Of particular relevance

to the FOIA requests at issue here, the Inspector General revealed that "NSL data is periodically

downloaded . . . into the FBI's Investigative Data Warehouse (IDW), a centralized repository for

intelligence and investigative data with advanced search capabilities."  *Id.* at 30.

4

By letter to defendant DOJ's Director of Public Affairs dated April 6, 2007, EFF formally requested that the processing of its pending FOIA requests for information concerning the IDW be expedited.  Exhibit 1 (attached hereto).  EFF asserted that its pending requests meet the criteria for expedited processing under applicable DOJ regulations, as they concern "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 CFR § 16.5(d)(1)(iv).[1]  Plaintiff's letter noted that the Director of Public Affairs had recently concluded that another request EFF submitted to the FBI, concerning the Bureau's use of NSLs, warranted expedited processing on this ground.  Plaintiff incorporated by reference EFF's earlier letter (dated March 12, 2007) which established that there was "widespread and exceptional media interest" in the FBI's abuse of NSL authority, and that the abuses raised "possible questions about the government's integrity which affect public confidence."  *Id.*; *see* Exhibit 2 (attached hereto).

In its letter of April 6, 2007, plaintiff underscored the Inspector General's finding that personal information obtained through the issuance of NSLs was incorporated into the IDW, and noted that "[t]he Bureau's continuing retention in the IDW of the personal data improperly or illegally obtained through abuses of the NSL process is obviously central to the undisputed questions about 'integrity which affect public confidence.'"  Exhibit 1 at 1.  Plaintiff further noted that during the Senate Judiciary Committee's hearing on the issue on March 21, Sen. Feingold had the following exchange with the Inspector General:

> Sen. Feingold:  In your October 2006 memo to the attorney general on the Justice Department's top management and performance challenges for fiscal year 2006, you caution that the Patriot Act granted the FBI broad new authorities to collect information, including the authority, quote, "To review and store information

---

[1] Pursuant to DOJ's regulations, requests for expedited processing based upon the "widespread and exceptional media interest" standard must be submitted to the Director of Public Affairs.  28 CFR § 16.5(d)(2).

about American citizens and others in the United States about whom the FBI has no individualized suspicion of illegal activity," unquote.

You cautioned nearly six months ago that the department and the FBI need to be particularly mindful about the potential for abuse of these types of powers.

First, I want to establish some basic facts alluded to in your memo. Under the existing NSL statutes, it is possible to obtain information, including full credit reports, about people who are entirely innocent of any wrongdoing. Isn't that correct?

Mr. Fine: Well, it is possible, yes, as a result of the investigation there's no finding of anything and that they are innocent. Yes.

Sen. Feingold: And the FBI's policy is that it will retain all information obtained via NSLs indefinitely, often in databases like the Investigative Data Warehouse that are available to thousands of investigators. Is that correct?

Mr. Fine: Yes.

Sen. Feingold: Now, with regard to your caution about the potential for abuse of these powers, DOJ responded in November 2006 that the FBI agrees and that it is, quote, "aggressively vigilant in guarding against any abuse," unquote.

Would you agree with that statement, that the FBI has been aggressively vigilant in guarding against abuses?

Mr. Fine: I would agree that the FBI was not aggressively vigilant in terms of guarding against the problems we found, yes.

*Id*. at 2.

Plaintiff noted that DOJ had itself acknowledged that serious questions were raised by the

Inspector General's revelations:

Indeed, the Department has recognized that the questions surrounding the retention of NSL data in the IDW are serious and require further examination. In a "Fact Sheet" issued on March 20, the Department announced "new oversight of the use and retention of NSL-derived information" and the creation of a "working group" to "examine how NSL-derived information is used and retained by the FBI." Fact Sheet: Department Of Justice Corrective Actions on the FBI's Use of National Security Letters (March 20, 2007).

In summary, it is clear that recent events warrant the expedited processing of EFF's requests for information concerning the policies and procedures governing the inclusion and use of information in the Investigative Data Warehouse.

*Id*. at 2-3.

To date, the Director of Public Affairs has not responded to EFF's request to expedite the processing of the FOIA requests at issue here.[2]

## Argument

### I.  **Plaintiff's FOIA Requests are Entitled to Expeditious Handling**

In requesting an extraordinary stay of 71 months, defendant DOJ seeks to rely upon the D.C. Circuit's decision in *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), which recognized that an agency may be granted a stay of proceedings

[when it] is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of [the FOIA], and when the agency can show that it "is exercising due diligence" in processing the requests.

*Id*. at 616 (quoting 5 U.S.C. § 552(a)(6)(C)).  The court of appeals also recognized, however, that requests should be given priority – and processed more quickly – "where exceptional need or urgency is shown."  *Id*.  Such requests should *not* be handled on the standard "first-in, first-out basis," but instead should be expedited:

We believe that Congress intended for a district court to require an agency to give priority to a request for information if some exceptional need or urgency attached to the request justified putting it ahead of all other requests received by the same agency prior thereto.

*Id*. at 615.

---

[2] The agency must notify a requester of its determination on a request for expedited processing within 10 days after receipt of the request. 5 U.S.C. § 552(a)(6)(E)(ii)(I); 28 CFR § 16.5(d)(4). With respect to plaintiff's April 6, 2006 request, the 10-day time limit expired on April 16, 2007.

Congress codified *Open America*'s recognition of a right to expedited processing in the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, § 8, 110 Stat. 3048, requiring agencies to promulgate regulations providing for expedition "in cases in which the person requesting the records demonstrates a compelling need; and *in other cases determined by the agency*." 5 U.S.C. § 552(a)(6)(E)(i) (emphasis added). Pursuant to that directive, DOJ's regulations provide for expedition, *inter alia*, under the "exceptional media interest" standard that plaintiff relies upon here. *See* 28 CFR § 16.5(d).[3]  The courts are empowered to review agency denials of requests for expedition, as well as an agency's failure to timely respond to such a request. 5 U.S.C. § 552(a)(6)(E)(iii); *American Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 28 (D.D.C. 2004).

In support of its expedition request, plaintiff made the following showing before the agency:

- According to a search of the Lexis-Nexis "News, Most Recent 90 Days" database, more than 125 articles containing the terms "FBI" and "National Security Letters" appeared in the first three days after the Inspector General's report was released. A search of Google News using the same terms indicates that 1,235 online articles appeared during the same period. Exhibit 2 (attached hereto).

- Further demonstrating that there has been "widespread and exceptional media interest" in the issue, FBI Director Mueller convened a press conference to answer questions about the IG's report less than two hours after it was released. *See* http://www.fbi.gov/pressrel/pressrel07/nsl_transcript030907.htm. In addition, the FBI's homepage featured a link to the Bureau's "response to the DOJ Inspector General's report on the use of National Security Letters and our answers to questions about their use and investigative value." *Id*.

---

[3] This standard for expedited processing was first adopted by the Department of Justice in 1994. Memorandum from United States Dep't of Justice, Office of Public Affairs (Feb. 3, 1994); Department of Justice, FOIA Update, Vol. XV, No. 2, 1994, http://www.usdoj.gov/oip/foia_updates/Vol_XV_2/page1.htm. *See also*, *Electronic Privacy Information Center v. Dep't of Justice*, 865 F. Supp. 1 (D.D.C. 1994).

- It is clear that "there exist possible questions about the government's integrity which affect public confidence." Such questions are exemplified in the following exchange at Director Mueller's press conference:

    Question: Director, you talked about how critically important these letters are to the mission of the FBI. And we also know that the FBI's allowed to do this without seeking a court order for the information. Is part of your frustration that this is about trust; that Congress gives you this authority to go out and do this, (inaudible) in dealing with these issues?

    Director Mueller: Well, I think Congress and the American people should have a lot of trust in the FBI. Occasionally, there are areas where we need to admit mistakes that we've made – this is one of them; areas where we should've done a better job – this is one of them. And I think Congress and ourselves should both trust but also verify.

    *Id.*

- Similarly, in remarks made shortly after the release of the IG report, the Attorney General acknowledged that "we must act quickly and decisively to restore the public's confidence." Prepared Remarks of Attorney General Alberto R. Gonzales at the International Association of Privacy Professionals Privacy Summit Washington, D.C., March 9, 2007 (available at http://www.usdoj.gov/ ag/speeches/2007/ag_speech_070309.html). *Id.*

- Editorials in the country's leading newspapers raised questions about "integrity" and "public confidence." *See, e.g.*, The Washington Post, "Abuse of Authority; The FBI's gross misuse of a counterterrorism device," March 11, 2007, p. B6 ("The report depicts an FBI cavalierly using its expanded power to issue 'national security letters' without adequate oversight or justification."); The New York Times, "The Failed Attorney General," March 11, 2007, p. 13, Section 4 ("[The] inspector general exposed the way the Federal Bureau of Investigation has been abusing yet another unnecessary new power . . ."). *Id.*

- The Bureau's continuing retention in the IDW of the personal data improperly or illegally obtained through abuses of the NSL process is obviously central to the undisputed questions about "integrity which affect public confidence." During the Senate Judiciary Committee's hearing on the issue on March 21, Sen. Feingold's exchange with DOJ Inspector General Glenn Fine addressed such questions. Exhibit 1 (attached hereto).

- Defendant DOJ has recognized that the questions surrounding the retention of NSL data in the IDW are serious and require further examination. In a "Fact Sheet" issued on March 20, the Department announced "new oversight of the use and retention of NSL-derived information" and the creation of a "working group" to "examine how NSL-derived information is used and retained by the FBI." Fact Sheet: Department of Justice Corrective Actions on the FBI's Use of National Security Letters (March 20, 2007). *Id.*

Upon review of defendant DOJ's failure to grant EFF's request to expedite the processing of its FOIA requests for information concerning the policies and procedures governing information in the Investigative Data Warehouse, the Court should recognize plaintiff's entitlement to expedition and reject the FBI's request to stay proceedings for 71 months.

## II. The FBI has Failed to Show that it Should Be Permitted Six Additional Years to Process EFF's FOIA Requests

Even if plaintiff's FOIA requests did not require expedited processing, the government would not be entitled to the extraordinary relief it requests. In support of its motion, defendant DOJ acknowledges that it is seeking a "lengthy stay" of proceedings in which to process plaintiff's requests, but maintains that the FBI is entitled to *six additional years* pursuant to the FOIA and *Open America*. Defendant's Memorandum ("Def. Mem.") at 2. The legal standard that DOJ must satisfy to demonstrate an entitlement to a stay is well established. The "exceptional circumstances-due diligence" standard derives from two sources: the FOIA itself, 5 U.S.C. § 552(a)(6)(C)(i)-(iii); and the D.C. Circuit's opinion in *Open America*, 547 F. 2d 605, which construed the statutory provision. This Court recently recognized that:

> [u]nder D.C. Circuit law, a stay pursuant to [the statute] and the *Open America* doctrine may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows reasonable progress in reducing its backlog of requests."

*The Wilderness Society v. Dep't of the Interior*, No. 04-0650, 2005 U.S. Dist. LEXIS 20042, at **31-32 (D.D.C. Sept. 12, 2005) (citations omitted; emphasis in original) (attached hereto as Exhibit 3).[4] *See also Electronic Privacy Information Center v. Dep't of Justice*, No. 02-0063,

---

[4] The court noted in *Wilderness Society* that:

2005 U.S. Dist. LEXIS 18876, at **10-11 (D.D.C. Aug. 31, 2005) (same) (attached hereto as Exhibit 4).  Under this standard, defendant has failed to show that it should be granted the wildly excessive stay that it seeks.

### A. The FBI Has Failed to Demonstrate That Exceptional Circumstances Exist to Justify a Stay

In addition to a relatively large (but, for many years, routine) FOIA request backlog, the FBI claims that it has encountered three "exceptional" circumstances weighing in favor of a 71-month stay of proceedings.  First, the Bureau has relocated its FOIA operations from Washington, DC to Frederick County, Virginia, and has lost a number of FOIA staff as a result. Def. Mem. at 23-24; Hardy Decl. ¶¶ 11-14.  Second, the FBI cites three federal district court deadlines, which defendant claims are "tak[ing] resources away from other pending FOIA requests." Def. Mem. at 24; Hardy Decl. ¶¶ 15-18.  Finally, defendant asserts that a "high volume" of administrative appeals further exacerbates the FBI's FOIA backlog. Def. Mem. at 24-25; Hardy Decl. ¶ 20.  However, defendant has failed to show that these events justify a six-year stay of proceedings in this case.

First, this Court recently determined that an agency's other processing commitments and personnel difficulties are insufficient to justify an *Open America* stay.  In *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005), the Department of Justice sought an additional 44 months to complete the processing of the plaintiff's six FOIA requests.

---

[p]ursuant to the 1996 amendments, Congress *tightened the standard* for obtaining a stay by defining the term "exceptional circumstances" so as to exclude any "delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of requests." 5 U.S.C. § 552(a)(6)(C)(ii).

*Id*. at *31 (emphasis added).

In support of its motion, the government cited circumstances similar to those in this case, such as a "large backlog of pending FOIA requests," including a number of requests "in the 'project' category which take a much longer time to process than other requests." *Id.* at 259. The agency also argued that "the work of the [FOIA processing] unit has not only been disrupted by court orders requiring maximum manpower on an emergency basis to other litigation and cases but also personnel issues." *Id.* On these facts, the Court found that the Department failed to demonstrate that exceptional circumstances existed to justify an *Open America* stay, explaining:

> The Court is in no position to determine which "projects" warrant an emergency treatment and which "projects" do not. Furthermore, the Court will not get involved in defendants' personnel and project management difficulties. Therefore, defendants have shown the existence of a *predictable* backlog of FOIA requests. In addition, defendants have not convinced the Court that they are acting with due diligence to decrease their backlog. Accordingly, defendants motion for an *Open America* stay . . . is denied.

*Id.* (emphasis added).

Furthermore, there is little evidence that the litigation deadlines cited by defendant will significantly affect the Bureau's ability to process plaintiff's FOIA requests in a timely manner. The FBI's court-imposed processing deadline (March 16) in *Hidalgo v. FBI*, Civ. No. 06-1513 (D.D.C.) has already passed. Hardy Decl. ¶ 18. Furthermore, the Court has ordered the FBI to complete its processing of the documents at issue in *Gerstein v. CIA*, Civ. No. 06-4643 (N.D. Cal.) before the end of this month (by April 27). Hardy Decl. ¶ 16. There is no indication that these cases should significantly affect the FBI's capability to process plaintiff's requests, and their mere existence does not justify the six-year stay defendant seeks.

Finally, the FBI's assertion that a high volume of administrative appeals constitutes an exceptional circumstance is unavailing. According to defendant, the Bureau received 1,015 administrative appeals in 2006. Def. Mem. at 24; Hardy Decl. ¶ 20. As of February 28, 2007,

520 administrative appeals were pending resolution. Def. Mem. at 24; Hardy Decl. ¶ 20.  As the

FBI concedes, "this number does not represent an increase," but "remains another significant

drain on resources." Def. Mem. at 24; Hardy Decl. ¶ 20.  The FBI presents no evidence that these

administrative appeals are anything more than part of the Bureau's predictable FOIA backlog,

nor that the agency is taking steps to reduce the number of administrative appeals pending

resolution.  Thus, the pending appeals cannot be considered an "exceptional circumstance"

weighing in favor of a stay.

Therefore, regardless of how difficult or time-consuming the processing of plaintiff's

FOIA requests may be when facing a large FOIA request backlog, litigation deadlines and

personnel difficulties, defendant has failed to cite the kind of  "exceptional circumstances"

sufficient to satisfy the well-established *Open America* standard as construed in this Circuit.

### B.  The FBI has not Exercised "Due Diligence" in Its Processing of Plaintiff's FOIA Requests

The Bureau has also failed to satisfy the "due diligence" prong of the standard.  The D.C.

Circuit has recognized that the FOIA's legislative history requires an agency to have exercised

"due diligence" *from the outset* in order to qualify for the kind of relief the FBI seeks here.

*Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 n.3 (D.C. Cir. 1990) ("The court [has] authority to

allow the agency additional time to examine requested records in exceptional circumstances

where the agency was exercising due diligence in responding to the request *and had been since

the request was received*.") (quoting H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 11 (1974))

(emphasis added).

The record clearly establishes that the Bureau has not even approached the requisite

showing in its handling of plaintiff's requests to date.  EFF's requests were submitted to the FBI

on August 25 and September 1, 2007.  Since then, the agency has located "approximately 72,000

pages of records potentially responsive to plaintiff's request[s]," Hardy Decl. ¶ 38, but has not yet even assigned them to a FOIA/Privacy Act processing analyst for review. Hardy Decl. ¶ 39. By no stretch of the imagination can the FBI's response be deemed diligent "since the request was received," *Oglesby*, where it has taken almost *eight months* to merely collect documents that *may* be responsive. Notwithstanding any representations that might be made in the government's submissions, it is beyond dispute that defendant has failed to meet its burden of satisfying the "exceptional circumstances-due diligence" test. Thus, the Court should not grant the FBI an additional 71 months to process EFF's requests, but should instead order the agency to process and release non-exempt material responsive to the requests within 60 days.

### C. Courts Routinely Order Agencies to Complete the Processing of FOIA Requests by a Date Certain

The approach that plaintiff suggests is not unusual. This Court has recently imposed specific processing deadlines on agencies, requiring the prompt delivery of non-exempt records to FOIA requesters. For example, in *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138 (D.D.C. 2002), the Court ordered the Commerce Department and the Transportation Department to process, respectively, 9000 and 6000 pages of material; to complete the processing within 60 days; and to provide the requester with a *Vaughn* index within 72 days. *Id.* at 141. It is worth noting that the requesters of the FOIA requests at issue in that case did *not* claim to be entitled to expedited processing.

Similarly, in *Natural Resources Defense Council v. Dep't of Energy* ("*NRDC*"), the Court ordered the Energy Department to process 7500 pages of material; to complete the processing of the "vast majority" of the material within 32 days; to complete all processing within 48 days; and to provide the requester with a *Vaughn* index within 63 days. 191 F. Supp. 2d 41, 43-44 (D.D.C. 2002). Again, the FOIA request in *NRDC* had *not* been granted expedited treatment.

14

More recently, in *ACLU v. Department of Defense*, 339 F. Supp. 2d 501 (S.D.N.Y. 2004), a case involving an expedited request, the court ordered a variety of agencies to "produce or identify all responsive documents," and to provide the requesters with a *Vaughn* index, within 30 days. *Id*. at 505. Furthermore, in *Electronic Privacy Information Center v. Dep't of Justice*, this Court ordered the FBI to "complete the processing of 1500 pages every 15 calendar days, and provide to Plaintiff all responsive non-exempt pages contained therein, until processing is complete," after the agency had granted a request for expedited processing but failed to produce any responsive records. Civ. No. 05-845, 2005 U.S. Dist. LEXIS 40318, at **5-6 (D.D.C. Nov. 16, 2005). Likewise, in another case between the same parties, this Court ordered defendant to process the plaintiff's request, which had been granted expedited treatment, within 20 days of the date of the Court's order, and produce a *Vaughn* index accounting for any withholdings within 10 days thereafter. *Electronic Privacy Information Center v. Dep't of Justice*, 416 F. Supp. 2d 30, 43 (D.D.C. 2006).

For these reasons, the Court should not only deny defendant's motion for an *Open America* stay of 71 months, but also order the FBI to complete processing of plaintiff's requests within 60 days.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion for entry of an *Open America* stay, and require defendant DOJ and its component the FBI to process plaintiff's FOIA requests for records concerning the FBI's Investigative Data Warehouse within 60 days of the Court's order. Should the Court grant the FBI a longer period of time to process EFF's requests, plaintiff respectfully asks that the Court order the agency to make interim releases of documents responsive to plaintiff's request every four weeks, and submit periodic reports to the

Court and plaintiff on the Bureau's progress toward completing the processing of plaintiff's

FOIA requests.

Respectfully submitted,

 /s/ *David L. Sobel*
DAVID L. SOBEL
D.C. Bar No. 360418

MARCIA HOFMANN
D.C. Bar. No. 484136

Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

# EXHIBIT 1

*Electronic Frontier Foundation v. Dep't of Justice*, Civ. No. 06-1773-RBW

Plaintiff's Opposition to Defendant's Motion for *Open America* Stay

**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

April 6, 2007

**BY FACSIMILE – (202) 514-5331**

Tasia Scolinos
Director of Public Affairs
Office of Public Affairs
U.S. Department of Justice
Room 1128
950 Pennsylvania Avenue, NW.
Washington DC 20530-0001

**REQUEST FOR EXPEDITED FOIA PROCESSING**

Dear Ms. Scolinos:

This is a request for expedited processing of a Freedom of Information Act ("FOIA") request, made pursuant to 28 CFR 16.5(d)(1). By letters dated August 25 and September 1, 2006 (attached hereto as Exhibits 1 & 2), the Electronic Frontier Foundation ("EFF") submitted FOIA requests to the Federal Bureau of Investigation ("FBI") seeking the disclosure of FBI records concerning the Investigative Data Warehouse ("IDW").

I believe these pending requests meet the criteria for expedited processing under 28 CFR 16.5(d)(1)(iv), as they concern "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 CFR 16.5(d)(1)(iv). You recently concluded that another request EFF submitted to the FBI, concerning the Bureau's use of National Security Letters ("NSLs"), warranted expedited processing on this ground. *See* Exhibit 3, attached hereto. As I explain below, the factors EFF cited in support of the expedited processing of our NSL request in our letter to you dated March 12, 2007 (which I incorporate herein by reference) are equally applicable to our pending IDW requests.

In his report of March 9, 2007, the Department's Inspector General documented numerous instances of the FBI's "improper or illegal use" of NSL authority. Of particular relevance to this request, the Inspector General revealed that "NSL data is periodically downloaded . . . into the FBI's Investigative Data Warehouse (IDW), a centralized repository for intelligence and investigative data with advanced search capabilities." U.S. Department of Justice, Office of the Inspector General, "A Review of the Federal Bureau of Investigation's Use of National Security Letters" (March 2007), at 30. The Bureau's continuing retention in the IDW of the personal data improperly or illegally obtained through abuses of the NSL process is obviously central to the undisputed questions about "integrity which affect public confidence." Indeed, during the Senate Judiciary Committee's hearing on the issue on March 21, Sen. Feingold had the following exchange with the Inspector General:

Director of Public Affairs
April 6, 2007
Page two

> Sen. Feingold: In your October 2006 memo to the attorney general on the
> Justice Department's top management and performance challenges for
> fiscal year 2006, you caution that the Patriot Act granted the FBI broad
> new authorities to collect information, including the authority, quote, "To
> review and store information about American citizens and others in the
> United States about whom the FBI has no individualized suspicion of
> illegal activity," unquote.
>
> You cautioned nearly six months ago that the department and the FBI need
> to be particularly mindful about the potential for abuse of these types of
> powers.
>
> First, I want to establish some basic facts alluded to in your memo. Under
> the existing NSL statutes, it is possible to obtain information, including
> full credit reports, about people who are entirely innocent of any
> wrongdoing. Isn't that correct?
>
> Mr. Fine: Well, it is possible, yes, as a result of the investigation there's no
> finding of anything and that they are innocent. Yes.
>
> Sen. Feingold: And the FBI's policy is that it will retain all information
> obtained via NSLs indefinitely, often in databases like the Investigative
> Data Warehouse that are available to thousands of investigators. Is that
> correct?
>
> Mr. Fine: Yes.
>
> Sen. Feingold: Now, with regard to your caution about the potential for
> abuse of these powers, DOJ responded in November 2006 that the FBI
> agrees and that it is, quote, "aggressively vigilant in guarding against any
> abuse," unquote.
>
> Would you agree with that statement, that the FBI has been aggressively
> vigilant in guarding against abuses?
>
> Mr. Fine: I would agree that the FBI was not aggressively vigilant in terms
> of guarding against the problems we found, yes.

Indeed, the Department has recognized that the questions surrounding the retention of
NSL data in the IDW are serious and require further examination. In a "Fact Sheet"
issued on March 20, the Department announced "new oversight of the use and retention

Director of Public Affairs
April 6, 2007
Page three

of NSL-derived information" and the creation of a "working group" to "examine how
NSL-derived information is used and retained by the FBI." Fact Sheet: Department Of
Justice Corrective Actions on the FBI's Use of National Security Letters (March 20,
2007) (attached hereto as Exhibit 4).

In summary, it is clear that recent events warrant the expedited processing of EFF's
requests for information concerning the policies and procedures governing the inclusion
and use of information in the Investigative Data Warehouse. As such, we hereby request
such expedited treatment.

Thank you for your consideration of this request. As applicable Department regulations
provide, I will anticipate your determination within ten (10) calendar days. 28 CFR
16.5(d)(1).

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best
of my knowledge and belief.


David L. Sobel
Senior Counsel


attachments

cc: (w/o attachments)

        James C. Luh
        Trial Attorney
        U.S. Department of Justice
        Civil Division, Federal Programs Branch

# Exhibit 1

Electronic Frontier Foundation Request to Expedite FOIA Processing
April 6, 2007

**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

August 25, 2006

**BY FACSIMILE — (202) 324-3752**

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue NW
Washington, DC  20535-0001

RE:    Freedom of Information Act Request

Dear Mr. Hardy:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Federal Bureau of Investigation ("FBI") on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

We seek disclosure of the following agency records (including, but not limited to, electronic records) concerning the FBI's "Investigative Data Warehouse" ("IDW"):

> 1) records listing, describing or discussing the categories of individuals covered by the IDW;
>
> 2) records listing, describing or discussing the categories of records in the IDW;
>
> 3) records listing, describing or discussing criteria for inclusion of information in the IDW;
>
> 4) records describing or discussing any FBI determination that the IDW is, or is not, subject to the requirements of the Privacy Act of 1974; and
>
> 5) records describing or discussing any FBI determination that the IDW is, or is not, subject to federal records retention requirements, including the filing of Standard Form (SF) 115, "Request for Records Disposition Authority."

David M. Hardy
August 25, 2006
Page two

To assist you in conducting a search for responsive records, we note that FBI Deputy
Assistant Director John E. Lewis stated, in a speech on March 14, 2005, that

> within the FBI's Counterterrorism Division, we operate an information
> system known as the Investigative Data Warehouse. The IDW provides
> our agents and analysts with instant access to photographs, biographical
> information, physical location information, and financial data for
> thousands of known and suspected terrorists. The database comprises
> more than 100 million pages of terrorism-related documents, and billions
> of structured records such as addresses and phone numbers. . . .

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF
qualifies as a representative of the news media pursuant to the FOIA and 28 C.F.R. §
16.11(b)(6).

EFF is a non-profit public interest organization that works "to protect and enhance our
core civil liberties in the digital age."[1]  One of EFF's primary objectives is "to educate
the press, policymakers and the general public about online civil liberties."[2]  To
accomplish this goal, EFF routinely and systematically disseminates information in
several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received
38,858,298 hits in July 2006 — an average of 52,228 per hour.  The web site reports the
latest developments and contains in-depth information about a variety of civil liberties
and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990.  The
EFFector currently has more than 77,000 subscribers.  A complete archive of past
EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes two blogs that highlight the latest news from around the
Internet.  DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy
developments in technology, while miniLinks (http://www.eff.org/minilinks/) directs

---

[1] Guidestar Basic Report, Electronic Frontier Foundation,
http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited July 5, 2006).
[2] *Id.*

David M. Hardy
August 25, 2006
Page three

readers to other news articles and commentary on these issues. DeepLinks had 817,993 hits in July 2006; miniLinks received 436,043 hits during the same period.[3]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded about 5,000 times from EFF's web site last month.

### Request for a Public Interest Fee Waiver

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, the FBI determines whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

---

[3] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

David M. Hardy
August 25, 2006
Page four

First, the FBI's development and use of the IDW concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i).

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on the FBI's development and use of a large investigative database, as well as its functionality and the extent of its use.

Third, the requested material will "contribute to public understanding" of the nature and extent of the information contained in the IDW. 28 C.F.R. § 16.12(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the FBI's investigative activity, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the FBI's development and use of the IDW. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Little is publicly known about the IDW, so disclosure of this information will help inform the public about the database and its potential impact on personal privacy.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Thank you for your consideration of this request. If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 10. As the FOIA provides, I will anticipate a determination on this request from your office within 20 working days.

Sincerely,

David Sobel (MCH)

David L. Sobel
Senior Counsel

# Exhibit 2

Electronic Frontier Foundation Request to Expedite FOIA Processing
April 6, 2007



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

September 1, 2006

**BY FACSIMILE — (202) 324-3752**

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue NW
Washington, DC 20535-0001

RE:    Freedom of Information Act Request

Dear Mr. Hardy:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Federal Bureau of Investigation ("FBI") on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On August 30, 2006, the Washington Post published an article, attached hereto, concerning the FBI's "Investigative Data Warehouse" ("IDW").[1] According to the article, the FBI described the 659 million-record database as "one of the most powerful data analysis tools available to law enforcement and counterterrorism agents."

With respect to the data quality practices used to maintain the IDW, the article reported:

> Irrelevant information can be purged or restricted, and incorrect information is corrected, [Gurvais Grigg, acting director of the FBI's Foreign Terrorist Tracking Task Force] said. Willie T. Hulon, executive assistant director of the FBI's National Security Branch, said that generally information is not removed from the system unless there is "cause for removal."
>
> Every data source is reviewed by security, legal and technology staff members, and a privacy impact statement is created, Grigg said. The FBI conducts in-house auditing so that each query can be tracked, he said.

---

[1] Ellen Nakashima, "FBI Shows Off Counterterrorism Database," Washington Post, Aug. 30, 2006 at A06, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/08/29/AR2006082901520.html.

We seek disclosure of the following agency records (including, but not limited to, electronic records):

1. all records describing data expungement, restriction or correction procedures for the IDW;

2. all privacy impact statements created for the IDW; and

3. all results of audits conducted to ensure proper operation of the IDW.

## Request for News Media Fee Status

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a representative of the news media pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 38,858,298 hits in July 2006 — an average of 52,228 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes two blogs that highlight the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology, while miniLinks (http://www.eff.org/minilinks/) directs readers to other news articles and commentary on these issues. DeepLinks had 817,993 hits in July 2006; miniLinks received 436,043 hits during the same period.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Sept. 1, 2006).

[3] Id.

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon. com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking -des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded about 5,000 times from EFF's web site last month.

### Request for a Public Interest Fee Waiver

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, the FBI determines whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the FBI's development and use of the IDW concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i).

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on the FBI's development and use of a large investigative database, as well as its functionality and the extent of its use.

Third, the requested material will "contribute to public understanding" of the nature and extent of the information contained in the IDW. 28 C.F.R. § 16.12(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the FBI's investigative activity, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the FBI's development and use of the IDW. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Little is publicly known about the IDW, so disclosure of this

3

information will help inform the public about the database and its potential impact on personal privacy.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Thank you for your consideration of this request. If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 12. As the FOIA provides, I will anticipate a determination on this request from your office within 20 working days.

Sincerely,

Marcia Hofmann
Staff Attorney

4

# Exhibit 3

Electronic Frontier Foundation Request to Expedite FOIA Processing
April 6, 2007



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

March 30, 2007

Ms. Marcia Hofmann
Staff Attorney
Electronic Frontier Foundation
Suite 650
1875 Connecticut Avenue, N.W.
Washington, DC 20009

### RE: FOIPA Request No. 1073946-000

Dear Ms. Hofmann:

       This letter is in response to your request to the U.S. Department of Justice
("DOJ"), Office of Public Affairs ("OPA"), for expedition of your Freedom of Information Act
("FOIA") request dated March 12, 2007 to FBI Headquarters ("FBIHQ"). Your March 12, 2007
FOIA request seeks access to "records discussing or reporting violations or potential violations of
statutes, Attorney General guidelines, and internal FBI policies governing the use of National
Security Letters." In your March 12, 2007 FOIA request you sought expedited processing
pursuant to 28 C.F.R. § 16.5 (d)(1)(iv) ("[a] matter of widespread and exceptional media interest
in which there exists possible questions about the government's integrity which affects public
confidence."). We have been advised that the Director of OPA has concluded that the subject
matter of your request is in fact a "matter of widespread and exceptional media interest in which
there exists possible questions about the government's integrity which affects public
confidence," and has therefore concluded that your request for expedited processing should be
granted.

       By separate letter dated March 29, 2007, the FBI acknowledged your March 12,
2007 FOIA request and advised you that your FOIA request has been assigned FOIPA Request
No. 1073946, and we have begun to conduct a search for potentially responsive records. Once
the FBI completes its search for all records potentially responsive to your FOIA request, you will
be advised as to the outcome of this search effort.

       With respect to the portion of your letter seeking a waiver of the customary fees,
we will make a decision once our records search is completed. In the event that your request for
a fee waiver is denied, you will be notified of any applicable fees prior to the processing of any
responsive records.

                          Sincerely yours,

                         David M. Hardy
                         Section Chief
                         Record/Information
                          Dissemination Section
                         Records Management Division

# Exhibit 4

Electronic Frontier Foundation Request to Expedite FOIA Processing
April 6, 2007

#07-168: 03-20-07 Fact Sheet Department Of Justice Corrective Actions on the FBI's Use of National Security L...

Case 1:06-cv-01773-RBW   Document 8-2   Filed 04/28/2007   Page 18 of 20   04/06/2007 10:37 AM



**FOR IMMEDIATE RELEASE**
**TUESDAY, MARCH 20, 2007**
**WWW.USDOJ.GOV**

**NSD**
**(202) 514-2007**
**TDD (202) 514-1888**

## Fact Sheet:
## Department Of Justice Corrective Actions
## on the FBI's Use of National Security Letters

WASHINGTON – Nearly two weeks ago, the Attorney General commended the work of the Inspector General in uncovering serious problems in the FBI's use of National Security Letters (NSLs). The Attorney General and the Director of the FBI agreed that such mistakes would not be tolerated, and the Attorney General ordered the FBI and the Justice Department to put in place safeguards to ensure greater oversight and controls over the use of NSLs.

Since that time, the FBI and Justice Department have moved expeditiously to implement the recommendations of the Inspector General's report and to create additional safeguards to ensure that NSLs are used properly. Below are some of the actions that the FBI and Justice Department have taken to date and will be taking in the near future to address these shortcomings:

New Oversight and Auditing of the FBI's Use of NSLs

*Initial Audit – Last Friday, the FBI's Inspection Division launched a retrospective audit of the use of NSLs in all 56 FBI field offices nationwide. The FBI consulted with and received input from the Justice Department's National Security Division (NSD) and the Department's Chief Privacy and Civil Liberties Officer (CPCLO) in developing its plan for the audit, which is based upon the Inspector General's methodology for identifying potential Intelligence Oversight Board (IOB) violations. While this audit is being led by the FBI's Inspection Division, the Justice Department's NSD and CPCLO are also participating in the audits at various FBI field offices.

*Regular Audits Going Forward – Starting next month, the Justice Department's NSD, in conjunction with the CPCLO, the FBI's Inspection Division and the FBI's Office of General Counsel, will begin conducting comprehensive reviews of the use of NSLs at FBI headquarters and in field offices around the country. It is expected that the findings of the FBI's initial audit will inform the process of these ongoing reviews. This is a new level of oversight by Department of Justice lawyers with years of experience in intelligence and law enforcement.

Prohibition on the Use of "Exigent" Letters

*On March 5, 2007, the FBI issued a Bureau-wide directive prohibiting the use of the exigent letters described in the Inspector General's report. All FBI field offices have been asked to identify any use in their office of an exigent letter or anything akin to an exigent letter.

*The FBI Director in February 2007 ordered an expedited review by the Inspection Division of the unit that issued the exigent letters described in the Inspector General's report, for the purpose of determining management accountability.

*The NSL audits described above will also include a review of whether exigent letters described in the

Inspector General's report were issued in other FBI field offices.

*The Associate Deputy Attorney General and the Justice Department's Office of Professional Responsibility are also examining the role FBI officials played in the use of NSLs and exigent letters.

New Oversight of FBI-Reported IOB Violations

*The Justice Department's NSD will now review all Intelligence Oversight Board (IOB) violations that the FBI reports to the IOB. When reviewing these IOB referrals from the FBI, the NSD will promptly notify the Attorney General if it appears that the incident suggests the need for a change in policy, training or oversight mechanisms. The NSD will also report to the CPCLO any IOBs that raise serious civil rights or privacy issues. *The NSD will also report to the Attorney General every six months on all IOB referrals reported by the FBI during the preceding six-month period. This mechanism will help identify trends and potential future problems.

New Measures to Address NSL Tracking

*In early 2006, the FBI began developing a new NSL tracking database. The Web-based system will be piloted in the FBI's Washington Field Office in the summer of 2007 and will be deployed to four large field offices in late 2007. The new system will include a field that will identify whether the NSL recipient complied with the request and will possibly allow for entry of notes or comments on the response.

*Until the new system is deployed, FBI field offices will report monthly on NSLs that have been issued. The FBI Office of General Counsel will ensure that the NSLs comply with applicable statutes, guidelines, and policies.

*To obtain a better accounting of past use of NSLs and correct inaccuracies in past Congressional reports, the FBI Director has ordered an intensive process to query other computer systems to locate files where NSLs may have been issued but not reported to FBI Office of General Counsel for inclusion in its tracking database. In addition, the FBI Office of General Counsel is correcting any data entry errors in the existing database. The Attorney General has also mandated that the Justice Department's NSD and CPCLO advise him on additional steps that should be taken to correct the inaccurate numbers reported to Congress.

*On March 5, 2007, the FBI issued a new policy requiring the retention of copies of signed NSLs.

New Training and Guidance on NSLs

*The FBI will re-issue comprehensive guidelines throughout the Bureau concerning the proper use of NSLs. The FBI Office of General Counsel will evaluate existing guidance and make necessary revisions in consultation with the Department of Justice's National Security Division.

*The FBI has begun developing a new training course on the proper use of NSLs that will be available to FBI personnel through the Internet. After the course development is complete, the FBI will issue a directive mandating training for all Special Agents-in-Charge, Assistant Special Agents-in-Charge, as well as all appropriate FBI agents and analysts.

*In the meantime, the FBI has ordered that anytime an FBI Office of General Counsel attorney is traveling in the field for any reason, the attorney must schedule mandatory NSL training. The FBI will consider whether additional training on NSLs for new agents is needed.

*The Justice Department's Executive Office of U.S. Attorneys will review its existing training materials and guidance for terrorism investigations and prosecutions to ensure that NSLs are properly described in such materials.

New Oversight of the Use and Retention of NSL-Derived Information

#07-168: 03-20-07 Fact Sheet DOJ Oversight of Justice & Effective Administration of FBI's Use of National Security Letters

Case 1:06-cv-01773-RBW   Document 8-2   Filed 04/28/2007   Page 20 of 20

04/06/2007 10:37 AM

*A working group co-chaired by the Office of the Director of National Intelligence and the Justice Department's CPCLO has been convened to examine how NSL-derived information is used and retained by the FBI. The FBI's Privacy Officer as well as a representative from the Justice Department's NSD will be represented on this working group. The working group will examine how the NSL records are stored and disseminated and determine the retention practices of other agencies with NSL authorities.

Review of Role of FBI's Division Counsel

*The Justice Department's NSD and the FBI have begun examining whether the FBI's organizational structure should be changed to have FBI's Division Counsel in field offices report to the FBI's Office of General Counsel in Headquarters rather than to field office Special-Agents-in-Charge.

Proposed Legislation

*The Inspector General recommended in its report that the term "toll billing records information" in the Electronic Communications Privacy Act NSL statute be clarified. The Justice Department and FBI are developing a proposal to address this concern.

Future Oversight

*The Attorney General has asked the Inspector General to report to him in four months on the FBI's implementation of the recommendations contained in the Inspector General report.

###

07-168

# EXHIBIT 2

*Electronic Frontier Foundation v. Dep't of Justice*, Civ. No. 06-1773-RBW

Plaintiff's Opposition to Defendant's Motion for *Open America* Stay



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

March 12, 2007

**BY FACSIMILE – (202) 514-5331**

Tasia Scolinos
Director of Public Affairs
Office of Public Affairs
U.S. Department of Justice
Room 1128
950 Pennsylvania Avenue, N.W.
Washington DC 20530-0001

**RE:    Request For Expedited FOIA Processing**

Dear Ms. Scolinos:

This is a request for expedited processing of a Freedom of Information Act ("FOIA") request, made pursuant to 28 C.F.R. § 16.5(d)(1). By separate letter (attached hereto), the Electronic Frontier Foundation ("EFF") today submitted an FOIA request to the Federal Bureau of Investigation ("FBI") seeking the disclosure of FBI records about policies, procedures and practices concerning the Bureau's issuance of National Security Letters ("NSLs").

We believe this request meets the criteria for expedited processing under 28 C.F.R. § 16.5(d)(1)(iv), as "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv).

In a report issued on March 9, 2007, the Department of Justice's Inspector General documented numerous instances of the FBI's "improper or illegal use" of NSL authority. Specifically, the Inspector General "found that the FBI used NSLs in violation of applicable NSL statutes, Attorney General Guidelines, and internal FBI policies." U.S. Department of Justice, Office of the Inspector General, "A Review of the Federal Bureau of Investigation's Use of National Security Letters" (March 2007), at xlvii.

There can be no question that the FBI's "improper or illegal use" of NSL authority has engendered "widespread and exceptional media interest" since the Inspector General's report was released three days ago. According to a search of the Lexis-Nexis "News, Most Recent 90 Days" database, more than 125 articles containing the terms "FBI" and "National Security Letters" appeared in the first three days since the report was released (search results attached hereto). A search of Google News using the same terms indicates that 1,235 online articles have appeared during the same period (search results listing first 50 hits attached hereto).

Lest there be any doubt that there has been "widespread and exceptional media interest" in the issue, we note that FBI Director Mueller convened a press conference to answer questions about the IG's report less than two hours after it was released. *See* http://www.fbi.gov/pressrel/ pressrel07/nsl_ transcript030907.htm. In addition, the FBI's homepage currently features a link to the Bureau's "response to the DOJ Inspector General's report on the use of National Security

1875 Connecticut Ave., NW · Suite 650 · Washington, DC 20009
202 797 9009    202 797 9066    www.eff.org    information@eff.org

Letters and our answers to questions about their use and investigative value" (image of FBI homepage attached hereto).

It is equally clear that "there exist possible questions about the government's integrity which affect public confidence." Such questions are exemplified in the following exchange at Director Mueller's press conference:

> QUESTION: Director, you talked about how critically important these letters are to the mission of the FBI. And we also know that the FBI's allowed to do this without seeking a court order for the information. Is part of your frustration that this is about trust; that Congress gives you this authority to go out and do this, (inaudible) in dealing with these issues?

> MUELLER: Well, I think Congress and the American people should have a lot of trust in the FBI. Occasionally, there are areas where we need to admit mistakes that we've made – this is one of them; areas where we should've done a better job – this is one of them. And I think Congress and ourselves should both trust but also verify.

Similarly, in remarks made shortly after the release of the IG report, the Attorney General acknowledged that "we must act quickly and decisively to restore the public's confidence." Prepared Remarks of Attorney General Alberto R. Gonzales at the International Association of Privacy Professionals Privacy Summit Washington, D.C., March 9, 2007 (available at http://www.usdoj.gov/ag/speeches/2007/ag_speech_070309.html).

In addition, editorials in the country's leading newspapers are raising questions about "integrity" and "public confidence." *See, e.g.*, The Washington Post, "Abuse of Authority; The FBI's gross misuse of a counterterrorism device," March 11, 2007, p. B6 ("The report depicts an FBI cavalierly using its expanded power to issue 'national security letters' without adequate oversight or justification."); The New York Times, "The Failed Attorney General," March 11, 2007, p. 13, Section 4 ("[The] inspector general exposed the way the Federal Bureau of Investigation has been abusing yet another unnecessary new power . . .").

The American public is deeply concerned about potential government intrusions into personal affairs, particularly those involving (as some NSLs do) private communications. While the Inspector General, Attorney General and FBI Director have acknowledged and addressed these concerns, there is no substitute for the disclosure of internal agency records detailing the policies, procedures and practices concerning the Bureau's issuance of NSLs. Indeed, the very purpose of the FOIA is to lessen the public's dependence on official agency statements and open the underlying documentation to public scrutiny. This is clearly an instance in which expedited processing of an FOIA request is warranted.

Thank you for your consideration of this request. As applicable Department regulations provide, we will anticipate your determination within ten (10) calendar days. 28 C.F.R. § 16.5(d)(1). Please be advised that, given the urgency of this matter, EFF intends to seek immediate judicial relief if a response to this request for expedition is not issued in a timely manner.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge and belief.

Sincerely,

Marcia Hofmann
Staff Attorney

Attachments

1. The Failed Attorney General,  The New York Times, March 11, 2007 Sunday,  Late Edition - Final, Section 4; Column 1; Editorial Desk; Pg. 13, 679 words

2. Bush Addresses Misuse of F.B.I. Subpoenas,  The New York Times, March 11, 2007 Sunday,  Late Edition - Final, Section 1; Column 1; National Desk; Pg. 27, 252 words, By The New York Times, ESTANCIA ANCHORENA, Uruguay, March 10

3. FBI vow to go straight,  Sunday Tasmanian (Australia), March 11, 2007 Sunday, WORLD; Pg. 22, 396  words, STEFANIE BALOGH

4. FBI abused terror phone-tap powers,  The Sunday Mail (Australia), March 11, 2007 Sunday,   State - Main Country Edition, WORLD; Pg. 44, 579 words, STEFANIE BALOGH in New York

5. Abuse of Authority;  The FBI's gross misuse of a counterterrorism device,  The Washington Post, March 11, 2007 Sunday,  Final Edition, Editorial; B06, 631 words

6. Remarks by President Bush and President Vazquez of Uruguay in a Joint Press Availability,  Business Wire, March 10, 2007 Saturday 5:55 PM GMT, , 3175 words, MONTEVIDEO, Uruguay

7. Justice Department criticizes FBI for misusing Patriot Act in gathering personal data on Americans,  CBS News Transcripts, SHOW: The Saturday Early Show 7:00 AM EST CBS, March 10, 2007 Saturday, 346  words

8. Remarks by President Bush and President V·zquez of Uruguay in a Joint Press Availability,  Christian Newswire, March 10, 2007 Saturday 12:00 AM GMT, , 3234 words, By White House

9. Bush Taunted on his Trip; FBI Gone Too Far?; Fatal Bus Crash; Tracking Predators; Bush in Uruguay, Anti-Bush Protests in Argentina; Iranian Official Disappears; D.C. Madam Threatens to Open Books,  CNN, SHOW: CNN SATURDAY MORNING NEWS 7:00 AM EST, March 10, 2007 Saturday, NEWS; Domestic, 10122  words, Don Lemon, Melissa Long, Ed Henry, Kelli Arena, Drew Griffin, Veronica de la Cruz, Elizabeth Cohen, Bob Franken, Ben Wedeman, Brianna Keilar, Reynolds Wolf, Susan Roesgen, Sanjay Gupta, Karl Penhaul, Jeanne Moos

10. Gasp!,  The Democratic Daily, March 10, 2007 Saturday 7:21 PM EST, , 541 words, Todd Mitchell

11. FBI admits abuse of security system to obtain citizens' personal data,  Financial Times (London, England), March 10, 2007 Saturday,  London Edition 1, WORLD NEWS; Pg. 8, 502 words, By STEPHANIE KIRCHGAESSNER, WASHINGTON

12. FBI criticized over use of Patriot Act,  The International Herald Tribune, March 10, 2007 Saturday, NEWS; Pg. 2, 518 words, David Johnston and Eric Lipton - The New York Times Media Group, WASHINGTON

13. FBI criticized over use of its subpoena power;  Justice Department cites lack of controls,  The International Herald Tribune, March 10, 2007 Saturday, NEWS; Pg. 2, 635 words, David Johnston and Eric Lipton - The New York Times Media Group, WASHINGTON

14. FBI ABUSES MAY LEAD TO LIMITS ON PATRIOT ACT;  Reports of the bureau improperly obtaining citizens' phone and bank data spark anger.;  SENATORS WANT ANSWERS,  Los Angeles Times, March 10, 2007 Saturday,  Home Edition, MAIN NEWS; National Desk; Part A; Pg. 1, 1552 words, Richard B. Schmitt, Times Staff Writer,  WASHINGTON

15. FBI broke law in prying out Americans' personal info, attorney general, FBI head say,  The Merced Sun-Star (California), March 10, 2007 Saturday, Pg. 01, 962 words, By LARA JAKES JORDAN

16. Judiciary Chairman Leahy on FBI Patriot Act Abuses,  National Public Radio (NPR), SHOW: Weekend All Things Considered 7:00 PM EST , March 10, 2007 Saturday, 801  words

17. FBI admits abusing powers;  Patriot Act faces more criticism,  The News & Observer (Raleigh, North Carolina), March 10, 2007 Saturday,  Final Edition, NEWS; Pg. A1, 770 words, Greg Gordon, McClatchy Newspapers

18. F.B.I. HEAD ADMITS MISTAKES IN USE OF SECURITY ACT,  The New York Times, March 10, 2007 Saturday,  Late Edition - Final, Section A; Column 1; National Desk; Pg. 1, 1156 words, By DAVID STOUT, WASHINGTON, March 9

19. FBI's Mueller takes blame for agency's abuse of power Lawmakers and civil libertarians called for a rollback of FBI authority under the Patriot Act.,  Orlando Sentinel (Florida), March 10, 2007 Saturday,  FINAL, A SECTION; FLORIDA; Pg. A3, 422 words, Greg Gordon, Mcclatchy Newspapers

20. SPECTER CALLS FOR PATRIOT ACT REVIEW SENATE JUDICIARY COMMITTEE'S LEADERS WANT EXTENSIVE HEARINGS ON FBI VIOLATIONS,  Pittsburgh Post-Gazette (Pennsylvania), March 10, 2007 Saturday,   REGION EDITION, NATIONAL; Pg. A-1, 582 words, Jerome L. Sherman Pittsburgh Post-Gazette

21. SPECTER CALLS FOR PATRIOT ACT REVIEW SENATE JUDICIARY COMMITTEE'S LEADERS WANT EXTENSIVE HEARINGS ON FBI VIOLATIONS,  Pittsburgh Post-Gazette (Pennsylvania), March 10, 2007 Saturday,   REGION EDITION, NATIONAL; Pg. A-1, 582 words, Jerome L. Sherman Pittsburgh Post-Gazette

22. Remarks by President Bush and President Vazquez of Uruguay in a Joint Press Availability ,  PR Newswire US, March 10, 2007 Saturday 7:03 PM GMT, , 3238 words, WASHINGTON March 10

23. Washington Arms,  Slate Magazine, March 10, 2007 Saturday, TODAY'S PAPERS, 786 words, Telis Demos

24. FBI REBUKED FOR ABUSING PATRIOT ACT,  Sun-Sentinel (Fort Lauderdale, Florida), March 10, 2007 Saturday,  Broward Metro Edition, NATIONAL; Pg. 3A, 751 words, WASHINGTON {BYLINE} By David Stout The New York Times

25. Two top officials admit FBI abuse of the Patriot Act,  Unknownpub: Star-Ledger, The (Newark, NJ), March 10, 2007 Saturday,   FINAL EDITION, NEWS; Pg. 9, 816 words, BY LARA JAKES JORDAN, ASSOCIATED PRESS, WASHINGTON

26. Remarks by President Bush and President Vazquez of Uruguay in a Joint Press Availability,  U.S. Newswire, March 10, 2007 Saturday 2:03 PM EST, , POLITICAL EDITORS, 3185 words, WASHINGTON,  March 10

27. Gonzales Tries to Mollify GOP Critics on Firings, FBI Missteps,  The Washington Post, March 10, 2007 Saturday,   Final Edition, A Section; A05, 774 words, Paul Kane and Michael Abramowitz, Washington Post Staff Writers

28. FBI Audit Prompts Calls for Reform;  Some Lawmakers Suggest Limits On Patriot Act,  The Washington Post, March 10, 2007 Saturday,   Final Edition, A Section; A01, 1270 words, Dan Eggen and John Solomon, Washington Post Staff Writers

29. Report Details Missteps in Data Collection,  The Washington Post, March 10, 2007 Saturday,   Final Edition, A Section; A01, 1158 words, R. Jeffrey Smith, Washington Post Staff Writer

30. FBI issues subpoenas improperly: report,  Xinhua General News Service, March 10, 2007 Saturday 11:30 AM EST, , WORLD NEWS; Political, 481 words, WASHINGTON

31. Saturday, March 10,  CNN.com, March 10, 2007 Saturday 11:01 PM EST, , WORLD, 2318 words

32. ABC NEWS NOW/SPECIAL REPORT,  ABC News Now, SHOW: SPECIAL REPORT 11:33 AM EST, March 9, 2007 Friday, 4021  words

33. PATRIOT ACT;  FBI TO HOLD NEWS CONFERENCE,  ABC News Now, SHOW: INSIDE THE NEWSROOM #2 10:01 AM EST, March 9, 2007 Friday, 164  words

34. NEWS HEADLINES,  ABC News Transcript, SHOW: GOOD MORNING AMERICA 7:10 AM EST, March 9, 2007 Friday, 806  words

35. FBI underreported use of USA Patriot Act,  AFX International Focus, March 9, 2007 Friday 2:27 PM GMT, , 531 words

36. FBI underreported use of USA Patriot Act,  AFX.COM, March 9, 2007 Friday 2:27 PM GMT, , 531 words

37. FBI underreported use of USA Patriot Act,  AFX - Asia, March 9, 2007 Friday 2:12 PM GMT, , 531 words

38. FBI NOT FOLLOWING LAW OF THE LETTERS,  American Public Radio, SHOW: APM MARKETPLACE 12:00 AM EST, March 9, 2007 Friday, 344  words

39. Text of Chinese government report on US human rights record in 2006,  BBC Monitoring Asia Pacific - Political Supplied by BBC Worldwide Monitoring, March 9, 2007 Friday, 10045 words

40. Justice Department inspector general says FBI misusing Patriot Act,  CBS News Transcripts, SHOW: CBS Evening News 6:30 PM EST CBS, March 9, 2007 Friday, 402  words

41. Justice Department finds `serious misuse' of power by FBI,  Chicago Tribune (Illinois), March 9, 2007 Friday, WASHINGTON DATELINE, 20070309-BC-FBI, 1174 words, By Andrew Zajac, Chicago Tribune, WASHINGTON

42. FBI Breaks Snooping Rules; Getting Out of Iraq; Challenging Chavez: President Bush Visits Latin America,  CNN, SHOW: LOU DOBBS TONIGHT 6:00 PM EST, March 9, 2007 Friday, NEWS; International, 7538  words, Lou Dobbs, Kelli Arena, Dana Bash, Ed Henry, William Schneider, Christine Romans

43. Talking With the Enemy: One-on-One With Iran?; Al Sharpton's Roots: Surprise Ties to Strom Thurmond; Chavez Leads Anti-Bush Rally,  CNN, SHOW: THE SITUATION ROOM 5:30 PM EST, March 9, 2007 Friday, NEWS; International, 7231  words, Suzanne Malveaux, Zain Verjee, Susan Candiotti, Jack Cafferty

44. Fierce Critic of Iraq War Criticiezd by Others; Misuse of FBI Power?; Newt Gingrich Admits Cheating on Former Wife,  CNN, SHOW: THE SITUATION ROOM 4:00 PM EST, March 9, 2007 Friday, NEWS; International, 7794  words, Dana Bash, Ed Henry, Carol Costello, Jack Cafferty, Bill Schneider, Suzanne Malveaux, Jacki Schechner, Jeff Greenfield, Donna Brazile, Brian Todd

45. President Bush Visits Latin America; Dick Cheney Losing Influence?,  CNN, SHOW: CNN NEWSROOM 3:00 PM EST, March 9, 2007 Friday, NEWS; International, 6841  words, Randi Kaye, Felicia Taylor, Rob Marciano, Brooke Anderson, Brianna Keilar, Kelli Arena, Don Lemon, Fredricka Whitfield, Tom Foreman, Karl Penhaul, Dr. Sanjay Gupta

46. President Bush and Brazilian President Address; Outcry Over Government Snooping in War on Terror; Deborah Jean Palfry Pleaded Not Guilty To Running Prostitution Ring in Washington, D.C., CNN, SHOW: CNN NEWSROOM 1:00 PM EST, March 9, 2007 Friday, NEWS; International, 5979 words, Don Lemon; Fredricka Whitfield; Kelli Arena; Brianna Keilar; Aneesh Raman; Felicia Taylor

47. FBI Privacy Violations?; President Bush Signs Ethanol Agreement With Brazil; Farrakhan One-on-One, CNN, SHOW: CNN NEWSROOM 11:00 AM EST, March 9, 2007 Friday, NEWS; International, 6381 words, Rick Sanchez, Heidi Collins, Kelli Arena, Juan Carlos Lopez, Don Lemon, C.J. Cassidy

48. Privacy Vs. Security; Shooting In Florida; Timely Move?; Private Information Report, CNN, SHOW: CNN NEWSROOM 10:00 AM EST, March 9, 2007 Friday, NEWS; Domestic, 8165 words, Heidi Collins, Rick Sanchez, Bob Franken, Kelli Arena, Drew Griffin, Brianna Keilar

49. Fuel and Fury; Privacy Vs. Security; Battle Over Iraq, CNN, SHOW: CNN NEWSROOM 9:00 AM EST, March 9, 2007 Friday, NEWS; International, 6881 words, Heidi Collins, Rick Sanchez, Elaine Quijano, Kelli Arena, Andrea Koppel, Brianna Keilar, Tom Foreman, Karl Penhaul, Randi Kaye

50. Under-Reported: FBI Private Record Search; Latin America Visit: Bush Pushes Ethanol Deal; A Reporter's Notebook: Life in Iraq, CNN, SHOW: AMERICAN MORNING 8:00 AM EST, March 9, 2007 Friday, NEWS; International, 6765 words, Soledad O'Brien, Miles O'Brien, Kelli Arena, Elaine Quijano, Arwa Damon, Karl Penhaul, Chris Lawrence, Ali Velshi, Gerri Willis, Heidi Collins

51. FBI Answering Questions About How Often They Were Searching Our Private Information; Hepatitis in Hollywood, CNN, SHOW: AMERICAN MORNING 7:00 AM EST, March 9, 2007 Friday, NEWS, INTERNATIONAL, 7603 words, Soledad O'Brien, Miles O'Brien, Brianna Keilar, Elaine Quijano, Zain Verjee, Chris Lawrence, Bob Franken, Jeff Toobin, Chad Myers, Paula Hancocks, Ali Velshi

52. Briefly, The Commercial Appeal (Memphis, TN), March 9, 2007 Friday, Final Edition, NEWS; Pg. A13, 272 words, From Our Press Services

53. PRESS CONFERENCE WITH SENATOR RICHARD DURBIN (D-IL); SENATOR JOHN SUNUNU (R-NH); AND OTHERS; TOPIC: THE DEPARTMENT OF JUSTICE INSPECTOR GENERAL'S REPORT ON NATIONAL SECURITY LETTERS AND PATRIOT ACT POWERS; LOCATION: THE RADIO/TV GALLERY, THE CAPITOL, WASHINGTON, D.C., Federal News Service, March 9, 2007 Friday, PRESS CONFERENCE OR SPEECH, 3019 words

54. PRESS CONFERENCE WITH ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION; TOPIC: THE DEPARTMENT OF JUSTICE INSPECTOR GENERAL'S REPORT ON NATIONAL SECURITY LETTERS AND PATRIOT ACT POWERS; LOCATION: WASHINGTON, D.C., Federal News Service, March 9, 2007 Friday, JUSTICE DEPARTMENT HEARING, 4460 words

55. PRESS CONFERENCE WITH SENATOR CHUCK SCHUMER (D-NY) AND REPRESENTATIVE RAHM EMANUEL (D-IL); SUBJECT: CHANGE OF COURSE IN IRAQ; LOCATION: SENATE RADIO/TV GALLERY, THE CAPITOL, WASHINGTON, D.C., Federal News Service, March 9, 2007 Friday, PRESS CONFERENCE OR SPEECH, 3301 words

56. REMARKS BY ATTORNEY GENERAL OF THE UNITED STATES ALBERTO GONZALES AT THE INTERNATIONAL ASSOCIATION OF PRIVACY PROFESSIONALS 2007 SUMMIT; LOCATION: GRAND BALLROOM, RENAISSANCE HOTEL, WASHINGTON, D.C., Federal News Service, March 9, 2007 Friday, 4130 words

57. PRESS CONFERENCE WITH SENATOR PATRICK LEAHY (D-VT), CHAIRMAN OF THE SENATE JUDICIARY COMMITTEE, AND SENATOR ARLEN SPECTER (R-PA), RANKING MEMBER; TOPIC: THE DEPARTMENT OF JUSTICE INSPECTOR GENERAL'S REPORT ON NATIONAL SECURITY LETTERS AND PATRIOT ACT POWERS; LOCATION: THE SENATE RADIO/TV GALLERY, THE CAPITOL, WASHINGTON, D.C., Federal News Service, March 9, 2007 Friday, PRESS CONFERENCE OR SPEECH, 1948 words

58. Teachers Having Sex with Students, Fox News Network, SHOW: FOX HANNITY & CO 9:00 PM EST, March 9, 2007 Friday, NEWS; Domestic, 1676 words, Sean Hannity; Alan Colmes, Mercedes Colwin

59. FBI Abused Patriot Act Powers, Fox News Network, SHOW: FOX SPECIAL REPORT WITH BRIT HUME 6:00 PM EST, March 9, 2007 Friday, NEWS; Domestic, 2000 words, Jim Angle, Catherine Herridge, Major Garrett, Carl Cameron

60. FBI Under Fire; Lewis Libby's Cloud, Fox News Network, SHOW: FOX SPECIAL REPORT WITH BRIT HUME 6:00 PM EST, March 9, 2007 Friday, 2083 words, Jim Angle; Mort Kondracke; Fred Barnes; Charles Krauthammer

61. DOJ IG Report Criticizes FBI's Use Of National Security Letters, The Frontrunner, March 9, 2007 Friday, WASHINGTON NEWS, 237 words

62. DOJ IG Report Criticizes FBI's Use Of National Security Letters, The Frontrunner, March 9, 2007 Friday, WASHINGTON NEWS, 237 words

63. FBI abused Patriot Act powers, audit finds , Guardian Unlimited , March 9, 2007, 503 words

64. FBI ABUSED PATRIOT ACT POWERS, AUDIT FINDS, Guardian Unlimited, March 9, 2007 Friday, A2007030958-14102-GNW, 506 words

65. "A Review of the Federal Bureau of Investigation's Use of National Security Letters", How Appealing, March 9, 2007 Friday 10:54 AM EST, , 51 words, Howard Bashman

66. The Hyperventilating Starts Early, Joust the Facts, March 9, 2007 Friday 3:05 PM EST, , 487 words, Giacomo

67. FACT SHEET: Department of Justice Actions on FBI Use of National Security Letters,  Justice Department Documents and Publications, March 9, 2007, JUSTICE DEPARTMENT PRESS RELEASES, 440  words

68. FBI abused its powers, the inspector general finds,  Knight Ridder Washington Bureau, March 9, 2007 Friday, WASHINGTON DATELINE, 20070309-BC-FBI, 992 words, By Greg Gordon, McClatchy Newspapers, WASHINGTON

69. FBI Investigations Faulted in Scathing Report,  National Public Radio (NPR), SHOW: All Things Considered 8:00 PM EST , March 9, 2007 Friday, 810  words

70. Libby, Iraq and Justice,  National Public Radio (NPR), SHOW: All Things Considered 8:00 PM EST , March 9, 2007 Friday, 1699  words

71. Audit Finds Illegal Use of Patriot Act,  National Public Radio (NPR), SHOW: Day to Day 4:00 PM EST , March 9, 2007 Friday, 852  words

72. FBI's Use of 'National Security Letters' Questioned,  National Public Radio (NPR), SHOW: Morning Edition 11:00 AM EST , March 9, 2007 Friday, 679  words

73. U.S. Report to Fault Wide Use Of Special Subpoenas by F.B.I.,  The New York Times, March 9, 2007 Friday,  Late Edition - Final, Section A; Column 2; National Desk; Pg. 1, 1077 words, By DAVID JOHNSTON and ERIC LIPTON, WASHINGTON, March 8

74. FBI Finds Misuses of Patriot Act,  The NewsHour with Jim Lehrer, SHOW: NEWSHOUR 6:00 PM EST, March 9, 2007 Friday, NEWS; International, 7034  words, Ray Suarez, Judy Woodruff, Jeffrey Brown

75. Reaction of Senator Patrick Leahy, Chairman, Senate Judiciary Committee, on the Inspector General's Report on the Use of National Security Letters ,  PR Newswire US, March 9, 2007 Friday 6:33 PM GMT, , 162 words, WASHINGTON March 9

76. Fact Sheet: Department of Justice Actions on FBI Use of National Security Letters ,  PR Newswire US, March 9, 2007 Friday 6:26 PM GMT, , 491 words, WASHINGTON March 9

77. Prepared Remarks of Attorney General Alberto R. Gonzales at the International Association of Privacy Professionals Privacy Summit ,  PR Newswire US, March 9, 2007 Friday 5:56 PM GMT, , 2943 words, WASHINGTON March 9

78. FBI draws flak for use of anti-terrorism laws' provision,  The Press Trust of India, March 9, 2007 Friday, NATIONWIDE INTERNATIONAL NEWS, 243  words, New York Mar 9

79. Inspector general: FBI is misusing "national security letters",  Salon.com, March 9, 2007 Friday, WAR ROOM, 558 words, Tim Grieve

80. The FBI's lawbreaking is tied directly to President Bush,  Salon.com, March 9, 2007 Friday, GREENWALD, 2513 words, Glenn Greenwald

81. The week in review,  Scripps Howard News Service, March 09, 2007, Friday 5:23 PM EST, , DOMESTIC NEWS, 780 words, THOMAS HARGROVE, Scripps Howard News Service

82. Improper snooping under Patriot Act,  Scripps Howard News Service, March 09, 2007, Friday 3:44 PM EST, , COMMENTARY, 302 words, An editorial / By Dale McFeatters, Scripps Howard News Service

83. Error Prone,  Slate Magazine, March 9, 2007 Friday, TODAY'S PAPERS, 946 words, Daniel Politi

84. Error Prone,  Slate Magazine, March 9, 2007 Friday, TODAY'S PAPERS, 946 words, Daniel Politi

85. Error Prone,  Slate Magazine, March 9, 2007 Friday, TODAY'S PAPERS, 946 words, Daniel Politi

86. Error Prone,  Slate Magazine, March 9, 2007 Friday, TODAY'S PAPERS, 946 words, Daniel Politi

87. Error Prone,  Slate Magazine, March 9, 2007 Friday, TODAY'S PAPERS, 946 words, Daniel Politi

88. G-Men Behaving Badly,  Slate Magazine, March 9, 2007 Friday, TODAY'S BLOGS, 996 words, Michael Weiss

89. Error Prone,  Slate Magazine, March 9, 2007 Friday, TODAY'S PAPERS, 946 words, Daniel Politi

90. Justice Dept. report faults FBI data on Patriot Act,  St. Louis Post-Dispatch (Missouri), March 9, 2007 Friday,  FIRST EDITION, NEWS; Pg. A6, 182 words, THE ASSOCIATE PRESS

91. Justice Dept. report faults FBI data on Patriot Act,  St. Louis Post-Dispatch (Missouri), March 9, 2007 Friday,  THIRD EDITION, NEWS; Pg. A6, 180 words, THE ASSOCIATE PRESS, WASHINGTON

92. JUSTICE REPORT CRITICIZES FBI'S USE OF PATRIOT ACT,  Sun-Sentinel (Fort Lauderdale, Florida), March 9, 2007 Friday,  BROWARD METRO Edition, NATIONAL; Pg. 9A, 959 words, WASHINGTON {BYLINE} By Lara Jakes Jordan The Associated Press

93. Impeach Alberto Gonzales,  TalkLeft: the Politics of Crime, March 9, 2007 Friday 8:04 PM EST, , 287 words, Big Tent Democrat

94. Frequent Errors In FBI's Secret Records Requests;  Audit Finds Possible Rule Violations,  TechNews, March 9, 2007 Friday 3:58 AM GMT, , POLITICS; Pg. A01, 1335 words, By John Solomon and Barton Gellman, Washington Post Staff Writers

95. CIVIL LIBERTIES;  FBI USE OF 'NATIONAL SECURITY LETTERS' CRITICIZED,  TECHNOLOGY DAILY, March 9, 2007 Thursday, AM EDITION, 164 words

96. CIVIL LIBERTIES;  MISUSE OF 'NATIONAL SECURITY LETTERS' SPURS OUTCRY,  TECHNOLOGY DAILY, March 9, 2007 Friday, PM EDITION, 497 words

97. Audit finds FBI flaws pervasive in secret requests for records,  Unknownpub: Star-Ledger, The (Newark, NJ), March 9, 2007 Friday,   FINAL EDITION, NEWS; Pg. 4, 968 words, JOHN SOLOMON AND BARTON GELLMAN, WASHINGTON POST, WASHINGTON

98. Legislators: FBI may need reining in,  UPI, March 9, 2007 Friday 4:11 PM EST, , 160 words, WASHINGTON, March 9

99. UPI NewsTrack TopNews,  UPI, March 9, 2007 Friday 8:44 AM EST, , 870 words

100. Report: FBI errors in records program,  UPI, March 9, 2007 Friday 7:42 AM EST, , 167 words, WASHINGTON, March 9

101. REP. HOYER ISSUES STATEMENT ON REPORT CRITICIZING FBI'S USE OF NATIONAL SECURITY LETTERS,  US Fed News, March 9, 2007 Friday 10:58 PM  EST, , 216  words, US Fed News, WASHINGTON

102. SEN. SUNUNU: INSPECTOR GENERAL'S REPORT ON NATIONAL SECURITY LETTERS INDICATES 'FAILURE OF SUPERVISION, MANAGEMENT, AND LEADERSHIP' AT FEDERAL BUREAU OF INVESTIGATION,  US Fed News, March 9, 2007 Friday 9:26 PM  EST, , 496  words, US Fed News, WASHINGTON

103. SEN. SPECTER COMMENTS FROM PRESS CONFERENCE OF INSPECTOR GENERAL'S REPORT,  US Fed News, March 9, 2007 Friday 9:07 PM  EST, , 224  words, US Fed News, WASHINGTON

104. Reaction of Senator Patrick Leahy, Chairman, Senate Judiciary Committee, on the Inspector General's Report on the Use of National Security Letters,  U.S. Newswire, March 9, 2007 Friday 1:33 PM EST, , POLITICAL EDITORS, 153 words, WASHINGTON,  March 9

105. Fact Sheet: Department of Justice Actions on FBI Use of National Security Letters,  U.S. Newswire, March 9, 2007 Friday 1:26 PM EST, , LEGAL AFFAIRS EDITORS, 98 words, WASHINGTON,  March 9

106. Prepared Remarks of Attorney General Alberto R. Gonzales at the International Association of Privacy Professionals Privacy Summit,  U.S. Newswire, March 9, 2007 Friday 12:56 PM EST, , LEGAL AFFAIRS EDITORS, 2515 words, WASHINGTON,  March 9

107. CIVIL LIBERTIES ADVOCATES' WORST FEARS REALIZED WITH PATRIOT ACT SCANDAL,  US Fed News, March 9, 2007 Friday 5:41 AM  EST, , 490  words, US Fed News, WASHINGTON

108. FACT SHEET: JUSTICE DEPARTMENT ACTIONS ON FBI USE OF NATIONAL SECURITY LETTERS,  US Fed News, March 9, 2007 Friday 4:33 AM  EST, , 451  words, US Fed News, WASHINGTON

109. REP. NADLER TO HOLD HEARINGS ON FBI'S MISUSE OF POWER TO SECRETLY GATHER PRIVATE INFORMATION,  US Fed News, March 9, 2007 Friday 2:17 AM  EST, , 387  words, US Fed News, WASHINGTON

110. REPS. FLAKE, SCHIFF TROUBLED BY PATRIOT ACT ABUSE,  US Fed News, March 9, 2007 Friday 1:48 AM  EST, , 401  words, US Fed News, WASHINGTON

111. SEN. DURBIN ISSUES STATEMENT REGARDING DEPARTMENT OF JUSTICE'S INSPECTOR GENERAL REPORT ON PATRIOT ACT,  US Fed News, March 9, 2007 Friday 1:46 AM  EST, , 847  words, US Fed News, WASHINGTON

112. SEN. BIDEN ISSUES STATEMENT ON FBI'S MISUSE OF PATRIOT ACT,  US Fed News, March 9, 2007 Friday 1:15 AM  EST, , 171 words, US Fed News, WASHINGTON

113. SEN. GRASSLEY COMMENTS ON INSPECTOR GENERAL'S REPORT ON NATIONAL SECURITY LETTERS,  US Fed News, March 9, 2007 Friday 1:01 AM  EST, , 394  words, US Fed News, WASHINGTON

114. HOUSE JUDICIARY COMMITTEE TO HOLD HEARINGS ON FBI'S SECRET RECORDS REPORTS,  US Fed News, March 9, 2007 Friday 12:44 AM  EST, , 487  words, US Fed News, WASHINGTON

115. Probe Finds FBI Abused Ability to Obtain Private Records,  Voice of America News, March 9, 2007, VOA ENGLISH SERVICE, 156  words

116. Frequent Errors In FBI's Secret Records Requests;  Audit Finds Possible Rule Violations,  The Washington Post, March 9, 2007 Friday,   Final Edition, A Section; A01, 1346 words, John Solomon and Barton Gellman, Washington Post Staff Writers

117. Where's Karl Rove?,  Washingtonpost.com, March 9, 2007 Friday 3:08 PM EST, , OPINION, 4514 words, Dan Froomkin, Special to washing-tonpost.com, washingtonpost.com

118. FBI admits improper, illegal use of law to get personal information, Xinhua General News Service, March 9, 2007 Friday 6:00 PM EST, , WORLD NEWS; Political, 382 words, WASHINGTON

119. Friday, March 9, CNN.com, March 9, 2007 Friday 10:23 PM EST, , WORLD, 3559 words

120. SEN. RICHARD J. DURBIN HOLDS A NEWS CONFERENCE ON THE JUSTICE DEPARTMENT INSPECTOR GENERAL'S INVESTIGATION OF THE USE OF NATIONAL SECURITY LETTERS, CQ Transcriptions "All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.", March 9, 2007 Friday, NEWS CONFERENCE, 1227 words, SEN. RICHARD J. DURBIN, SENATE MAJORITY WHIP, WASHINGTON, D.C.

121. FBI DIRECTOR ROBERT MUELLER HOLDS A NEWS CONFERENCE, CQ Transcriptions "All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.", March 9, 2007 Friday, NEWS CONFERENCE, 4382 words, FBI DIRECTOR ROBERT MUELLER, WASHINGTON, D.C.

122. SEN. PATRICK J. LEAHY AND SEN. ARLEN SPECTER HOLD A NEWS CONFERENCE ON THE JUSTICE DEPARTMENT INSPECTOR GENERAL'S INVESTIGATION OF THE USE OF NATIONAL SECURITY LETTERS, CQ Transcriptions "All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.", March 9, 2007 Friday, NEWS CONFERENCE, 1948 words, SEN. PATRICK J. LEAHY AND SEN. ARLEN SPECTER, WASHINGTON, D.C.

123. SEN. CHARLES E. SCHUMER AND REP. RAHM EMANUEL HOLD A NEWS CONFERENCE ON IRAQ, CQ Transcriptions "All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.", March 9, 2007 Friday, NEWS CONFERENCE, 3259 words, SEN. CHARLES E. SCHUMER AND REP. RAHM EMANUEL, WASHINGTON, D.C.

124. ATTORNEY GENERAL ALBERTO R. GONZALES DELIVERS REMARKS TO THE INTERNATIONAL ASSOCIATION OF PRIVACY PROFESSIONALS, CQ Transcriptions "All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.", March 9, 2007 Friday, NEWS EVENT, 2585 words, ATTORNEY GENERAL ALBERTO R. GONZALES, WASHINGTON, D.C.

125. Audit: FBI's Patriot Act snooping broke rules, CNN.com, March 9, 2007 Friday 6:49 PM EST, , LAW, 894 words, WASHINGTON



Sign in

Web   Images   Video   **News**   Maps   **more »**

[ FBI "national security letters" ]   [ Search ]   Advanced news search
Preferences

## News results

| | |
|---|---|
| **Browse Top Stories** | Results **1 - 50** of about **1,235** for FBI national-security-letters. **(0.24 seconds)** |
| | Sort by relevance **Sorted by date** |

Last hour
Last day
Past week
**Past month**

Archives New!

✉ News Alerts

RSS | Atom
About Feeds

### Gonzales Under Fire
New York Sun, NY - 11 minutes ago
... Justice Department found itself on the defensive over the US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### An Interview Gone Wild
News Hounds, CA - 31 minutes ago
... the "audit also concluded that the **FBI** had for three years underreported to Congress how often it used **national security letters** to get customer data. ...

### No. 3 Senate leader calls on Gonzales to resign
El Paso Times, TX - 1 hour ago
... Justice Department found itself on the defensive over the US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### Schumer Calls For Gonzales's Resignation
CBS News, NY - 1 hour ago
... found itself on the defensive over the dismissal of US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### Attorney general should resign, senator says
Houston Chronicle, TX - 1 hour ago
... found itself on the defensive over the dismissal of US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### Sen. Schumer says Gonzales should go
SI.com - 1 hour ago
... found itself on the defensive over the dismissal of US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### Schumer says Gonzales should go
CNN - 2 hours ago
... found itself on the defensive over the dismissal of US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### No. 3 Senate leader calls on Gonzales to step down
San Diego Union Tribune, CA - 2 hours ago
... Justice Department found itself on the defensive over the US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

### Schumer Calls for Attorney General Gonzales to Resign (Update1)
Bloomberg - 2 hours ago
Separately, the inspector general's audit released March 9 said the **FBI** improperly used so-called **national security letters** to collect telephone, banking, ...

 ### No. 3 Senate leader calls on Gonzales to step


[down](#)
WHDH-TV, MA - 2 hours ago
... found itself on the defensive over the dismissal of US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

[No. 3 Senate leader calls on Attorney General Gonzales to step down](#)
International Herald Tribune, France - 3 hours ago
... found itself on the defensive over the dismissal of US attorneys and the **FBI's** misuse of a type of subpoena known as **national security letters**. ...

[Bush admits 'shortfallings' in **FBI** use of Patriot Act](#)
International Herald Tribune, France - 6 hours ago
The audit also concluded that the **FBI** had for three years underreported to Congress how often it used **national security letters** to get customer data. ...

[Bush promises 'swift action' on Patriot Act abuses](#)
Capitol Hill Blue, VA - 7 hours ago
The American Civil Liberties Union called on Congress to repeal the provision of the Patriot Act that allows the **FBI** to use **national security letters**. ...

[The failed attorney general](#)
International Herald Tribune, France - 7 hours ago
Then his inspector general reported that the **FBI** has been using powers it obtained under the Patriot Act to get financial, business and telephone records of ...

[Surveillance: The buck stops where?](#)
Palladium-Item, IN - 9 hours ago
The **FBI's** top brass is admitting to illegally poking around into the personal lives of Americans under the auspices of the Patriot Act. ...

[Bush Pledges to End **FBI** Privacy Lapses](#)
Durham Herald Sun, NC - 9 hours ago
A new audit by the Justice Department's internal watchdog found that the **FBI** improperly used a tool called **national security letters**. ...

[Attorney general, **FBI** head vow to prevent illegal intrusions](#)
Mohave Valley News, NV - 10 hours ago
The audit also concluded that the **FBI** for three years underreported to Congress how often it used **national security letters** to ask businesses to turn over ...


[**FBI** Abused Patriot Act rules....Now act surprised](#)
Unconfirmed Sources (satire) - 11 hours ago
The Justice Department's inspector general looked at the **FBI's** use of **national security letters**, in which agents demand personal and business information ...

[Swinging back](#)
Baltimore Sun, MD - 11 hours ago
A Justice Department audit of the **FBI's** use of **national security letters** to obtain telephone, e-mail and financial records from US residents and visitors ...

[Sununu: Report indicates failure of supervision](#)
Laconia Citizen, NH - 11 hours ago
At issue are the **national security letters**, a power outlined in the Patriot

Act that the Bush administration pushed through Congress after the Sept. **...**

### FBI illegally used Patriot Act on public
Laconia Citizen, NH - 11 hours ago
The audit released Friday found that the number of **national security letters** issued by the **FBI** skyrocketed in the years after the Patriot Act became law. **...**

### Bush: Problems at FBI to be fixed
Detroit Free Press, MI - 12 hours ago
A new audit by the Justice Department's internal watchdog found that the **FBI** improperly used a tool called **national security letters**, **...**

### Bush says problems at FBI will be fixed
Arizona Daily Star, AZ - 13 hours ago
A new audit by the Justice Department's internal watchdog found that the **FBI** improperly used a tool called **national security letters**. **...**

### Scripps Howard News Service
HNN Huntingtonnews.net, WV - 13 hours ago
**...** subpoena that the local **FBI** office could issue on its own say-so that basically allowed open-ended searches. Previously, **national security letters** were **...**



### Bush pledges to end FBI privacy lapses
PakTribune.com, Pakistan - 14 hours ago
A new audit by the Justice Department`s internal watchdog found that the **FBI** improperly used a tool called **national security letters**. **...**



### He May Not Be Houdini, But...
Atlantic Free Press, Netherlands - 14 hours ago
**...** to take responsibility for the fact that the **FBI** "broke the law," and "under-reported" to Congress the number of **National Security Letters** it used by, **...**

### Abuse of Authority
Washington Post, DC - 15 hours ago
The report depicts an **FBI** cavalierly using its expanded power to issue "**national security letters**" without adequate oversight or justification. **...**



### Bush says FBI has addressed prying into personal information
China Post, Taiwan - 17 hours ago
**...** report from the Justice Department's internal watchdog that disclosed the **FBI's** transgressions involving a subpoena known as **national security letters**. **...**

### The Failed Attorney General
New York Times, NY - 18 hours ago
The **FBI** has been using powers it obtained under the Patriot Act to get financial, business and telephone records of Americans by issuing tens of thousands **...**

### Bush Addresses Misuse of FBI Subpoenas
New York Times, NY - 19 hours ago
ESTANCIA ANCHORENA, Uruguay, March 10 — President Bush acknowledged on Saturday "FBI shortfallings" in the disclosure that the bureau improperly used the **...**

 **Bush Pledges to End FBI Privacy Lapses**
Twin Falls Times-News, ID - 20 hours ago
A new audit by the Justice Department's internal
watchdog found that the FBI improperly used a tool
called **national security letters**. ...

**Bush Pledges to End FBI Privacy Lapses**
Wyoming News, WY - 20 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**DOJ leaders admit FBI broke laws in soliciting personal
information**
JURIST - 21 hours ago
Mueller also admitted that the FBI violated privacy protections in its use of
**national security letters** (NSLs) [FAS backgrounder; example, ...

**(AP) Bush Pledges to End FBI Privacy Lapses**
WKRN, TN - 21 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush Pledges to End FBI Privacy Lapses**
Hendersonville Times News, NC - 21 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush Pledges to End FBI Privacy Lapses**
Central Florida News 13|, FL - 21 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush Pledges to End FBI Privacy Lapses**
phillyBurbs.com, PA - 21 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush Pledges to End FBI Privacy Lapses**
Newsday, NY - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush pledges to end FBI privacy lapses**
Times Picayune, LA - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush pledges to end FBI privacy lapses**
Belleville News-Democrat, IL - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush pledges to end FBI privacy lapses**
Brocktown News, NV - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

**Bush pledges to end FBI privacy lapses**
White Rock Reviewer, SD - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
FBI improperly used a tool called **national security letters**. ...

[Bush Pledges to End **FBI** Privacy Lapses](#)
San Francisco Chronicle, CA - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush pledges to end **FBI** privacy lapses](#)
Chandler News-Dispatch, MN - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush pledges to end **FBI** privacy lapses](#)
Meadow Free Press, ID - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush pledges to end **FBI** privacy lapses](#)
Jordan Falls News, IA - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush pledges to end **FBI** privacy lapses](#)
Sky Valley Journal, WY - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush pledges to end **FBI** privacy lapses](#)
The Benton Crier, IA - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush Pledges To End **FBI** Privacy Lapses](#)
Guardian Unlimited, UK - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

[Bush pledges to end **FBI** privacy lapses](#)
Akron Farm Report, NE - 22 hours ago
A new audit by the Justice Department's internal watchdog found that the
**FBI** improperly used a tool called **national security letters**. ...

**New!** More ways to find the latest on **FBI national-security-letters**:
- [Search blogs](#)
- [Create an email alert](#)



Result Page:   **1**   2   3   4   5   6   7   8   9   10   **Next**

| FBI "national security letters" |   [ Search ]

©2007 Google - [About Google News](#) - [Help Center](#) - [Help for Publishers](#) - [Terms of Use](#) - [Google Home](#)

# FEDERAL BUREAU OF INVESTIGATION

Home | Site Map | FAQs

SEARCH

## Contact Us

- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

## Learn About Us

- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

## Get Our News

- Press Room
- E-mail Updates
- News Feeds

## Be Crime Smart

- Wanted by the FBI
- More Protections

## Use Our Resources

- For Law Enforcement
- For Communities
- For Researchers
- More Services

## Visit Our Kids' Page

## Apply for a Job

 

**Top Story**

## Mortgage Fraud

### New Partnership to Combat Problem

Equity skimming. Property flipping. Straw buyers. Inflated appraisals. These are some of the schemes criminals are using to take advantage of a $2.37 trillion mortgage market in the U.S. To fight the scourge, we've partnered with leading representatives of the mortgage finance industry. Full Story

**Extra**

Read our response to the DOJ Inspector General's report on the use of National Security Letters and our answers to questions about their use and investigative value.

### FBI in the News

- CA Brothel Money Laundering
- Photographer Child Porn Plea
- SF Gang Members Sentenced
- Heroin Ring Prison Sentence
- More News

### More Stories

- 2006 Financial Crimes Report
- FBI Response to WMD Threats
- FBI Records on Zodiac Killer
- Top Story Index
- FBI Radio: Gotcha | FBI This Week

### Issues & Concerns

- National Name Check Program
- The FBI and Library Records
- FBI Transformation Since 9/11
- Help Prevent Terrorist Attacks
- Checks & Balances on the FBI

### What We Investigate

 Follow the links below for details on each of our investigative priorities.

- Counterterrorism
- Counterintelligence
- Cyber
- Public Corruption
- Civil Rights
- Organized Crime
- White Collar Crime
- Major Thefts/Violent Crime

### Be Crime Smart

 Get advice and tips for protecting your family, your community, and your workplace.

- New E-Scams and Warnings
- Reporting Internet Fraud
- Sex Offender Registry
- Submitting Case Tips
- Common Fraud Schemes
- Internet Safety For Kids
- More Tips and Suggestions

### Wanted By the FBI

 Help us find wanted fugitives and missing persons. Rewards are being offered in some cases.

- Most Wanted Terrorists
- Seeking Terrorism Info
- Top Ten Fugitives
- Featured Fugitives
- Parental Kidnappings
- Crime Alerts
- Kidnappings, Missing Persons
- Televised Sexual Predators

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Links | Privacy Policy | USA.gov | White House

FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

# EXHIBIT 3

*Electronic Frontier Foundation v. Dep't of Justice*, Civ. No. 06-1773-RBW

Plaintiff's Opposition to Defendant's Motion for *Open America* Stay

LEXSEE 2005 U.S. DIST. LEXIS 20042

**THE WILDERNESS SOCIETY, et al., Plaintiffs, v. UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Defendants.**

**Civil Action No. 04-0650 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2005 U.S. Dist. LEXIS 20042**

**September 12, 2005, Decided**

**COUNSEL:** [*1] For WILDERNESS SOCIETY, Plaintiff: James Stuart Angell, Edward B. Zukoski, EARTHJUSTICE, Denver, CO; Leslie L. Jones, THE WILDERNESS SOCIETY, Washington, DC.

For SOUTHERN UTAH WILDERNESS ALLIANCE, Plaintiff: James Stuart Angell, Edward B. Zukoski, EARTHJUSTICE, Denver, CO.

For UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, GALE NORTON, in her capacity as Secretary for the Interior of the United States, KATHLEEN CLARKE, in her capacity as Director of the Bureau of Land Management, ELAINE ZIELINSKI, in her capacity as Director of the Bureau of Land Management's Arizona Office, Defendants: Oliver W. McDaniel, U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA, CIVIL DIVISION, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

### MEMORANDUM OPINION

Plaintiffs, The Wilderness Society and the Southern Utah Wilderness Alliance, brought this action for declaratory and injunctive relief against the United States Department of the Interior, Bureau of Land Management, and various members of the Department of the Interior ("the Department") in their official capacities for failure to produce records as [*2] requested pursuant to the Freedom of Information Act, 5 U.S.C. ß 552 ("FOIA"). Plaintiffs, non-profit environmental organizations that seek to protect America's wilderness and promote sensible land management, seek records held by the Depart-

ment that relate to the Department's passage of certain amendments to the "Disclaimer Rule" on January 6, 2003 -- a policy shift which enables states, counties, and interest groups to wrest title from the United States in order to build highway rights-of-way across federal lands pursuant to a Civil War-era law generally known as R.S. 2477. *See* 43 C.F.R. Part 1864, 68 Fed. Reg. 494-503 (Jan. 6, 2003); Act of July 26, 1866, ß 8, 14 Stat. 251, 253, formerly ß 2477 of the Revised Statutes, later 43 U.S.C. ß 932, *repealed by* Pub. L. No. 94-579, Title VII ß 706(a) (1976).

Currently before the Court are two motions: (1) Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay, to which Plaintiffs have filed an Opposition; and (2) Plaintiffs' Motion for Summary Judgment, to which Defendants have filed an Opposition, and Plaintiffs have filed a Reply [*3] and two Notices of Supplemental Authority. Upon a searching examination of the parties' motions, the attached exhibits, the relevant case law, and the entire record herein, the Court shall deny Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay, deny without prejudice Plaintiffs' Motion for Summary Judgment, and shall require the parties to file a Joint Status Report with this Court by September 28, 2005 setting out information as detailed in this Memorandum Opinion. *See infra* Section III(B).

### I: BACKGROUND

Over the past two decades, the State of Utah and various counties within Utah -- as well as other counties and special interest groups across the West -- have declared their intention to claim thousands of highway rights-of-way across federal lands in order to promote transportation and development pursuant to a Civil War-era law known as R.S. 2477. Environmental groups have opposed these claims, arguing that they traverse some of the most scenic and environmentally sensitive public lands in the country, including proposed wilderness, fed-

eral wilderness study areas, national parks, and national monuments. As Plaintiffs contend, [*4] "recognition of such rights-of-way could lead to the construction of ecologically destructive highways across these lands." Pls.' Mot. for Summ. J. at 5.

On January 6, 2003, the Department of the Interior passed several amendments to the so-called "Disclaimer Rule" in order to facilitate the ability of states, counties, and interest groups to wrest title from the United States of these claimed rights-of-way and spur development. *See* Pls.' 2nd Am. Compl. P 17 (citing 43 C.F.R. Part 1864, 68 Fed. Reg. 494-503 (Jan. 6, 2003)). The Disclaimer Rule implements a provision of the Federal Land Policy and Management Act ("FLPMA") that allows the federal government to disclaim its interest in lands. *Id.* P 18. Among other things, the 2003 revised rule allows states, counties, local governments, and special interest groups to obtain disclaimers regardless of whether they have ever been recognized as owners of record, which the Disclaimer Rule had previously required. *Id.* Moreover, the new rule also exempts states and local governments from the statute-of-limitations requirement that applies to all other property owners seeking a disclaimer, and allows the Department to [*5] recognize R.S. 2477 claims within national parks and wildlife refuges, even over the objections of the National Park Service or the U.S. Fish and Wildlife Service. *Id.* After the adoption of the 2003 revised rule, the Department secretly negotiated a Memorandum of Understanding ("MOU") with the State of Utah, signed on April 11, 2003, that specifies how the Disclaimer Rule will be used to recognize potentially tens of thousands of miles of claimed highways through public lands in Utah. Pls.' Stmt. of Facts P 9, n.1; Pls.' 2nd Am. Compl. P 20. On January 14, 2004, the State of Utah submitted its first request for a right-of-way under R.S. 2477 pursuant to the MOU, with at least nineteen other submissions planned. Pls.' 2nd Am. Compl. P 22.

In an effort to garner information regarding the Department's policy shifts and to determine the new policy's potential impact on public lands, Plaintiffs submitted separate FOIA requests via facsimile and email with three government offices on September 26, 2003 -- one with the Department of the Interior, one with the Bureau of Land Management's Washington, D.C., headquarters office, and one with the Arizona State Office of the Bureau of Land [*6] Management. *Id.* P 23; Pls.' Stmt. of Facts P 9; Pl.'s Mot. for Summ. J., Exs. 2-4. Plaintiffs requested:

> **all records** (including but not limited to documents, information, faxes, letters, comments, emails, summaries of tele-

phone conversations, handwritten notes, meeting minutes, or any other materials) generated, modified, or acquired by . . . [each agency] **relating to or otherwise concerning** the following:

> . implementation of revisions to regulations concerning Recordable Disclaimers of Interest, 43 C.F.R. Part 1860, adopted January 6, 2003;

> . submission of requests for recordable disclaimers;

> . memoranda of understanding (MOUs) or other agreements concerning recordable disclaimers of interest and/or rights-of-way under Revised Statute (R.S.) 2477, including but not limited to the MOU entered into between the Interior Department and the State of Utah on April 9, 2003;

> . policy, rules, legislation, or guidance relating to R.S. 2477;

> . any and all individual R.S. 2477 claims or assertions; and

> . any and all R.S. 2477 potential claims or potential assertions.

Pls.' 2nd Am. Compl. P 23; Pls.' Stmt. of Facts P [*7] 9; Exs. 2-4 at 1 (emphasis in original).

Nearly two months after Plaintiffs submitted their three FOIA requests to Defendants, the Department sent Plaintiffs a letter on November 19, 2003, that simply acknowledged its receipt of Plaintiffs' various FOIA requests. Pls.' Stmt. of Facts P 11. The Department's November 19, 2003 letter did not provide Plaintiffs with any of the requested information, and did not inform Plaintiffs of their appeal rights. *Id.* However, the November 19, 2003 letter did indicate that the Department was then "in the process of issuing a determination on

[Plaintiffs'] request for a fee waiver." Pls.' Corrected Opp'n, Ex. 4 at 1. On December 10, 2003, the Department informed Plaintiffs that it had made a "decision to deny your request for a waiver of FOIA processing fees for the entirety of your request." Pls.' Stmt. of Facts P 12; Pls.' Mot. for Summ. J., Ex. 6 at 3. The December 10, 2003 letter stated that Plaintiffs could appeal the "decision to deny your request for a waiver of FOIA processing fees for the entirety of your request," Pls.' Corrected Opp'n, Ex. 5 at 3, or -- rather than appeal -- Plaintiffs could (1) limit their request to documents already [*8] available to the public and receive such at no cost; (2) specify an amount that they were willing to pay so that the Department could process the request to the extent that the agreed amount covered the Department's costs; or (3) agree to pay the full costs of processing the entire request, id. at 4-5. The December 10, 2003 letter did not provide an estimate of the costs associated with processing Plaintiffs' FOIA requests. See id.

Plaintiffs administratively appealed the Department's denial of their fee waiver petition on December 19, 2003. Pls.' Stmt. of Facts P 13; Pls.' Mot. for Summ. J., Ex. 8. In their appeal, Plaintiffs asserted that they were entitled to a waiver of fees pursuant to 5 U.S.C. ß 552(a)(4)(A)(iii) and 43 C.F.R. ß 2.19, and also appealed the Department's failure to determine and announce what documents it would release or withhold as required by 5 U.S.C. ß 552(a)(6)(A)(i). Id. The Department did not address Plaintiffs' appeal until April 6, 2004, upon which it issued a decision that did not grant the requested fee waiver and did not respond to Plaintiffs' appeal of the Department's alleged failure to promptly [*9] provide the requested records. Pls.' Stmt. of Facts PP 13-14; Pls.' Mot. for Summ. J., Ex. 9 at 1.

Meanwhile, on February 6, 2004, the Department provided a partial, incomplete response to Plaintiffs' three FOIA requests. Pls.' Stmt. of Facts P 15; Pls.' Mot. for Summ. J., Ex. 11. This February 6 response acknowledged the it was "limited" to a subset of the requested records -- namely, the external correspondence and final agency documents for which Plaintiffs would have qualified for a full fee waiver -- from one of the Department's offices, as it was "still awaiting file search results" from the other two offices to which Plaintiffs had directed their requests. Id. The letter accompanying this production noted that the Department was enclosing copies of fifty-three (53) documents, and that "redactions will be clearly identified and labeled." Pls.' Corrected Opp'n, Ex. 10 at 2. On March 22, 2004, Plaintiffs appealed this February 6, 2004 partial response, reiterating their December 19, 2003 challenge to the Department's alleged failure to respond by providing all responsive records in a timely manner and expanding their challenge to "unlawful" redactions in several of the fifty-three [*10] documents

provided in the February 6, 2004 partial response. Pls.' Corrected Opp'n, Ex. 11 at 2. On April 27, 2004, the Department notified Plaintiffs that their appeal was "awaiting legal review," that a response would be provided "as soon as possible," and that Plaintiffs had the right to "treat the delay in responding . . . as a final denial" of their appeal. Pls.' Corrected Opp'n, Ex. 12 at 1.

In response to the delays encountered, Plaintiffs filed a Complaint before this Court on April 22, 2004. Plaintiffs amended their original complaint on June 9, 2004, and -- with Defendants' consent -- submitted a Second Amended Complaint on July 27, 2004. Plaintiffs' Second Amended Complaint contends that the Department's actions violated the strictures of the FOIA in three separate ways: (1) Defendants failed to provide Plaintiffs with all of the information requested in their September 2003 FOIA requests in a timely manner; (2) Defendants failed to grant Plaintiffs a waiver of fees with respect to the information requested; and (3) Defendants failed to make a determination on Plaintiffs' appeal of the denial of the fee waiver requested in their September 26, 2003 FOIA request letters. [*11] See 2nd Am. Compl. at 12. On July 29, 2004, after ten months of effectively denying Plaintiffs their fee waiver request, personnel of the Department signed a declaration stating that "upon careful consideration, the Department has reversed its earlier decision to deny Plaintiff's [sic] request for fee waivers" and that with this reversal, the Department considers "the fee waiver issue to be resolved." Defs.' Mot. to Dismiss, Ex. 1 (7/29/04 Decl. of Ms. Sue Ellen Sloca) at P 3.

Defendants, on August 10, 2004, filed a Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay. Defendants argue that dismissal is warranted under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for two reasons: (1) because -- according to Defendants -- "Plaintiffs here have advanced a pure challenge to the Department's refusal to grant a fee-waiver without any component challenging the underlying policy associated with the fee waiver," "Plaintiffs' fee waiver challenge is mooted by the Department's decision to grant the fee waiver," Defs.' Mot. to Dismiss at 3; and (2) Plaintiffs failed to exhaust their administrative remedies as required, id. at 4-5. In [*12] the alternative, Defendants request a six-month *Open America* stay. Id. at 5-9. After simply setting forth the case law relevant to such a stay, Defendants assert *in toto*:

> As should be apparent now, Defendants, by regulation could not fully process Plaintiffs' FOIA request until the fee-waiver issue has been resolved. Now that it has been resolved by the Department's

reversing its decision, the DOI can now fully process the request. Because Plaintiffs effectively concede that they were given the opportunity to limit their request, but refused to do so, instead filing suit, both exceptional circumstances and due diligence should be found to exist[.]

Defs.' Mot. to Dismiss at 8-9. In their motion, Defendants do not specifically identify the due diligence exercised as to Plaintiffs' requests, nor do they explicate the exceptional circumstances necessitating the delay, nor do they attach any affidavits attesting to such alleged facts. *See generally* Defs.' Mot. to Dismiss.

In addition to opposing Defendants' motion, n1 Plaintiffs filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on October 4, 2004, in which they assert that [*13] summary judgment in their favor is appropriate due to the fact that the Department "has failed for more than a full year to comply with a statutory deadline requiring a response to [Plaintiffs'] FOIA requests within 20 days" -- i.e., 5 U.S.C. ß 552(a)(6)(A)(i). *See* Pls.' Mot. for Summ. J. at 9. Plaintiffs also contend that the Department's "illegal failure to timely grant [Plaintiffs'] fee waiver cannot excuse the agency's failure to timely respond to [Plaintiffs'] requests." *Id.* at 8. n2

n1 "Due to an error of counsel," Plaintiffs' counsel "inadvertently mischaracterized Plaintiffs' Second Amended Complaint" in "several places" in its two initial Oppositions to Defendants' Motion to Dismiss. *See, e.g.,* Pls.' Unopposed Mot. to File a Corrected Opp'n at 1. As such, with Defendants consent, Plaintiffs filed two separate Unopposed Motions to File a Corrected Opposition, each of which the Court shall grant.

n2 Defendants failed to respond to Plaintiffs' Motion for Summary Judgment within the requisite time period. As such, on November 2, 2004, Plaintiffs filed a Motion to Treat as Conceded Plaintiffs' Motion for Summary Judgment. On November 4, 2004, Defendants filed with this Court a Motion for Leave to File an Opposition to Plaintiffs' Motion for Summary Judgment, which the Court granted *nunc pro tunc* on November 17, 2004. As such, Plaintiffs' Motion to Treat as Conceded Plaintiffs' Motion for Summary Judgment is denied as moot.

[*14]

In the time period subsequent to the parties' motions, the Department has provided Plaintiffs with two supplemental installments of documents responsive to their September 26, 2003 FOIA requests -- one of which arrived on April 8, 2005, and the other of which was provided on July 7, 2005. *See* Pls.' 5/20/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J.; Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. While certainly much more substantial than the first installment provided on February 6, 2004, Plaintiffs consider these responses "incomplete" due to the fact that Defendants have withheld numerous documents and "heavily-redacted" other records pursuant to FOIA Exemption 5 "without satisfying the most basic standards for invoking exemptions." Pls.' 5/20/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. at 2. In support of *their* claim, Plaintiffs have highlighted several examples of "documents withheld in full or in part [which] are simply stamped Exemption 5' with absolutely no indication on them as to why they might be exempt from disclosure." Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. at 4. Defendants [*15] have not filed a response to Plaintiffs' supplemental notices, nor have they filed a *Vaughn* index detailing the withheld documents and relevant redactions.

## II: LEGAL STANDARDS

As noted previously, Defendants have moved to dismiss Plaintiffs' action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and, in the alternative, have moved for a stay under the doctrine elicited in *Open America v. Watergate Special Prosecution Force*, 178 U.S. App. D.C. 308, 547 F.2d 605 (D.C. Cir. 1976). In contrast, Plaintiffs have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The Court shall discuss the relevant legal standards for each motion in turn.

### A. Defendants' Motion

#### 1. Rule 12(b)(1)

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1). In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to relief." *Kowal v. MCI Commun. Corp.*, 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citations omitted). A court may appropriately dispose of a case [*16] under 12(b)(1) for standing, and may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 357 U.S. App. D.C. 72, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Artis v. Greenspan*,

223 F. Supp. 2d 149, 152 n.1 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment") (citing *Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507, 515 (6th Cir. 1999)). At the stage in litigation when dismissal is sought, the plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. [*17] *EEOC v. St. Francis Xavier Parochial Sch.*, 326 U.S. App. D.C. 67, 117 F.3d 621, 624 (D.C. Cir. 1997); *Leatherman v. Tarrant County Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000); *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F. Supp. 2d 15, 18 (D.D.C.1998).

2. Rule 12(b)(6)

"In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, unlike resolving a motion under Rule 12(b)(1), the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 199 U.S. App. D.C. 23, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be liberally [*18] construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are not supported by the facts set out in the complaint." *Kowal*, 16 F.3d at 1276. Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 328 U.S. App. D.C. 52, 132 F.3d 753, 762 (D.C. Cir. 1997). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See St. Francis Xavier Sch.*, 117 F.3d at 624; *Marshall County Health Care Auth. v. Shalala*, 300 U.S. App. D.C. 263, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993). Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion,

particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy*, 308 U.S. App. D.C. 36, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf.* [*19] *Behrens v. Pelletier*, 516 U.S. 299, 309, 133 L. Ed. 2d 773, 116 S. Ct. 834 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

3. *Open America* Stay

Under Section 552 (a)(6)(C)(i) of FOIA, the Government may obtain a stay of proceedings "if the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. ß 552(a)(6)(C)(i). In *Open America*, the D.C. Circuit addressed Section 552(a)(6)(C)(i) and found that an agency is entitled to additional time under FOIA's "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

547 F.2d at 616 (quoting 5 U.S.C. ß 552 (a)(6)(C)). Effective October 2, 1997, as part of the Electronic Freedom of Information Amendments of 1996, Congress added [*20] the following two subsections to Section 552(a)(6)(C):

> (ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

> (iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. ß 552 (a)(6)(C)(ii), (iii). The legislative history of the 1996 amendments reveals that Congress, having considered the decision in *Open America*, intended the amendments to be "consistent with the holding in *Open America,"* and sought only to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104-795 at 24 (1996), *reprinted in* 1996 U.S.C.C. [*21] A.N. 3448, 3467. However, the amendments clearly contemplate that other circumstances, such as an agency's efforts to reduce the number of pending requests, the amount of classified material, the size and complexity of other requests processed by the agency, the resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals, are relevant to the courts' determination as to whether exceptional circumstances exist. *Id.*

When considering a request for an *Open America* stay, "agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. Secs. & Exch. Comm'n*, 288 U.S. App. D.C. 324, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted).

*B. Plaintiffs' Motion*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); [*22] *Tao v. Freeh*, 307 U.S. App. D.C. 185, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendants, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiffs, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, [*23] the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). [*24] Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

Currently before the Court are Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay Pursuant to 5 U.S.C. ß 552(a)(6)(C), and Plaintiffs' Motion for Summary Judgment. The Court shall address each motion in turn.

*A. Defendants' Motion to Dismiss or for an Open America Stay*

1. Motion to Dismiss

Defendants make two arguments in favor of dismissal of Plaintiffs' Second Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. First, Defendants claim that "Plaintiffs here have advanced a pure challenge to the Department's refusal to grant a fee-waiver without any component challenging the underlying policy associated with the fee waiver." Defs.' Mot. to Dismiss at 3. [*25] As such, given the fact that the July 29, 2004 Declaration of Ms. Sue Ellen Sloca, Office of the Secretary, Department of the Interior, noted that "the Department has reversed its earlier decision to deny Plaintiff's [sic] requests for fee waivers for te processing of the Requests," *see id.*, Ex. 1 (7/29/04 Decl. of Ms. Sue Ellen Sloca) at P 3, De-

fendants assert that the claims within Plaintiffs' Second Amended Complaint are moot. *Id.* at 3 (citing *Better Gov't Ass'n v. Dep't of State*, 250 U.S. App. D.C. 424, 780 F.2d 86, 91 (D.C. Cir. 1986); *Pub. Citizen v. Dep't of State*, 349 U.S. App. D.C. 291, 276 F.3d 634, 641 (D.C. Cir. 2002)). Second, Defendants contend that Plaintiffs have failed to exhaust their administrative remedies, an essential requirement before a party can seek judicial review. *Id.* at 4 (citing *Dettmann v. Dep't of Justice*, 802 F.2d 1472, 1477, 256 U.S. App. D.C. 78 (D.C. Cir. 1986)). Specifically, Defendants argue that because Plaintiffs failed to pay the requested fees and appealed the decision denying the fee waiver, their "appeal was not effective as to the full processing of the FOIA request, since by regulation full processing could not occur before the fee issue had been [*26] resolved." *Id.* at 5.

Each argument forwarded by Defendants is without merit. First, Defendants misconstrue the scope of Plaintiffs' Second Amended Complaint. Plaintiffs' Second Amended Complaint alleges at least two distinct violations of FOIA: (1) the Department's failure to make available the requested records and its failure to make a determination as to whether it would provide or withhold requested records within the stated twenty-day deadline; and (2) the Department's failure to make a determination concerning Plaintiffs' fee waiver request. *See* Pls.' 2nd Am. Compl. PP 31-40 & 12. Defendants' July 29, 2004 decision to grant Plaintiffs' fee petition, after nearly one year of obfuscation and various denials, only renders moot the second argument propounded by Plaintiffs in their Second Amended Complaint. Plaintiffs' first contention that "because the [Department] continues to violate FOIA's mandate to provide records promptly' and to make a determination as to whether [the Department] would provide or withhold requested records and to respond to a FOIA appeal within 20 days" remains in live controversy. *See* Pls.' Corrected Opp'n at 10. Given the broader [*27] scope of Plaintiffs' Second Amended Complaint and the issues still in controversy, it is clear that Defendants' assertion that the entire case is moot is certainly without foundation.

Second, federal case law makes plain the fact that Plaintiffs have exhausted their administrative remedies sufficient to establish jurisdiction in this case vis-a-vis their remaining claims. Before proceeding with this suit, Plaintiffs pursued a two-track administrative appeals process. For instance, Plaintiffs administratively appealed the Department's December 10, 2003 denial of their fee waiver petition by filing an appeal on December 19, 2003 in which they (1) asserted that they were entitled to a waiver of fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 43 C.F.R. § 2.19, and (2) appealed the Department's failure to determine and announce what documents it would release or withhold as required by 5

U.S.C. § 552(a)(6)(A)(i). Pls.' Stmt. of Facts P 13; Pls.' Mot. for Summ. J., Ex. 8. Next, Plaintiffs appealed Defendants' February 6, 2004 partial response with a filing on March 22, 2004 that reiterated their December 19, 2003 challenge to the Department's [*28] alleged failure to respond by providing all responsive records in a timely manner and expanded their challenge to the "unlawful" redactions in several of the fifty-three documents provided in the February 6, 2004 partial response. Pls.' Corrected Opp'n, Ex. 11 at 2. After these two appeals, the Department notified Plaintiffs on April 27, 2004 that their March 22, 2004 appeal was "awaiting legal review," that a response would be provided "as soon as possible," and that Plaintiffs had the right to "treat the delay in responding . . . as a final denial" of their appeal. Pls.' Corrected Opp'n, Ex. 12 at 1. In this April 27, 2004 letter, the Department specifically informed Plaintiffs that, given the delay they had experienced, Plaintiffs could now "seek judicial review in the United States District Court for the District in which you reside or have your principal place of business, the District in which the records subject to your appeal are located, or the United States District Court for the District of Columbia." *Id.*

Accordingly, it is clear that at every opportunity Plaintiffs administratively appealed the (1) Department's delays in processing their FOIA request and fee waiver [*29] petitions, (2) the Department's denial of their fee waiver petition, and (3) the Department's withholding of certain documents and redactions in other provided records. Importantly, Plaintiffs filed suit in this Court only after two events -- each separately sufficient to establish jurisdiction -- took place. First, the Department actually informed Plaintiffs on April 27, 2004 that they were free to seek judicial relief in order to resolve these three areas of contention. *See* Pls.' Corrected Opp'n, Ex. 12 at 1. Second, Plaintiffs ensured that they had made several administrative appeals of the Department's initial decision to refuse to waive the fees associated with the processing of their FOIA requests. The law of this Circuit demonstrates that no further exhaustion by Plaintiffs is required to pursue their claim that Defendants have unlawfully failed to respond to their FOIA requests. *See, e.g., Oglesby v. Dep't of the Army*, 287 U.S. App. D.C. 126, 920 F.2d 57, 66 (D.C. Cir. 1990) ("Exhaustion does not occur until the required fees are paid *or an appeal is taken from the refusal to waive fees*") (emphasis added); *Maydak v. Dep't of Justice*, 254 F. Supp. 2d 23, 49 (D.D.C. 2003) [*30] ("The payment or waiver of fees or an administrative appeal from the denial of a fee waiver request is a jurisdictional prerequisite to bringing suit on a FOIA claim in district court."); *Krese v. Executive Office of the President*, Civ. A. No. 99-2415 (JR), 2000 U.S. Dist. LEXIS 14024, at * 3 (D.D.C. Sept. 25, 2000) (same). As such, Defendants' allegation that Plaintiffs are somehow attempting to "leapfrog" over the administra-

tive appeal process is simply without merit. Given that a portion of Plaintiffs' Second Amended Complaint remains in controversy, and Plaintiffs properly exhausted their administrative remedies, Defendants' Motion to Dismiss must be denied.

## 2. Motion for a Six-Month *Open America* Stay

In the alternative, Defendants move for a six-month stay of these proceedings under 5 U.S.C. ß 552(a)(6)(C)(i) and *Open America v. Watergate Special Prosecution Force*, 547 F.2d at 616, to allow them "an opportunity to fully prosecute Plaintiffs' FOIA requests as required." Defs.' Mot. to Dismiss at 5. According to Defendants, "a period of six months" is required, "depending upon the true scope of Plaintiffs' requests, [*31] to process them." *Id.* Defendants contend that Plaintiffs could have expedited their request previously given that they were provided the opportunity to limit their request, and assert that "both exceptional circumstances and due diligence should be found to exist." *Id.* at 8-9.

Defendants' Motion for an *Open America* stay must fail for two reasons. First, given that Defendants filed their motion on August 10, 2004, and provided Plaintiffs with supplemental documents pursuant to their FOIA requests on April 8, 2005 and July 7, 2005, it is clear from the record that any further extension of the production timeline is simply unwarranted. Second, Defendants fail to meet the standard for an *Open America* stay to extend their production timeline. Pursuant to the 1996 amendments, Congress tightened the standard for obtaining a stay by defining the term "exceptional circumstances" so as to exclude any "delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of requests." 5 U.S.C. ß 552(a)(6)(C)(ii). Under D.C. Circuit law, a stay pursuant to this subsection and the [*32] *Open America* doctrine may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising due diligence' in processing the requests; *and* (4) the agency shows reasonable progress' in reducing its backlog of requests." *Williams v. Fed. Bureau of Investigation*, Civ. A. No. 99-3378 (AK), 2000 U.S. Dist. LEXIS 17493, at * 4 (D.D.C. Nov. 30, 2000) (emphasis in original); *see also Summers v. Dep't of Justice*, 288 U.S. App. D.C. 219, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors). Agency affidavits provide a critical insight into this process, and are often determinative. *See SafeCard Servs.*, 926 F.2d at 1200; *Aguilera v. Fed. Bureau of Investigation*, 941 F. Supp. 144, 149 (D.D.C. 1996) (citing agency affidavits in addressing stay criteria).

Here, Defendants have failed to provide any evidence or make any allegations that would meet the standards necessary to support a stay. Defendants' Motion to Dismiss contains no [*33] specifics other than a bald assertion that "both exceptional circumstances and due diligence should be found to exist." Defs.' Mot. to Dismiss at 8-9. Defendants provide no analysis, statistics, affidavits, declarations or other sworn statements from agency personnel to support this contention. In Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, Defendants "expand" this argument by noting that the Department "proffers that it is inundated with a large volume of FOIA requests and that it is unable to process the request submitted by Plaintiffs within the statutorily commanded period of time." Defs.' Opp'n at 4. Once again, Defendants fail to support this claim with any analysis, statistics, agency affidavits, declarations, or other sworn statements. Accordingly, the factors relied upon by previous courts to make a finding of "exceptional circumstances" are conspicuously absent here. *See, e.g., Edmond v. United States Attorney*, 959 F. Supp. 1, 3 (D.D.C. 1997) (declarations filed by defendants providing explanations for backlog and describing attempts to remedy the delay by reassigning staff); *Jimenez v. Fed. Bureau of Investigation*, 938 F. Supp. 21, 31 (D.D.C. 1996) [*34] (agency submitted declarations detailing limited agency resources and FOIA response backlog); *Kuffel v. Bureau of Prisons*, 882 F. Supp. 1116, 1127 (D.D.C. 1995) ("The agencies have provided evidence in their affidavits. . . ."). Defendants do no more than allege that the Department faces a large but unspecified volume of requests; as such, they simply fail to establish (1) an unanticipated number of requests; (2) inadequate resources; (3) that they are exercising "due diligence"; and (4) that they are making "reasonable progress" in the reduction of their backlog of FOIA requests. Given that Defendants fail to meet the necessary standards, Defendants motion for an *Open America* stay must be denied.

## B. Plaintiffs' Motion for Summary Judgment

Plaintiffs, in their initial Motion for Summary Judgment, make the relatively straight-forward argument that they are entitled to summary judgment pursuant to 5 U.S.C. ß 552(a)(6)(A)(i), 43 C.F.R. ß 2.12(a) -- the implementing regulations for FOIA that require the Department to have responded to Plaintiffs' September 26, 2003 FOIA requests by October 27, 2003. *See* Pls.' Mot. for Summ. J. at 6. [*35] Given that Defendants did not even acknowledge Plaintiffs' request until November 19, 2003, and did not provide Plaintiffs with any information concerning the content of their requests for more than a year following this communication, Plaintiffs contend that they are entitled to summary judgment. *Id.*

However, after Plaintiffs' filed their Motion for Summary Judgment, Defendants expanded their initial

February 6, 2004 partial production of documents and provided Plaintiffs with several hundreds of pages of material on both April 8, 2005 and July 7, 2005. *See* Pls.' 5/20/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J.; Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. In response, Plaintiffs have filed two "Notices of Supplemental Authority in Support of Their Motion for Summary Judgment" that discuss in depth these additional productions and assert that (1) the Department has failed to conduct a reasonable search for the requested documents, *see, e.g.,* Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. at 3; and (2) the Department's submission of some, heavily-redacted records does not satisfy with its obligation [*36] to comply with FOIA, *id.* Plaintiffs further argue that "for virtually all the redactions" the Department invokes FOIA Exemption Five but fails to satisfy its "heavy burden of showing how the specific privilege applies to each of the redacted or withheld records." *Id.* at 3-4 (emphasis in original).

Upon a review, it is clear that Defendants' decision to produce requested documents to Plaintiffs and Plaintiffs' subsequent Notices of Supplemental Authority have significantly altered the parameters of Plaintiffs' initial Motion for Summary Judgment. Despite this material alteration, Defendants have provided no response to the assertions contained within Plaintiffs' Notices of Supplemental Authority, nor have they filed anything with the Court approximating a *Vaughn* index. Given the sheer lack of material before the Court at this time and the need for a new set of motions to accompany this new stage in the litigation, the Court shall deny without prejudice Plaintiffs' current Motion for Summary Judgment and shall grant Plaintiffs leave to refile an expanded motion at the appropriate time. Rather than proceed down the path to which this litigation has been drifting, the [*37] Court shall give the parties until September 28, 2005 to communicate and discuss (1) what materials have been provided, or are predicted to be provided (and when); (2) what materials have been withheld, or are predicted to be withheld (and when); and (3) what materials have been redacted, or are predicted to be redacted (and when). The parties are to meet and discuss whether they can come to an agreement over any areas in which they have a difference of opinion. If the parties are unable to reach an agreement, they shall provide this Court with a Joint Status Report on September 28, 2005 that sets out where the parties are in the current production phase and what disputes remain. In the Joint Status Report, the parties are also to propose dates to the Court for the filing of the *Vaughn* index in this case, and for the anticipated cross-motions for summary judgment to accompany the completion of the FOIA production process.

## IV: CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay is denied. Further, Plaintiffs' Motion for Summary Judgment is denied without prejudice. Moreover, Plaintiffs' two [*38] motions to amend or correct their Oppositions to Defendants' Motion to Dismiss are granted, and Plaintiffs' Motion to Treat as Conceded Plaintiffs' Motion for Summary Judgment is denied *nunc pro tunc*. Finally, Plaintiffs and Defendants are to meet and construct a Joint Status Report to be filed with this Court by September 28, 2005, in which they inform the Court of the status of the FOIA production and set out proposed dates for the filing of a *Vaughn* index and the anticipated cross-motions for summary judgment. An Order accompanies this Memorandum Opinion.

Date: September 12, 2005

COLLEEN KOLLAR-KOTELLY

United States District Judge

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 12th day of September, 2005, hereby

**ORDERED** that [14] Defendants' Motion to Dismiss or, in the Alternative, Motion for an *Open America* Stay is DENIED; it is further

**ORDERED** that [19] Plaintiffs' Motion to Amend/Correct [18] Plaintiffs' Memorandum in Opposition to [14] Defendants' Motion to Dismiss or, in the Alternative, Motion for an *Open America* Stay is GRANTED; it is further

**ORDERED** that [20] Plaintiffs' Unopposed [*39] Motion to Amend/Correct [18] Plaintiffs' Memorandum in Opposition to [14] Defendants' Motion to Dismiss or, in the Alternative, Motion for an *Open America* Stay is GRANTED; it is further

**ORDERED** that [21] Plaintiffs' Motion for Summary Judgment is DENIED WITHOUT PREJUDICE; it is further

**ORDERED** that [23] Plaintiffs' Motion to Treat as Conceded [21] Plaintiffs' Motion for Summary Judgment is DENIED *nunc pro tunc;* it is further

**ORDERED** that the parties are to meet and confer, and provide the Court with a Joint Status Report by Wednesday, September 28, 2005 setting out the information and proposed dates as specified in this Court's accompanying Memorandum Opinion.

**SO ORDERED.**

2005 U.S. Dist. LEXIS 20042, *

COLLEEN KOLLAR-KOTELLY                          United States District Judge

# EXHIBIT 4

*Electronic Frontier Foundation v. Dep't of Justice*, Civ. No. 06-1773-RBW

Plaintiff's Opposition to Defendant's Motion for *Open America* Stay

LEXSEE 2005 U.S. DIST. LEXIS 18876

**ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff, v. UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**Civil Action No. 02-0063 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2005 U.S. Dist. LEXIS 18876**

**August 31, 2005, Decided**
**August 31, 2005, Filed**

**PRIOR HISTORY:** Elec. Privacy Info. Ctr. v. United States DOJ, 2004 U.S. Dist. LEXIS 28485 (D.D.C., Aug. 23, 2004)

**COUNSEL:** [*1] For ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff: Chris Jay Hoofnagle, ELECTRONIC PRIVATE INFORMATION CENTER, San Francisco, CA.

For U.S. DEPARTMENT OF JUSTICE, DEPARTMENT OF THE TREASURY, Defendants: Vesper Mei, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

### MEMORANDUM OPINION

(August 31, 2005)

Plaintiffs initiated this action on January 14, 2002, seeking release of agency records under the Freedom of Information Act ("FOIA"), 5 U.S.C. ß 552, related to government use of privately owned databases containing personal information. Currently before the Court is Defendants' motion for a stay of proceedings in the above-captioned action until August 31, 2005 pursuant to the doctrine announced in *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 178 U.S. App. D.C. 308 (D.C. Cir. 1976). According to Defendants, although the Federal Bureau of Investigation ("FBI") is exercising due diligence in responding to the Plaintiff's FOIA request, exceptional circumstances have prevented it from completely processing Plaintiff's request -- which covers around 5,000 [*2] pages of documents relating to a classified contract between the Government and ChoicePoint, Inc., a private company that sells personal information -- within the statutory time limit. Plaintiff opposes Defendants' motion. Upon a review of the parties' filings, the attached exhibits, the lengthy affidavit submitted by Mr. Keith R. Gehle, Assistant Section Chief of the FBI's Record/Information Dissemination Section, the relevant case law, and the entire record herein, the Court shall grant Defendants' Motion for an *Open America* Stay.

### I: BACKGROUND

By a letter dated June 22, 2001, Plaintiff submitted a FOIA request to the FBI, seeking "all records relating to transactions, communications, and contracts concerning businesses that sell individuals' personal information." Compl., Ex. A (6/22/01 FOIA request). By a letter dated July 7, 2001, FBI Headquarters closed Plaintiff's request upon a finding that its parameters were too vague. *See* Defs.' Mot. to Stay, Ex. A (9/23/04 Decl. of Keith Gehle)("Gehle Decl.") at P 22. Following a clarification letter from Plaintiff dated August 8, 2001, FBI Headquarters subsequently acknowledged Plaintiff's request as seeking access to information [*3] concerning only ChoicePoint, Inc., a private company that sells personal information. *Id.* Following Defendants' lack of responsiveness, Plaintiff's filed this action on January 14, 2002.

As a result, what is now the FBI's Record/Information Dissemination Section began its search for documents responsive to Plaintiff's FOIA request on February 15, 2002. *Id.* The search revealed two large categories of potentially responsive documents: (1) documents related to a public contract that the FBI has with ChoicePoint to provide FBI employees access to information about individuals and companies as well as archived news databases; and (2) approximately 5,000 pages of documents related to a classified contract be-

2005 U.S. Dist. LEXIS 18876, *

tween the FBI and ChoicePoint. Once these documents were identified, it became apparent that the total volume of potentially responsive records would be quite large. *Id.* P 23. As such, after failed negotiations to narrow the scope of Plaintiff's FOIA request, the FBI proceeded on parallel tracks with regard to the two categories of documents. *Id.* As for the documents related to the public ChoicePoint contract, the FBI sought and obtained a stay of proceedings until January 31, 2003, and [*4] later through April 30, 2003, to complete its review, processing, and release of that material. *Id.*

With respect to the second category of documents, i.e., the classified ChoicePoint contract, Defendants notified Plaintiff of the existence of this material in a letter dated May 28, 2003, and informed Plaintiff that processing of the material would take in excess of eighteen (18) months. *See* 12/30/03 Pub. Decl. of J. Stephen Tidwell (then-Deputy Assistant Director of the FBI's Criminal Investigative Division) P 16. On October 1, 2003, after Plaintiff declined Defendants' invitation to exclude the material from its FOIA request, Defendants informed Plaintiff again that it would take the FBI approximately twenty-four (24) months to process the 5,000 pages. *Id.* P 18. On December 31, 2003, Defendants sought to exclude these 5,000 pages of material from the FOIA request, or alternatively to be granted an eighteen (18) month stay to process (b)(1) exemptions first, or a twenty-four (24) month stay to process the documents under all exceptions. *See* Defs.' Mot. to Exclude Classified Docs. From Pl.'s FOIA Request or, in the Alternative, to Brief FOIA Exemption (B)(1) Issues [*5] First or, in the Alternative, for an Extension of Time.

In a Memorandum Opinion and Order dated August 23, 2004, this Court denied Defendants' motion to exclude the 5,000 pages of documents relating to the classified ChoicePoint contract from processing, but invited Defendants to move for a stay pursuant to the doctrine set forth in *Open America. See Elec. Privacy Info. Ctr. v. United States DOJ*, 2004 U.S. Dist. LEXIS 28485, Civ. No. 02-0063 (CK), at 13 (D.D.C. Aug. 23, 2004) (memorandum opinion denying Defendants' motion to exclude documents) ("Defendant is invited to move for a stay that meets the *Open America* standard."). Taking the Court's invitation, Defendants filed the present Motion for an *Open America* Stay on September 23, 2004, claiming that exceptional circumstances exist to justify the delay in production of the 5,000 pages of documents responsive to Plaintiff's FOIA request.

In Defendants' filing, they note that the classification review of the 5,000 pages is presently ongoing at the FBI's Record/Information Dissemination Section Classification Unit ("CU"). Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") P 24. These documents are being reviewed first for the applicability of Exemption [*6] (b)(1), and are

being prepared for review by the Department of Justice's Department Review Committee ("DRC"). *Id.* A total of nine (9) FOIA paralegals in CU are performing the classification review, and -- at the time of Defendants' filing -- 3,535 pages were reviewed already for initial classification. *Id.* P 25. The DRC will then review all classification determinations in the documents at issue and concur or disagree with the CU's classification actions. *Id.* P 24. The CU will then apply the DRC's classification decisions to the documents, make the appropriate changes, and stamp the face of each document to indicate the date that the DRC review occurred. *Id.* After the CU and DRC complete their (b)(1) work on the documents, the collected material will be forwarded to the Disclosure Unit for a page-by-page, line-by-line review of the information to determine if any exemptions in addition to Exemption (b)(1) should be applied. *Id.* Although it was planned that the case was to be assigned to one (1) FOIA paralegal in the Disclosure Unit for processing, additional paralegals were to be made available for the assignment. *Id.* P 25. The FBI avers that it is committed [*7] to completing the review as expeditiously as possible while balancing the competing demands of other pending requests both in the litigation and administrative queues. *Id.*

## II: LEGAL STANDARDS

Under FOIA, an agency is required to determine within twenty (20) days of the receipt of a request for records "whether to comply with such request[,]" and "to immediately notify the person making such request of such determination and the reasons thereof." 5 U.S.C. ß 552(a)(6)(A)(i). However, this time limit can be extended by ten (10) working days if the agency determines that "unusual circumstances" exist. 5 U.S.C. ß 552(a)(6)(B).

Nevertheless, FOIA explicitly contemplates the possibility of a stay of judicial proceedings at the district court level. Under Section 552 (a)(6)(C)(i) of FOIA, the Government may obtain a stay of proceedings "if the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. ß 552(a)(6)(C)(i). Moreover, in *Open America*, the D.C. Circuit addressed Section 552(a)(6)(C)(i) and found that an agency is entitled to additional time [*8] under FOIA's "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the

2005 U.S. Dist. LEXIS 18876, *

agency can show that it "is exercising due diligence" in processing the requests.

547 F.2d at 616 (quoting 5 U.S.C. ß 552 (a)(6)(C)). Effective October 2, 1997, as part of the Electronic Freedom of Information Amendments of 1996, Congress added the following two subsections to Section 552(a)(6)(C):

> (ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

> (iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person [*9] made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. ß 552 (a)(6)(C)(ii), (iii). The legislative history of the 1996 amendments reveals that Congress, having considered the decision in *Open America*, intended the amendments to be "consistent with the holding in *Open America*," and sought only to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104-795 at 24 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3467. However, the amendments clearly contemplate that other circumstances, such as an agency's efforts to reduce the number of pending requests, the amount of classified material, the size and complexity of other requests processed by the agency, the resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals, are relevant to the courts' determination as to whether exceptional circumstances exist. *Id.*; *see also* EFOIA Report, at *23, H.R. Rep. No. 106-50, 106th Cong., 1st Sess., 1999 WL 132731, [*10] at *13 (Mar. 19, 1999).

Following the decision in *Open America*, courts in the D.C. Circuit "have interpreted [Section (a)(6)(C) ] as excusing any delays encountered in responding to a request as long as the agencies are making a good faith effort and exercising due diligence in processing the requests on a first-in first-out basis." *Kuffel v. U.S. Bureau of Prisons*, 882 F. Supp. 1116, 1127 (D.D.C. 1995) (citations omitted); *see also Edmond v. United States Atty.*, 959 F. Supp. 1, 3 (D.D.C. 1997) ("Courts have uniformly granted the government reasonable periods of time in which to review FOIA requests when there is a backlog."); *Ferguson v. Fed. Bureau of Investigation*, 722 F. Supp. 1137, 1140 (S.D.N.Y. 1989) ("In the D.C. Circuit, courts generally have granted extensions when presented with evidence of an overburdened agency following necessary procedures.") (citations omitted).

Under D.C. Circuit law, a stay pursuant to this subsection and the *Open America* doctrine may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests [*11] within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising due diligence' in processing the requests; *and* (4) the agency shows reasonable progress' in reducing its backlog of requests." *Williams v. FBI*, 2000 U.S. Dist. LEXIS 17493, at *4, Civ. A. No. 99-3378 (AK) (D.D.C. Nov. 30, 2000) (emphasis in original); *see also Summers v. Dep't of Justice*, 288 U.S. App. D.C. 219, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors). Agency affidavits provide a critical insight into this process, and are often determinative. *See SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200, 288 U.S. App. D.C. 324 (D.C. Cir. 1991) (citations and internal quotation marks omitted) ("Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."); *Aguilera v. Fed. Bureau of Investigation*, 941 F. Supp. 144, 149 (D.D.C. 1996) (citing agency affidavits in addressing stay criteria).

### III: DISCUSSION

Upon a searching examination of parties' filings, the attached exhibits, [*12] Mr. Gehle's Affidavit, and the relevant case law, the Court concludes that Defendants have met the standards necessary to obtain an *Open America* stay. The Court finds that Defendants have established both that exceptional circumstances exist and that the FBI has been proceeding with its response to Plaintiff's FOIA request with due diligence. Accordingly, the Court shall grant Defendants' motion for a stay of proceedings in this matter until August 31, 2005, pursuant to the doctrine elicited in *Open America*.

First, the Court concludes that "exceptional circumstances" exist to warrant the imposition of a temporary *Open America* stay -- i.e., the FBI (1) is currently inundated with an unanticipated amount of lengthy FOIA

requests, (2) its current resources are inadequate to re-spond to these requests, including Plaintiff's request, in the time period set forth by the statute, and (3) the agency clearly has made reasonable progress in reducing its once-substantial backlog despite these exceptional circumstances. Importantly, FOIA places an extreme burden on the FBI's information processing resources: the FBI receives an average of 700 FOIA requests each month, and due to [*13] the rise in litigation and appeals over the last twenty years, the FBI's FOIA backlog jumped from its 1985 level of 4,736 requests to a high of 16,244 requests on December 31, 1996. *See* Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") P 8. Due to this backlog, the agency sought additional funding from Congress, which provided it with over 368 new employees in the 1997 and 1998 budgets. *Id.* P 14. Due to this influx of staffing and continued good faith responsiveness, the FOIA backlog has fallen from the high of 16,244 on De-cember 31, 1996 to the August 30, 2004 figure of 1,763 requests currently outstanding -- a reduction of roughly 89%. *Id.* The FBI anticipates that future totals will reflect a continuation of this downward trend. *Id.* As such, while the FBI currently faces a large backlog of requests, the recent reduction of that unanticipated backlog certainly constitutes "reasonable progress" as required by Section 552(a)(6)(C)(ii).

Moreover, despite this commendable reduction, it is also plain that the FBI's current resources remain inade-quate to respond to FOIA requests such as those made by Plaintiff within the time required by statute. First, em-ployees within the FBI's [*14] Record/Information Dis-semination Section must now split their time with other, ever-increasing duties. For instance, handling administra-tive appeals -- of which there were approximately 480 pending resolution on August 30, 2004 -- consumes sub-stantial amounts of FOIA staff time, taking employees away from their regular processing efforts. *Id.* P 9. The Record/Information Dissemination Section has also as-sumed significant litigation responsibilities, which fur-ther reduce the amount of available processing time. *Id.* P 10. On August 30, 2004, the FBI was involved in ap-proximately 150 pending lawsuits in various federal courts involving roughly 650 FOIA requests. *Id.* Second, in response to the tragic events of September 11, 2001, the FBI has diverted manpower to assist with the ongo-ing "war on terrorism." *Id.* P 13. In furtherance of the FBI's newfound responsibilities, the agency has shifted and refocused many of its priorities and resources in a manner that has resulted in the shifting, or "detailing," of numerous paralegal assistants from the Re-cord/Information Dissemination Section to operational divisions within FBI Headquarters for indeterminate pe-riods of time to work [*15] in support of the "war on terrorism." *Id.* This has further exacerbated the resource crunch within the Record/Information Dissemination

Section and ensured that its resources are currently in-adequate to ensure that response time to FOIA requests falls within the statutory timeframe.

In weighing these factors, the Court concludes that the FBI faces "exceptional circumstances" warranting an *Open America* stay. The Court notes that its finding is consonant with the recent rulings of other courts within this jurisdiction. *See, e.g., Summers v. Cent. Intelligence Agency*, Civ. No. A. 98-1682, at 1-2 (D.D.C. July 26, 1999) (memorandum opinion granting stay because "the FBI has demonstrated through its affidavits that excep-tional circumstances do exist, the agency is exercising due diligence in processing requests, and it is making reasonable progress in reducing its backlog"); *Haddon v. Freeh*, 31 F. Supp. 2d 16, 19 (D.D.C. 1998) (noting that court had granted an *Open America* stay until January 1998 on request submitted to the FBI nearly four years before); *Narducci v. Fed. Bureau of Investigation*, Civ. A. No. 98-0130, at 1 (D.D.C. July 17, 1998) (granting [*16] approximately three-year stay because the FBI "is deluged with a volume of requests for information vastly in excess of that anticipated by Congress"); *Guzzino v. FBI*, 1997 U.S. Dist. LEXIS 462, Civ. A. No. 95-1780, 1997 WL 22886, at *2 (D.D.C. Jan. 10, 1997) (granting more than four-year stay because "the FBI has shown that even though it is exercising due diligence, because of inadequate resources it is unable to respond to plain-tiff's request within the statutory [] limit").

Second, the Court concludes that the FBI has dem-onstrated the "due diligence" necessary to substantiate an *Open America* stay. Plaintiff's request, which covers more than 5,000 pages, is certainly a "large request" as defined by the FBI, as it stretches beyond 2,500 pages. See U.S. DEPARTMENT OF JUSTICE FREEDOM OF INFORMATION ACT (FOIA) REPORT FOR FISCAL YEAR 2003, Compliance With Time Limits/Status of Pending requests, *available at* http://www.usdoj.gov/oip/annual_report/2003/03contents .htm. It is not surprising that large requests such as the present one take additional amounts of time. *See, e.g., Jimenez v. Fed. Bureau of Investigation*, 938 F. Supp. 21, 24, 31-32 (D.D.C. 1996) [*17] (issuing *Open America* stay until March 2000, five years after request filed, so FBI could process 700 pages); *Ohaegbu v. Fed. Bureau of Investigation*, 936 F. Supp. 7, 8 (D.D.C. 1996) (grant-ing stay until July 1997, over three years after request filed, to permit FBI to process 175 pages); *Cecola v. FBI*, 1995 U.S. Dist. LEXIS 13253, Civ. No. 94-4866, 1995 WL 549066, at *1-*2 (N.D.Ill. Sept. 8, 1995) (dismissing case without prejudice to permit FBI until November 1999 to complete processing of over 1,500 pages respon-sive to a request filed over six years before). Moreover, it is clear that the FBI has been exercising "due diligence" vis-a-vis FOIA requests in general. The substantial re-

duction in the FBI's backlog is attributable to an increase in manpower, the introduction of certain on-line and computerized processing techniques to reduce delays, and the adoption of a new three-queue first-in, first-out system. *See* Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") PP 15-16. This new three-tiered system, which replaced the two-track, first-in, first-out system that the D.C. Circuit previously recognized as supporting a "due diligence" argument, *see* [*18] *Open America*, 547 F.2d at 616, has greatly increased the overall efficiency of the FBI's response system. *See* Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") P 19.

The FBI's general "due diligence" extends to the processing of Plaintiff's request. As noted previously, the 5,000 pages of documents associated with the classified contract must go through a review by the CU to determine the applicability of Exemption (b)(1), then must be reviewed by the DRC. *Id.* P 24. As of September 23, 2004, nine FOIA paralegals were working on Plaintiff's request, and reviewed over 3,500 pages at that early time. *Id.* P 25. After DRC review, the CU will apply the DRC's classification decisions and complete the (b)(1) work on the documents. *Id.* P 24. After this, the Disclosure Unit will be required to conduct page-by-page, line-by-line review of the information to determine if any exemptions other than Exemption (b)(1) might apply. *Id.* Given this system, the real improvements made, and the FBI's stated progress, the Court finds that the efforts made by the FBI constitute the "due diligence" necessary for the imposition of an *Open America* stay. As such, the Court is "satisfied [*19] that [the FBI] is doing the best it can do within its physical limitations to process all requests in a timely manner." *Freeman v. U.S. Dep't of Justice*, 822 F. Supp. 1064, 1066 (S.D.N.Y. 1993); *see also Ohaegbu*, 936 F. Supp. at 8 ("In view of this two-track system and the large volume of documents expected to be responsive to plaintiff's request, this Court finds that the FBI has met the due diligence requirement for a stay.").

**IV: CONCLUSION**

For the reasons set forth above, the Court shall grant Defendants' Motion for an *Open America* Stay until August 31, 2005, as requested. An Order accompanies this Memorandum Opinion.

Date: August 31, 2005

    COLLEEN KOLLAR-KOTELLY

    United States District Judge

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 31st day of August, 2005, hereby

**ORDERED** that [39] Defendants' Motion for an *Open America* Stay until August 31, 2005, is GRANTED.

**SO ORDERED.**

    COLLEEN KOLLAR-KOTELLY

    United States District Judge