IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**DEPARTMENT OF JUSTICE,** )<br>)<br>Defendant. )<br>) | Civ. No. 06-1773-RBW |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S
SUPPLEMENT TO MOTION FOR *OPEN AMERICA* STAY**

On April 2, 2007, defendant Department of Justice ("DOJ") moved for a stay of proceedings until February 2013 to allow the FBI to complete its processing of the FOIA requests at issue in this case. DOJ subsequently conceded that the requests are legally entitled to "expedited processing," but the Bureau has still not released a single page of responsive material to plaintiff, despite the fact that the requests have now been pending for more than one year. On August 22, 2007, plaintiff moved for entry of a preliminary injunction requiring the FBI to process 2500 pages of material each month and release non-exempt records or portions of records on a monthly, rolling basis. Defendant has now opposed plaintiff's motion and filed a "supplement" in support of its stay motion. The government's submission warrants a brief reply.

1. Notwithstanding defendant's suggestion that preliminary injunctive relief is somehow inappropriate in FOIA cases, the recent weight of authority clearly rejects that view. As this Court recognized last year, "[o]n numerous occasions, federal courts have entertained motions for a preliminary injunction in FOIA cases and, when appropriate,

have granted such motions." *Electronic Privacy Information Center v. Dep't of Justice*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006) (citations omitted). More recently, as we noted in our opening memorandum, the Court found that "where a plaintiff contends in good faith that an agency has failed to expedite a FOIA request in accordance with statute or regulation . . . the availability of an order that effectively is an injunction, preliminary or otherwise, should not be foreclosed." *Electronic Frontier Foundation v. Dep't of Justice*, C.A. No. 07-0656 (JDB) (D.D.C. June 15, 2007) (order granting in part and denying in part motion for preliminary injunction), attached to Motion for Preliminary Injunction as Exhibit B, at 4. Such an order is all that plaintiff seeks here.

    2. The FBI's characterizations of the burdensomeness of processing plaintiff's FOIA requests are clearly unreliable. The government's motion to stay proceedings until February 2013 was initially premised upon the Bureau's assertion that "72,000 pages of records [are] potentially responsive to EFF's FOIA requests." Defendant's Opposition and Supplement ("Def. Opp.") at 8. The Bureau now reports that it "has reviewed approximately 21,000 pages of documents; of those, it has identified 750 pages as responsive and eliminated the remainder as nonresponsive." *Id.* (citation omitted). In other words, less than 3.6 percent of the FBI's original estimate is, in fact, responsive to the requests and subject to processing. Assuming that a similar percentage will apply to the remaining estimate of 51,000 pages, the more realistic number would be approximately 1820 pages. As such, the *total* number of responsive pages (2570) would barely qualify for placement in the Bureau's "large" FOIA request processing queue.[1]

---

[1] The FBI employs a three track system for processing FOIA requests: small (500 pages or less); medium (501-2500 pages); and large (2501 pages or more). DOJ Reference

3.  The FBI appears to be backtracking on its initial representations concerning the rate at which it would process material responsive to plaintiff's requests. When it moved for a stay of proceedings in April, the Bureau asserted that it "will be able to process approximately 800 pages every four (4) weeks, and therefore anticipates that it will require approximately 68 months for responsive documents to be processed and released to plaintiff." Memorandum in Support of Motion for *Open America* Stay at 12 (citation omitted). Now that it is clear that the universe of "responsive" documents is far smaller than the FBI initially claimed, the Bureau is strangely silent on the question of its processing rate. It is unclear, for instance, why only 200 of the 750 pages of responsive material described in the government's submission "will be released to EFF on or before September 28, 2007." Def. Opp. at 8. Indeed, if (as now appears likely) fewer than 3000 pages of material are actually responsive to plaintiff's requests, a processing rate of 800 pages per month would result in the completion of all processing in less than four months. These "expedited" requests have now been pending for more than a year, and it is time for processing to be completed.

4.  Defendant DOJ implies that plaintiff should not be heard to complain about the processing delay at issue in this case because "the FBI has recently had to direct much of its processing capacity to meeting court-imposed schedules for accelerated processing of two other FOIA requests filed by EFF." *Id*. at 10 (citation omitted). Plaintiff acknowledges that it has submitted several FOIA requests to the FBI, many of which seek the disclosure of timely and potentially controversial information. Indeed, a front page article in yesterday's edition of the New York Times was based upon documents

---

Guide: Attachment C, Descriptions of DOJ Components, *available at* http://www.usdoj.gov/oip/attachmentbmay99.htm.

concerning the Bureau's use of National Security Letters that were recently released to plaintiff pursuant to this Court's order in *Electronic Frontier Foundation v. Department of Justice*, No. 07-cv-656 (D.D.C.). Eric Lichtblau, *F.B.I. Data Mining Reached Beyond Initial Targets*, NY Times, September 9, 2007 at A1 (attached hereto as Exhibit 1). While the Bureau may chafe under the requirements of expediting the processing of FOIA requests that are legally entitled to such handling, there can be no question that plaintiff's use of disclosed material serves the public interest and achieves precisely the result that Congress intended when it established a right to expedition.

## CONCLUSION

For the foregoing reasons and those set forth in plaintiff's opening memorandum, plaintiff's motion for a preliminary injunction should be granted and defendant's motion for a stay of proceedings until February 2013 should be denied.

Respectfully submitted,

 /s/ David L. Sobel
DAVID L. SOBEL
D.C. Bar No. 360418

MARCIA HOFMANN
D.C. Bar No. 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue NW
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

# Exhibit 1

*Electronic Frontier Foundation v. Dep't of Justice*, Civ. No. 06-1773-RBW

**Reply in Support of Plaintiff's Motion for a Preliminary Injunction and Response to Defendant's Supplement to Motion for *Open America* Stay**



September 9, 2007

# F.B.I. Data Mining Reached Beyond Initial Targets

By ERIC LICHTBLAU

WASHINGTON, Sept. 8 — The F.B.I. cast a much wider net in its terrorism investigations than it has previously acknowledged by relying on telecommunications companies to analyze phone-call patterns of the associates of Americans who had come under suspicion, according to newly obtained bureau records.

The documents indicate that the Federal Bureau of Investigation used secret demands for records to obtain data not only on individuals it saw as targets but also details on their "community of interest" — the network of people that the target was in contact with. The bureau stopped the practice early this year in part because of broader questions raised about its aggressive use of the records demands, which are known as national security letters, officials said.

The community of interest data sought by the F.B.I. is central to a data-mining technique intelligence officials call link analysis. Since the attacks of Sept. 11, 2001, American counterterrorism officials have turned more frequently to the technique, using communications patterns and other data to identify suspects who may not have any other known links to extremists.

The concept has strong government proponents who see it as a vital tool in predicting and preventing attacks, and it is also thought to have helped the National Security Agency identify targets for its domestic eavesdropping program. But privacy advocates, civil rights leaders and even some counterterrorism officials warn that link analysis can be misused to establish tenuous links to people who have no real connection to terrorism but may be drawn into an investigation nonetheless.

Typically, community of interest data might include an analysis of which people the targets called most frequently, how long they generally talked and at what times of day, sudden fluctuations in activity, geographic regions that were called, and other data, law enforcement and industry officials said.

The F.B.I. declined to say exactly what data had been turned over. It was limited to people and phone numbers "once removed" from the actual target of the national security letters, said a government official who spoke on condition of anonymity because of a continuing review by the Justice Department.

The bureau had declined to discuss any aspect of the community of interest requests because it said the issue was part of an investigation by the Justice Department inspector general's office into national security letters. An initial review in March by the inspector general found widespread violations in the F.B.I.'s use of the letters, but did not mention the use of community of interest data.

On Saturday, in response to the posting of the article on the Web site of The New York Times, Mike

Kortan, a spokesman for the F.B.I., said "it is important to emphasize" that community of interest data is "no longer being used pending the development of an appropriate oversight and approval policy, was used infrequently, and was never used for e-mail communications."

The scope of the demands for information could be seen in an August 2005 letter seeking the call records for particular phone numbers under suspicion. The letter closed by saying: "Additionally, please provide a community of interest for the telephone numbers in the attached list."

The requests for such data showed up a dozen times, using nearly identical language, in records from one six-month period in 2005 obtained by a nonprofit advocacy group, the Electronic Frontier Foundation, through a Freedom of Information Act lawsuit that it brought against the government. The F.B.I. recently turned over 2,500 pages of documents to the group. The boilerplate language suggests the requests may have been used in many of more than 700 emergency or "exigent" national security letters. Earlier this year, the bureau banned the use of the exigent letters because they had never been authorized by law.

The reason for the suspension is unclear, but it appears to have been set off in part by the questions raised by the inspector general's initial review into abuses in the use of national security letters. The official said the F.B.I. itself was examining the use of the community of interest requests to get a better understanding of how and when they were used, but he added that they appeared to have been used in a relatively small percentage of the tens of thousand of the records requests each year. "In an exigent circumstance, that's information that may be relevant to an investigation," the official said.

A federal judge in Manhattan last week struck down parts of the USA Patriot Act that had authorized the F.B.I.'s use of the national security letters, saying that some provisions violated the First Amendment and the constitutional separation of powers guarantee. In many cases, the target of a national security letter whose records are being sought is not necessarily the actual subject of a terrorism investigation and may not be suspected at all. Under the Patriot Act, the F.B.I. must assert only that the records gathered through the letter are considered relevant to a terrorism investigation.

Some legal analysts and privacy advocates suggested that the disclosure of the F.B.I.'s collection of community of interest records offered another example of the bureau exceeding the substantial powers already granted it by Congress.

"This whole concept of tracking someone's community of interest is not part of any established F.B.I. authority," said Marcia Hofmann, a lawyer for the Electronic Frontier Foundation, which provided the records from its lawsuit to The New York Times. "It's being defined by the F.B.I. And when it's left up to the F.B.I. to decide what information is relevant to their investigations, they can vacuum up almost anything they want."

Matt Blaze, a professor of computer and information science at the [University of Pennsylvania](#) and a former researcher for AT&T, said the telecommunications companies could have easily provided the F.B.I. with the type of network analysis data it was seeking because they themselves had developed it over many

years, often using sophisticated software like a program called Analyst's Notebook.

"This sort of analysis of calling patterns and who the communities of interests are is the sort of things telephone companies are doing anyway because it's central to their businesses for marketing or optimizing the network or detecting fraud," said Professor Blaze, who has worked with the F.B.I. on technology issues.

Such "analysis is extremely powerful and very revealing because you get these linkages between people that wouldn't be otherwise clear, sometimes even more important than the content itself" of phone calls and e-mail messages, he said. "But it's also very invasive. There's always going to be a certain amount of noise," with data collected on people who have no real links to suspicious activity, he said.

Officials at other American intelligence agencies, like the National Security Agency and the Central Intelligence Agency, have explored using link analysis to trace patterns of communications sometimes two, three or four people removed from the original targets, current and former intelligence officials said. But critics assert that the further the links are taken, the less valuable the information proves to be.

Some privacy advocates said they were troubled by what they saw as the F.B.I.'s over-reliance on technology at the expense of traditional investigative techniques that rely on clearer evidence of wrongdoing.

"Getting a computer to spit out a hundred names doesn't have any meaning if you don't know what you're looking for," said Michael German, a former F.B.I. agent who is now a lawyer for the American Civil Liberties Union. "If they're telling the telephone company, 'You do the investigation and tell us what you find,' the relevance to the investigation is being determined by someone outside the F.B.I."

Copyright 2007  The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map